**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

GARY HICKS,                                    *
                                               *
    Plaintiff,                           *
                                               *
vs.                                            *        CASE NO:  2:06-CV-1017-WKW
                                               *
CITY OF MONTGOMERY and                         *
CHIEF ARTHUR BAYLOR,                           *
                                               *
    Defendants.                          *

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, City of Montgomery and Chief Arthur Baylor, submit the following Memorandum of Law in support of their Motion for Summary Judgment, and state unto the Court the following:

**I.**

#### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of genuine issue of material fact.'" *Id.* at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present

evidence in support of some element of the case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the non-moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file 'designate' specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP. Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of his case or there is the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115-16 (11th Cir. 1993).

Additionally, conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

## II.
### PROCEDURAL BACKGROUND

This lawsuit was filed on November 13, 2006. Plaintiff Gary Hicks ("Hicks") named as Defendants the City of Montgomery ("the City") and Chief Arthur Baylor ("Baylor"), Chief of the Police Department for the City of Montgomery. The Complaint contains one count of First Amendment based retaliation pursuant to 42 U.S.C. § 1983.

Defendants filed an Answer on December 7, 2006 with affirmative defenses. The trial is set

for March 24, 2008.

## III.
### NARRATIVE STATEMENT OF FACTS

In January 2006, Kevin Murphy was a Major and Patrol Division Commander. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* Captain Hicks was also assigned to the Patrol Division as second shift commander. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* The regular work hours for second shift are 2:00 p.m. until 11:00 p.m. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* However, the shift commanders usually have to come in a little earlier than the shift starts to prepare for the shift and stay a little longer after the shift has ended to complete paperwork. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* The shift commander is responsible for the daily report for their shift. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

In January 2006, Captain Gary Hicks went to Chief Baylor's office to talk to him about Major Murphy *(DX 1, Baylor Affidavit).* Captain Hicks complained of Major Murphy's management skills and the way that Major Murphy treated him in an earlier meeting. *(DX 1, Baylor Affidavit).* Chief Baylor met with both Major Murphy and Captain Hicks to try to resolve the matter. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* However, Captain Hicks said that he could no longer work for Major Murphy. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

Major C.J. Dixon, Administrative Division Commander, was then contacted to see if she could use Captain Hicks to help in her division. *(DX 1, Baylor Affidavit).* Major Dixon indicated that she could, so Chief Baylor immediately, approved Captain Hicks to be "on loan" from the Patrol Division to the Administrative Division. *(DX 1, Baylor Affidavit).* Major Dixon was responsible for assigning Captain Hicks his duties while on loan to the Administrative Division. *(DX 1, Baylor*

*Affidavit).* Major Dixon could assign Captain Hicks to the desk, to the jail or any other areas of the division, wherever she could use him. *(DX 1, Baylor Affidavit).*

Captain Hicks continued to work second shift. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* Because Captain Hicks was on loan and not permanently transferred from his assignment as Patrol Division second shift commander, he kept the city vehicle assigned to him in Patrol as second shift commander. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

Captain Hicks never complained to Chief Baylor of corruption in the Patrol Division or that Major Murphy's style of management caused any kind of public safety concern. *(DX 1, Baylor Affidavit).* Chief Baylor considers it Captain Hicks' duty report any concerns regarding corruption or public safety. *(DX 1, Baylor Affidavit).* The only thing that Captain Hicks expressed to Chief Baylor was his unhappiness and disapproval of Major Murphy's style of management and supervision of members of the Patrol Division. *(DX 1, Baylor Affidavit).*

On January 10, 2006, Chief Baylor advised the City Attorney that he had been made aware of allegations that Division Commander Major K.J. Murphy was creating a hostile work environment in the Patrol Division. *(DX 1, Baylor Affidavit).* Subsequently, the legal department requested an internal affairs investigation which was conducted by the investigative division of the Montgomery Fire Department. *(DX 1, Baylor Affidavit).*

The investigation lasted about three months and included statements of over thirty employees of the Montgomery Police Department, including others outside of the Patrol Division. *(DX 1, Baylor Affidavit).*

On February 1, 2006, the internal affairs investigator took a statement from Captain Hicks. *(DX 1, Baylor Affidavit).* The statement given by Captain Hicks in the internal affairs investigation

4

does not state that there was corruption in the Patrol Division or that Major Murphy's management caused Captain Hicks to have any concerns about the safety of the public. *(DX 1, Baylor Affidavit and DX 3, Davis Affidavit).*

Although some of the members of the Police Department might not agree with Major Murphy's style of management, there was never any finding that Major Murphy discriminated against anyone or acted unlawfully. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

After the investigation was completed, Chief Baylor was contacted by the Mayor's office and was advised to continue with any plans for Major Murphy as there had been no finding of wrongdoing by Murphy. *(DX 1, Baylor Affidavit).*

Also after the investigation, Chief Baylor informed Captain Hicks that he was going back to his allotted Captain position in the Patrol Division, but  Captain Hicks did not want to go back to work for Major Murphy. *(DX 4, Baylor Affidavit).*  Captain Hicks went to see the Mayor who later contacted Chief Baylor and told him not to put Captain Hicks back to work for Major Murphy. *(DX 1, Baylor Affidavit and DX 4, Bright Affidavit).*

Captain Hicks remained on loan to the Administrative Division until his permanent transfer on July 28, 2006. *(DX 1, Baylor Affidavit).*  At the time of his permanent transfer to the Administrative Division, Captain Hicks was relieved of the vehicle assigned to second shift commander for the Patrol Division. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

Captain Hicks requested to go back to the jail and was again assigned to the jail. *(DX 1, Baylor Affidavit).* Chief Baylor instructed that Captain Hicks work out of the Municipal Jail Administrator's office but never asked Captain Hicks to become the Municipal Jail Administrator. *(DX 1, Baylor Affidavit).*  Captain Hicks asked to become the Municipal Jail Administrator. *(DX 1,*

*Baylor Affidavit and DX 6, Plaintiff's Response to Defendants' Request for Admission).* There is only one position for Municipal Jail Administrator and it was not open. *(DX 1, Baylor Affidavit and DX 5, Montoya Affidavit).* The Municipal Jail Administrator position is a classified position in which applicants must be qualified as certified by the Montgomery City/County Personnel Board. *(DX 1, Baylor Affidavit and DX 5, Montoya Affidavit).*

Chief Baylor did not assign Captain Hicks a separate office in the jail. *(DX 1, Baylor Affidavit).* Chief Baylor instructed that Captain Hicks work out of the Municipal Jail Administrator's office. *(DX 1, Baylor Affidavit).* Additionally, other than a hour or so for the Municipal Jail Administrator and Captain Hicks to meet and brief each other on events that occurred during their respective shifts, Chief Baylor also instructed that Captain Hicks work a different schedule than the Municipal Jail Administrator worked, so there would not be overlapping of employees in that office and to provide longer supervisory coverage by the Administrative Division on the three-shift workday of jail employees. *(DX 1, Baylor Affidavit).* Captain Hicks had remained on second shift until his permanent transfer in July 2006 to the Administrative Division, working second shift from 2:00 p.m. until 11:00 p.m., which is only a few hours different from the 4:00 p.m. until 1:00 a.m. shift he worked while assigned to the jail. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

The Mayor was later informed that Captain Hicks was not happy with his new assignment and asked to meet with Captain Hicks. *(DX 4, Bright Affidavit).* Captain Hicks told the Mayor that he was not happy with his assignment to the jail because he felt like the assignment was degrading and did not appreciate having to answer to a civilian employee. *(DX 4, Bright Affidavit).* The Mayor called Chief Baylor and told him that Captain Hicks needed to be moved from his assignment

in the jail. *(DX 3, Bright Affidavit)*.  Chief Baylor told the Mayor that it was Captain Hicks' suggestion that he go to the jail when he was transferred from Patrol.  *(DX 4, Bright Affidavit)*.  The Mayor told Chief Baylor to put Captain Hicks somewhere more useful in the department rather than at a desk in the jail.  *(DX 4, Bright Affidavit)*.  The Mayor does not recall Captain Hicks reporting anything regarding corruption in the Patrol Division or that there was any kind of public safety concern.  *(DX 4, Bright Affidavit)*.   If the Mayor had been told there was corruption in the Police Department or an issue regarding public safety for Montgomery, Captain Hicks' reassignment would not have been the only action taken.  *(DX 4, Bright Affidavit)*.

On October 27, 2006, Captain Hicks was transferred from the Administrative Division back to the Patrol Division as first shift commander. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*. Captain Hicks was again provided a vehicle as first shift commander.  *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.  Captain Hicks worked directly under Major Murphy as first shift commander of the Patrol Division from October 27, 2006 until June 2007 when Major Murphy was promoted to Lt. Colonel as Deputy Chief for the City of Montgomery Police Department. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*. Although Captain Hicks now works for a different Major, the Patrol Division is still under the supervision of Lt. Colonel Murphy.  *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.

Captain Hicks is scheduled to work from 6:00 a.m. until 3:00 p.m. on first shift, however once again, as shift commander, he may have to come in a little early or leave a little later than the regular shift hours.  *(DX 2, Murphy Affidavit)*.  The assignment of first shift commander is a very desirable assignment amongst supervisory personnel.  *(DX 2, Murphy Affidavit)*.

Captain Hicks filed this lawsuit on November 13, 2006.

## IV.
### ARGUMENT

Hicks filed this lawsuit claiming First Amendment based retaliation, brought pursuant to 42 U.S.C. §1983. Hicks claims that his speech was protected by the First Amendment because he spoke on a matter of public concern. However, the Complaint contains nothing other than conclusory allegations on the public concern claim. *(Doc. 1)*. Additionally, there is nothing to support a claim for retaliation. Hicks was reassigned, transferred or otherwise accommodated from the day he complained in January until he returned back to the Patrol Division in October 2006.

Hicks' statements to the Mayor, Chief Baylor and to the internal affairs investigator were merely an internal grievance regarding supervision and management by Murphy. *(DX 1, Baylor Affidavit, DX 2, Murphy Affidavit and Doc. 1)*.

### A.    HICKS' CLAIM OF FIRST AMENDMENT BASED RETALIATION

Hicks cannot support a claim of First Amendment based retaliation because the subject speech was not protected. It is clear on the face of Hicks' Complaint that his subject speech was made pursuant to his duties of employment as a Captain and his conflict with the management style of his immediate supervisor. *(DX 1, Baylor Affidavit, DX 2, Murphy Affidavit and Doc. 1)*.

The U.S. Supreme Court recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties in *Garcetti, et al. v. Ceballos*, 126 S.Ct. 1951, 2006 WL 1458026 (May 30, 2006). The plaintiff, Richard Ceballos, was employed as a deputy district attorney with the Los Angeles County District Attorney's Office. Pursuant to his duties, Ceballos investigated a complaint from a defense attorney regarding inaccuracies in an affidavit from the sheriff's department used to obtain a search

warrant. Ceballos concluded that the affidavit contained factual inaccuracies. Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed. Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated. In spite of Ceballos' concerns, the district attorney's office decided to proceed with prosecution. Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his observations, but the trial court upheld the warrant. Ceballos claimed that he was subsequently subjected to retaliation, including a transfer and denial of a promotion.

The District Court granted Garcetti summary judgment ruling that the memo was not protected speech because Ceballos wrote it pursuant to his employment duties. The Ninth Circuit reversed and held that the memo's allegations were protected speech based on the First Amendment analysis set out in *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.,* 391 U.S. 563 (1968) and *Connick v. Myers,* 461 U.S. 138 (1983).

However the U. S. Supreme Court reversed the Ninth Circuit and held:

> "When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

Here, Hicks was a public employee making statements pursuant to his official duties and falls directly within the scope of the *Garcetti* decision. It is undisputed that Hicks' testimony was given pursuant to his capacity as a police officer with a conflict with the management style of his immediate supervisor. Therefore, Hicks cannot prevail on his First Amendment based claim of retaliation.

In *Garcetti,* the Supreme Court found that the controlling factor in answering the question of

whether Ceballos' speech was protected was that his expressions were made pursuant to his official

duties.  Under these circumstances, the Supreme Court concluded that Ceballos was not acting as a

citizen but as a government employee doing what he was employed to do; therefore, his speech did

not qualify for First Amendment protection.  Specifically, the Court stated:

> (a) Two inquiries guide interpretation of the constitutional protections accorded public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *Pickering*, *supra*, at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on the employer's reaction to the speech. See *Connick, supra,* at 147, 103 S.Ct. 1684. If the answer is yes, the possibility of a First Amendment claim arises. The question becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering, supra,* at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. Without a significant degree of control over its employees' words and actions, a government employer would have little chance to provide public services efficiently. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684. Thus, a government entity has broader discretion to restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations.

> (b) Proper application of the Court's precedents leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail. The dispositive factor here is not that Ceballos expressed his views inside his office, rather than publicly, see, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619, nor that the memo concerned the subject matter of his employment, see, *e.g., Pickering,* 391 U. S, at 573, 88 S.Ct. 1731. Rather, the controlling factor is that Ceballos' expressions were made pursuant to his official duties. That consideration distinguishes this case from those in which the First Amendment provides protection against discipline. Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it.

(c) Exposing governmental inefficiency and misconduct is a matter of considerable significance, and various measures have been adopted to protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. These include federal and state whistle-blower protection laws and labor codes and, for government attorneys, rules of conduct and constitutional obligations apart from the First Amendment. However, the Court's precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.

In the Southern District of Florida, a city police officer sued under section 1983 alleging First Amendment violations in retaliation for grand jury testimony concerning police misconduct regarding the planting of evidence by the SWAT team in a shooting. *Deprado v. City of Miami,* 446 F. Supp.2d 1344 (Sept. 20, 2006). The District Court granted the City's Motion for Summary Judgment.  In the discussion regarding the police officer's cause of action for retaliation for exercising First Amendment Constitutional rights, the Court citing *Garcetti* stated:

In order for a public employee to state a cause of action alleging retaliation for exercising one's Constitutional rights, the Plaintiff must meet his threshold requirements. Preliminarily, the Plaintiff must demonstrate that he engaged in a protected activity. *Akins v. Fulton County,* 420 F.3d 1293, 1300 (11th Cir.2005). In the context of a First Amendment claim, the Court must first look at whether the employee engaged in speech as a citizen, on a matter of public concern. *Garcetti v. Ceballos,* --- U.S. ----, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) If there has been no such qualifying speech, the employee cannot state a First Amendment claim. *Id.* However, where the employee is able to demonstrate such speech, the Court will then determine whether the government employer was properly justified in its treatment of the employee, or whether the employee was subjected to adverse employment action in retaliation for that protected activity. *Id.; Akins,* 420 F.3d 1293…

….In *Garcetti,* the United States Supreme Court held that when public employees make statements pursuant to their official duties, they are not speaking as citizens for purposes of the First Amendment. 126 S.Ct. at 1957 (citing *Pickering v. Board of Ed. of*

11

*Township High School Dist. 205 Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

The complaint of Hicks regarding Major Murphy's management style of the Patrol Division is not a matter of public concern. The *Garcetti* and *Deprado* cases address allegations of unlawful conduct much more severe and would appear to rise more to the level of a public concern than a division commander's style of supervision. To be successful on his claim that the City violated his First Amendment rights to free speech, Hicks must prove that his speech was done in his capacity as a citizen rather than in the context of his employment.   There is nothing to support such a claim.  It is undisputed that the speech for which Hicks claims protection was merely a complaint against Major Murphy for his style of supervision of Hicks.     There were no claims made by Hicks to anyone regarding a matter of public concern. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).* There were no claims made by Hicks to anyone regarding concern for the safety of the public. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).* There were no claims made by Hicks to anyone of corruption. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).*   There is absolutely no evidence that Hicks gave any statement other than pursuant to his employment regarding personality conflict with his supervisor; therefore, Hicks cannot prevail on his claim of violation of his First Amendment rights.   Defendants are entitled to summary judgment as a matter of law.

### B.  NO RETALIATION AGAINST HICKS

Even assuming *arguendo¸* the speech was protected whereby retaliation would be unlawful, Hicks still cannot prevail on his claim of retaliation by Murphy because Defendants did not engage in any retaliatory action.  Hicks was transferred, on loan or otherwise accommodated at Hicks'

request either to Chief Baylor or Mayor Bright from the time of his complaint in January 2006 until he was moved back to Patrol Division in October 2006.

Hicks filed this lawsuit in November 2006.    Captain Hicks was transferred back to the Patrol Division as first shift patrol commander in October 2006. *(DX 2, Murphy Affidavit)*.  Hicks erroneously alleges in his Complaint that there are available Captain slots within the Montgomery Police Department that are not presently filled but Captain Hicks remained assigned to the jail reporting to a civilian employee that would be equal to a Corporal or Sergeant. *(Doc. 1, ¶ 31)*.

Additionally, at the time of his transfer from the Administrative Division, Captain Hicks was again assigned a vehicle from Patrol when he permanently transferred as first shift commander. *(DX 2, Murphy Affidavit)*.  Hicks is now scheduled to work from 6:00 a.m. until 3:00 p.m. on first shift, however once again, as shift commander, he may have to come in a little early or leave a little later than the regular shift hours. *(DX 2, Murphy Affidavit)*.  The assignment of first shift commander is a very desirable assignment amongst supervisory personnel.  *(DX 2, Murphy Affidavit)*.

Hicks cannot demonstrate any act of retaliation.   On January 10, 2006, at Hicks' initial complaint and request to not work under Major Murphy, Hicks was immediately placed "on loan" status to the Administrative Division.  *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.

Captain Hicks continued to work second shift. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.  Because Captain Hicks was on loan and not transferred from Patrol Division as second shift commander, he kept the city vehicle assigned to him in Patrol as second shift commander. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.  Captain Hicks remained on loan status until his permanent transfer to the Administrative Division on July 28, 2006. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit)*.

At the time of his permanent transfer to the Administrative Division, Captain Hicks was relieved of the vehicle assigned to second shift commander for the Patrol Division, because his assignment had changed not because of retaliation. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

Captain Hicks requested to go back to the jail and was again assigned to the jail. *(DX 1, Baylor Affidavit).* Captain Hicks asked to move to the jail and become the Municipal Jail Administrator. *(DX 1, Baylor Affidavit; DX 6, Plaintiff's Response to Defendants' First Request for Admissions and Doc. 1).* However, there is only one position for Municipal Jail Administrator and it was not open. *(DX 1, Baylor Affidavit and DX 5, Montoya Affidavit).*

Chief Baylor did not assign Hicks a separate office in the jail because of retaliation, but because Hicks' shift would not overlap with the jail administrator's so they could both work out of the same office. *(DX 1, Baylor Affidavit).*

Hicks complained of being assigned to the jail reporting to a civilian employee. *(DX 6, Plaintiff's Response to Defendants' First Request for Admissions and Doc. 1).* However the Municipal Jail Administrator is not a position that is equal to a Corporal or Sergeant. In fact, the classification of Municipal Jail Administrator is a pay grade 11 in the City of Montgomery Administrative Pay and Classification Plan with a pay range of $ 58,610 – 83,432. *(DX 4, Montoya Affidavit).* The ranked public safety position of Captain in the Montgomery Police Department is a pay grade 5 on the City of Montgomery Public Safety Pay and Classification Plan with a pay range of $ 52,952 – 75,379. *(DX 4, Montoya Affidavit).* Therefore, Hicks was reporting to a higher pay grade position. Again, Hicks' assignment to the jail was by Hicks' own request and not in retaliation. *(DX 6, Plaintiff's Response to Defendants' First Request for Admissions and Doc. 1)*

Hicks complained about his work hours in the jail. However, Hicks remained on second shift until his permanent transfer in July 2006 to the Administrative Division, working second shift from 2:00 p.m. until 11:00 p.m., which is not very different from the 4:00 p.m. until 1:00 a.m. shift he worked while assigned to the jail. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

When the Mayor was later informed that Hicks was not happy with his new assignment, the Mayor called Chief Baylor and told him that Hicks needed to be moved from his assignment in the jail. *(DX 4, Bright Affidavit).* Chief Baylor told the Mayor that it was Hicks' suggestion to go to the jail when he was transferred from Patrol, but the Mayor told Chief Baylor to put Hicks somewhere more useful in the department rather than at a desk in the jail. *(DX 4, Bright Affidavit).*

Hicks worked directly under Major Murphy as first shift commander of the Patrol Division from October 27, 2006 until June 2007 when Major Murphy was promoted to Lt. Colonel as Deputy Chief for the City of Montgomery Police Department. *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*

Put simply, Hicks can demonstrate nothing to support a claim of retaliation by either the City of Montgomery or Chief Baylor. Neither Baylor nor Lt. Col. Murphy has retaliated against Hicks. The Mayor tried to accommodate Hicks. Chief Baylor acted on Hicks' complaint and advised the city attorney.

Baylor put Hicks on loan status to move him from Major Murphy's command at Hicks request in on January 10, 2006. Hicks was moved to first shift commander before the lawsuit was even filed. Because there has been no retaliation, Hicks cannot prevail on his claim of First Amendment based retaliation. Defendants are entitled to summary judgment as a matter of law.

## C.  BAYLOR IS ENTITLED TO QUALIFIED IMMUNITY

Chief Baylor is entitled to qualified immunity. Qualified immunity is an affirmative defense to an action pursuant to § 1983 against a government official sued in his or her individual capacity. *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In order to receive qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002). It is undisputed that Baylor was acting as Hicks' supervisor and acting in his capacity as a police officer therefore satisfying the first prong of the qualified immunity test. Having established the first requirement, the burden shifts to the Hicks to prove that qualified immunity is not warranted. *Id.* First "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Sammons v. Taylor*, 967 F. 2d 1533, 1539 (11th Cir. 1992). "Then the burden shifts to the plaintiff to demonstrate that the defendant 'violated clearly established constitutional law.'" *Id.*

Once the qualified immunity defense is raised, the plaintiff bears the burden of showing that the federal "rights" allegedly violated were "clearly established." *Barts v. Joyner*, 865 F. 2d 1187,

16

1190 (11th Cir. 1989), citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816, 86 L. Ed. 2d 411 (1985). For the law to be clearly established to the point that qualified immunity does not apply, it must have earlier been developed in such a concrete and factually defined contest as to make it obvious to all reasonable government actors, in the defendant's place that "what he is doing" violated federal law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 523 (1987). There is nothing to support that Chief Baylor violated federal law.

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel… the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates Federal law <u>in the circumstances</u>." *Lassiter v. Alabama A & M University*, 28 F. 3d 1146, 1150 (11th Cir. 1994) (emphasis in original).

Also, the Eleventh Circuit has held, "When the qualified immunity defense has been raised, an opposing plaintiff must convince the court that the law clearly established that 'the defendant's conduct in the circumstances amounted to 'deliberate indifference.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1185 (11th Cir. 1994) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989)).

Hicks cannot establish a claim against Baylor for retaliation. Baylor is entitled to summary judgment as a matter of law.

### D.  CLAIMS AGAINST THE CITY OF MONTGOMERY

For civil rights liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's constitutional rights by acting pursuant to official governmental policy.

Not only can Hicks not prevail on his claim of First Amendment based retaliation, Hicks has

not submitted evidence that any final policymaker of the City acted with an unconstitutional motive. Merely using the words "policy" or "custom" or "unconstitutional" in the allegation is not sufficient to state a claim under 42 U.S.C. § 1983. *See Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Hicks has only made conclusory allegations in an effort to try to make the City liable. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56(c).

A municipality is liable only for its own wrongs and cannot be liable under the theory of respondeat superior. Hicks may not base claims against the City on respondeat superior or vicarious liability; rather, he must show an official policy or custom of the City directly caused the alleged injury to him. A governing entity cannot be held liable in an action brought pursuant to 42 U.S.C.A. § 1983 under a theory of respondeat superior. *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 694 (1978). Hicks made his claim in January 2007. From the day he made his claim, Hicks was transferred, on loan or otherwise accommodated at Hicks' request either to Chief Baylor or to the Mayor. There is no custom or policy that has violated Hicks' constitutional rights.

In *Monell*, the Supreme Court held that municipalities cannot be liable under §1983 on the theory of respondeat superior, but rather, can be liable under that statute only if they maintain unconstitutional or illegal policies or customs; absent unconstitutional or illegal policies or customs, municipalities and their officials may not be sued for the acts of their employees. Moreover, a plaintiff must show that an official policy was the reason behind the alleged constitutional deprivation. *Farred v. Hicks,* 915 F. 2d 1530 (11th Cir. 1990).

It is well established that a local government agency or its officials "may only be liable under §1983 if an action pursuant to official policy of some nature caused a constitutional tort." *Church v.*

*City of Hickssville*, 30 F. 3d 1332, 1342 (11th Cir. 1994); *Dowdell v. Chapman,* 730 F. Supp. 533, 545 (M.D. Ala. 1996) (causal link must be established between official policy and custom and plaintiff's injury).  It is only when execution of municipal policy or custom inflicts constitutional injury that the municipality or its official policymakers are responsible under §1983.  *Monell v. New York Dept. of Social Services, supra* at 694.  The Plaintiff must show the official policy or custom was the reason behind the alleged constitutional deprivation. *Farred v. Hicks, supra*.

In some situations a municipality or its officials may be subject to §1983 liability for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval from the bodies of official decision making channels."  *Monell v. New York Dept. of Social Services, supra* at 690-91.  Such liability requires that the Plaintiff provide evidence that establishes "a widespread practice that, 'although not authorized by written law or express municipal policy is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).  Stated differently, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  *Brown v. City of Ft. Lauderdale,* 923 F. 2d 1474, 1481 (11th Cir. 1991).  In such circumstances, however, "considerably more proof than [a] single incident will be necessary" to establish liability.  *Oklahoma City v. Tuttle,* 471 U.S. 808, 834 (1985).

A governmental entity can only be held responsible under §1983 for the unauthorized actions of its employees when its final decision makers participated in a policy or custom which resulted in a constitutional violation or a governmental entity can be held liable under §1983 when constitutional violations arise from "custom", even though the custom is not the product of a formal adoption by

the municipal policy making authorities.  *Monell*, 436 U.S. 658, 690-691.

In the present case, Hicks cannot succeed on his claim of a practice or custom that would make the City of Montgomery liable under 42 U.S.C. § 1983.   From the day he made his claim, Hicks was transferred, on loan or otherwise accommodated at Hicks' request either to Chief Baylor or to the Mayor.  There is no custom or policy that has violated Hicks' constitutional rights.  In fact, many of the allegations in Hicks Complaint were not accurate because Hicks had been transferred to Patrol as first shift commander before he filed this lawsuit.

In order to recover there must be a causal connection between the policy or custom of the municipality and the constitutional right alleged to have been violated.  *Church v. City of Hickssville,* 30 F. 3d 1332, 1342 (11th Cir. 1994).  To establish causation, "a plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Comm'rs. of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404 (1997).  The causal link must be such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run."  *Spell v. McDaniel,* 424 F. 2d 1380, 1389-91 (4th Cir. 1987); *McCroy v. City of Dothan,* 169 F. Supp. 2d 1260, 1285 (M.D. Ala. 2001).  *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) (the identified deficiency must be closely related to the ultimate injury).

In the present case, Hicks's claims against the City must fail.  Hicks fails to state any facts that support a theory that the City participated in any policy, practice, or custom which resulted in a violation of §1983.  The City of Montgomery is entitled to summary judgment on Hicks's claim of First Amendment based retaliation as there is no genuine issue of any material fact.

**V.**
**CONCLUSION**

20

Hicks cannot succeed on any claims for First Amendment violations. Hicks submits only conclusory allegations that his complaints regarding the mismanagement of the patrol division was a matter of public concern and protected by the First Amendment. However, the allegations of the Complaint and undisputed facts reflect that Hicks' speech was pursuant to his employment as a Captain in the Patrol Division that he has a conflict with the personality of Major K.J. Murphy, then commander of the Patrol Division. Hicks' claims that Murphy was confrontational and abusive to Plaintiff and others within the division to the point that it affected morale and efficiency were directly related to his employment with the City rather than to having been made as a citizen in a matter of public concern.

Further, Hicks cannot prevail on his § 1983 claim against the City. From the day he made his claim, Hicks was transferred, on loan or otherwise accommodated at Hicks' request either to Baylor or to the Mayor. The City has no custom or policy that has violated Hicks' constitutional rights. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c). In light of the foregoing, summary judgment should be entered in favor of Defendants with respect to all claims.

Respectfully submitted this 26th day of November, 2007.

/s/ Kimberly O. Fehl
Kimberly O. Fehl (FEH001)

21

OF COUNSEL:

City of Montgomery
City Attorney's Office
P. O. Box 1111
Montgomery, AL 36101-1111
Telephone:  (334) 241-2050
Facsimile:  (334) 241-2310

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of November, 2007, I electronically filed the foregoing

with the Court of the Clerk using the CM/ECF system to be upon the following:

J. Bernard Brannan, Jr.
*The Brannan Law Firm, P. C.*
602 South Hull Street
Montgomery, AL 36104

/s/ Kimberly O. Fehl
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY HICKS,                         *
                                    *
       **Plaintiff,**            *
                                    *
**vs.**                               *      **CASE NO: 2:06-CV-1017-WKW**
                                    *
**CITY OF MONTGOMERY and**       *
**CHIEF ARTHUR BAYLOR,**          *
                                    *
       **Defendants.**         *

### AFFIDAVIT OF A. D. BAYLOR

Before me, the undersigned authority, personally appeared A. D. Baylor, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is A. D. Baylor. I am over nineteen years of age. I am currently employed with the City of Montgomery as the Chief of Police. It is in that capacity that I state the following:

In January 2006, Captain Gary Hicks came to my office and said that he needed to talk to me about Kevin Murphy. I informed Captain Hicks that I had a meeting to go to and asked him to talk to my administrative assistant. However, Captain Hicks was visibly upset and said that he needed to talk to me so right away I made arrangements with my prior engagement to meet with Captain Hicks at that time.

Captain Hicks told me that he had met with Major Murphy earlier and complained of Major Murphy's management skills and the way that Major Murphy treated him. In January 2006, Kevin Murphy was a Major and Patrol Division Commander. Captain Hicks was also assigned to the Patrol Division as second shift commander. The regular work hours for second shift are 2:00 p.m. until 11:00 p.m. However, the shift commanders usually have to come in a little earlier than the shift starts to prepare for the



1

shift and stay a little longer after the shift has ended to complete paperwork. The shift commander is responsible for the daily report for their shift.

I met with both Major Murphy and Captain Hicks to try to resolve the matter. However, Captain Hicks told me that he could no longer work for Major Murphy.

Major C.J. Dixon, Administrative Division Commander, was then contacted to see if she could use Captain Hicks to help in her division. Major Dixon indicated that she could so on that day I approved Captain Hicks to be "on loan" from the Patrol Division to the Administrative Division. Major Dixon was responsible for assigning Captain Hicks his duties while on loan to the Administrative Division. Major Dixon could assign Captain Hicks to the desk, to the jail or any other areas of the division, wherever she could use him.

Captain Hicks continued to work second shift. Because Captain Hicks was on loan and not transferred from Patrol Division as second shift commander, he kept the city vehicle assigned to him in Patrol as second shift commander.

Captain Hicks never told me that he felt like there was corruption in the Patrol Division or that he felt like his conflict with Major Murphy caused any kind of public safety concern. As members of the Montgomery Police Department, all officers should report unlawful activity or concerns with public safety caused by the actions or conduct of anyone in the department. In his position as a Captain and second shift commander, Captain Hicks certainly should have reported to me any concerns he had regarding corruption or public safety. The only thing that Captain Hicks expressed to me was his unhappiness and disapproval of Major Murphy's style of management and supervision of him and other members of the Patrol Division.

2

After my conversation with Captain Hicks, I advised the City Attorney on January 10, 2006 that it had been brought to my attention that members of the Patrol Division had alleged that they were forced to work in a hostile work environment. I subsequently received a letter from the City Attorney's office that the Investigation Division of the Montgomery Fire Department was being asked to conduct an internal affairs investigation into the possible hostile work environment of the Patrol Division.

In May 2006, I received a copy of the completed investigation. The investigation lasted about three months and included statements of over thirty employees of the Montgomery Police Department, not only members of the Patrol Division.

On February 1, 2006, the investigator took a statement from Captain Hicks. I have reviewed a copy of Captain Hicks' statement from the internal affairs investigation and do not see that he mentioned anywhere that there was corruption or that Major Murphy's management of the Patrol Division caused Captain Hicks to have any concerns about the safety of the public. Attached to my affidavit as *Exhibit 1* is a copy of the statement that I reviewed given by Captain Hicks during the investigation to the investigator.

After the investigation was completed, I was contacted by the Mayor's office and was advised to continue with any plans for Major Murphy as there had been no finding of wrongdoing or discriminatory treatment by Murphy. Although some of the members of the Police Department might not agree with Major Murphy's style of management, there was never any finding that Major Murphy discriminated against anyone or acted unlawful.

Also after the investigation, I informed Captain Hicks that he was going back to his allotted Captain position in the Patrol Division. Captain Hicks did not want to go back

3

to work for Major Murphy. Captain Hicks went to see the Mayor who later contacted me and told me not to put Captain Hicks back to work for Major Murphy.

Captain Hicks stayed on loan to the Administrative Division until he was permanently transferred in July 2006. At the time of his permanent transfer to the Administrative Division, Captain Hicks was relieved of the vehicle assigned to second shift commander for the Patrol Division.

Captain Hicks requested to go back to the jail and was again assigned to the jail. I instructed that Captain Hicks work out of the Municipal Jail Administrator's office but I never asked Captain Hicks to become the Municipal Jail Administrator. Captain Hicks asked to become the Municipal Jail Administrator. There is only one position for Municipal Jail Administrator and it was not open. The Municipal Jail Administrator position is a classified position in which applicants must be qualified as certified by the Montgomery City/County Personnel Board.

I did not assign Captain Hicks a separate office in the jail. I instructed that Captain Hicks work out of the Municipal Jail Administrator's office. Additionally, other than a hour or so for the Municipal Jail Administrator and Captain Hicks to meet and brief each other on events that occurred during their respective shifts, I also instructed that Captain Hicks work a different schedule than the Municipal Jail Administrator worked, so there would not be overlapping of employees in that office and to provide longer supervisory coverage from the Administrative Division into the three-shift workday of jail employees. Captain Hicks had remained on second shift until his permanent transfer in July 2006 to the Administrative Division, working second shift from 2:00 p.m. until 11:00 p.m., which is not very different from the 4:00 p.m. until 1:00 a.m. shift he worked while assigned to the jail.

4

I never sent a memo saying that Captain Hicks was confined to the jail. However I did inquire why Captain Hicks was always downstairs rather than in the jail after several days of consistently seeing Captain Hicks away from the jail.

Additionally, it is untrue that Captain Hardy is no longer P.O.S.T. certified. Captain Hardy retired from the Montgomery Police Department and therefore, kept his P.O.S.T. certification. Like other P.O.S.T. certified individuals, Captain Hardy also has to maintain his continued education standards.

On October 27, 2006, Captain Hicks was transferred from the Administrative Division to the Patrol Division as first shift commander. Captain Hicks was again provided a vehicle as first shift commander. Captain Hicks worked directly under Major Murphy as first shift commander of the Patrol Division from October 27, 2006 until June 2007 when Major Murphy was promoted to Lt. Colonel as Deputy Chief for the City of Montgomery Police Department. Although Captain Hicks now works for a different Major, the Patrol Division is still under the supervision of Lt. Colonel Murphy.

I have read the above and foregoing affidavit consisting of five (5) pages and state that it is true and correct to my present knowledge and information.

_____
A. D. Baylor

**SWORN TO AND SUBSCRIBED** before me this _16th_ day of November, 2007.

_____
Notary Public
My commission expires _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES:  Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

(SEAL)

# VOLUNTARY STATEMENT

## CAPTAIN G.D. HICKS

## HOSTILE WORK ENVIRONMENT

**EXHIBIT**

1

tabbies

VOLUNTARY STATEMENT FORM
MONTGOMERY FIRE DEPARTMENT


DIVISION:                        Bureau of Investigations

NAME:                            Captain G.D. Hicks
                                 Montgomery Police Department

CONCERNING:                      Hostile Work Environment

LOCATION OF INTERVIEW:           Internal Affairs Office
                                 Montgomery Fire Department Headquarters

STATEMENT TAKEN BY:              Chief W.D. Davis

BEGINNING TIME:                  February 1, 2006 – 1543 hours

This is Chief Davis with the Montgomery Fire Department.  Today's date is February 1, 2006.  The time is 1543 hours.  The location is Fire Department Headquarters Internal Affairs Office.  Also present in my office is Captain G.D. Hicks, ID 420 of the Montgomery Police Department.  This will be a taped statement from Captain Hicks in regards of, in regards to a um, hostile work environment.  It is also important to note that I am doing this internal affairs case at the request of Chief Baylor and the Mayor's Office.

QUESTION  CHIEF W.D. DAVIS
          Captain Hicks you have been read your Internal Investigation Warning is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.

QUESTION  CHIEF W.D. DAVIS
          You are giving this statement voluntarily is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.

QUESTION  CHIEF W.D. DAVIS
          And you are aware that this statement is being taped.

ANSWER    CAPTAIN G.D. HICKS
          Correct.

1

QUESTION    CHIEF W.D. DAVIS

What I like you to do for me ugh, Captain Hicks is I like for you to go over some of the things that you and I had talked about prior to this taped statement. Um, you stated that on December the twenty-seventh that um, Major Kevin Murphy made the comment that if he didn't get some answers regarding some patrol vehicles some damage to a patrol vehicle that he was going to take those patrol vehicles from those people in patrol. Can you tell me what initiated that whole thing what happened I understand that it was an incident that took place out in Southlawn. Can you explain to me what took place in regards to that?

ANSWER    CAPTAIN G.D. HICKS

The ugh, on the incident where he said he was to take the cars from Patrol Division was going to be involving Captain Wilson and Captain Wilson at twenty-two fifteen hours had told me that he had just got off the phone with the Major and there was some damage to the front of the vehicle and they were investigating to see what was going on. Um, he told him that the, he, he had gotten red in his face and really mad and he was flustered and he said that um, the Major told him if he didn't find the answers that he was taking everybody's vehicle from them in the Patrol Division. Um, I just told Captain Wilson to calm down and relax on that. Um, the situation involving Southlawn was a um, we had a, a foot pursuit and the officer was chasing a subject I can't remember exactly what the charge was. We had ugh, Corporal Green, Mark Green was with his partner and they were slowing down and almost to a slowing stop right there by the Winn Dixie and I think it was Church's Chicken right there. The suspect he said came running around the dumpster toward the front of the vehicle. (*excuse me*). Now Corporal Green was putting his vehicle in park and a slow stop less than five mile an hour. He was stopping the vehicle his partner was exiting the vehicle. He said the suspect was running toward him and he couldn't remember if the suspect was turned and looking to an officer chasing him or toward the car but he said the suspect was running toward him and kind of put his arm out and vaulted over he hood. Rolled across the hood and kept running and the other officers out on the scene had to tackle the guy. They got the subject in custody and the guy never complained about any injuries or anything. So the family got there and they talked the suspect in to complaining of that he was injured from the officers getting him down on the ground and taking him into custody not from the contact with the vehicle. Well I, I've been advised this when they get to Headquarters and I asked the Sergeant, Sergeant Johnson I said now we don't have a twenty-five do we. Twenty-five being a vehicle accident. He said no it's not a collision. He said according those on the scene this guy purposely you know ran and kind of rolled across the hood of the car and continued going. He had other avenues he could have taken to either way but he, he took that one route. I guess he thought that was the most expeditious. Well anyway um, I said ok so you satisfied with it and he said I am and I said any damage to the car. He said nope no damage to the car no injury to the suspect. Then the suspect gets to Headquarters he said his knee hurting. I told the Sergeant I said look to cover us to make sure that we don't deny anybody the right to medical

2

attention, make sure you call the medics. So the medics come, Firemedics come and look at him and he points to his knee. Well there's no obvious contusion or swelling or abrasion or nothing but to make sure everybody's covered they say you need to get an x-ray.

QUESTION    CHIEF W.D. DAVIS
Let me stop you right there. Do you remember what date that, that foot pursuit occurred on?

ANSWER    CAPTAIN G.D. HICKS
Um, I have it, I have it written down in my calendar on the day but I don't have that with me, with me sir.

QUESTION    CHIEF W.D. DAVIS
Ok. Go ahead.

ANSWER    CAPTAIN G.D. HICKS
Um, anyway they took him to the hospital and I told them to go ahead and take him up there and I let the Major know that we were going to have a bill on this because he came down was looking at some stuff on there and I told him nothing to it and he said ok. Well anyway um, they came back and they said there's no injuries to this guy, nothing at all and I believe the suspect was making this up to keep from going to jail. So we went ahead we did the arrest paperwork and the Major talked to me later he said look why don't we go ahead and do a collision report on this an accident report and I told him I said Major it's not an accident. I said this is pedestrian that purposely ran into the vehicle. I had went out and looked at it and I could see where the fingers of the, of the hand of the guy because it was all sweaty greasy palm stain on the hood. Was towards the grill which meant that he had to pivot his wrist a hundred and eighty degrees so he rode up on the heel of hand to go across. I said if he had got hit you know the arms would have been like out stretched and I said basically what the officer said I think this guy you know rolled across it and ugh, it's not, it's not a twenty-five. He said well it's just going to be for internal and he said just paperwork just in case this guy comes back later. Ok I said we usually do a State Form which is City Vehicle that's normal protocol and let me call a DNT on private property, which is Do Not Tally that means it don't get sent in to the State but everybody else gets a copy of this and of course the officer was real concerned about it and you know I, I told him I said don't worry about it because he was concerned that he was going to go to the Accident Review Board and everything and I said look it's not a collision. I said we're just doing this paperwork on this to cover us in case the guy comes back. Well that, the next day the officer ugh, gets a phone call from the Major and he verbally berates him on the phone saying you should have had better judgment you hit this guy.

QUESTION   CHIEF W.D. DAVIS
This is Major Kevin Murphy is that correct?

ANSWER    CAPTAIN G.D. HICKS
Correct, calls, calls Corporal Green on the phone and verb berates over that and basically makes Green feel like he's done a bad job, you know and Green came to me and I said don't worry about it. I said you were slowing stopping this guy ran into you. He said well I think the Major's mad at me. I said don't worry I'll explain. That also that same day when um, I was told to, to create a detail for robbery suppression. We've been hitting, we've been hit a lot with a lot of robberies of persons and a lot of it was Mexican victims. Um, anyway they, Captain Essex called me in who's my Supervisor. He's Assistant Division Commander and he says um, they want you to develop a, a detail encompassing the streets of McGhee Road, Calamar Drive, and I think there's one other that's what it was but anyway I said you know we have been hit a lot in the apartment complexes and I said how about if I make a grid and that way we'll have a one man unit patrolling that grid and that will be his job and I said I'll probably alternate it that way we don't create a pattern. He said that's fine. So I sit a couple of hours on this putting this together I put where the boundaries would be and how they rotate that and how we could ugh, substantiate the manpower to do this. Well the next day I get a call at the house and it's Captain Essex and he's telling me the Majors aggravated and wants to see me in his office at one-thirty. Ok, well I'm what's he mad about. Well he don't like the detail you wrote. Alright, so I'm, I'm what could I've done to, to try to made that better. So I go in there and sit down and he immediately says—

QUESTION   CHIEF W.D. DAVIS
You come in on your off day.

ANSWER    CAPTAIN G.D. HICKS
No sir that was a regular work day.

QUESTION   CHIEF W.D. DAVIS
Ok.

ANSWER    CAPTAIN G.D. HICKS
That was regular work day I had to come in thirty minutes early.

QUESTION   CHIEF W.D. DAVIS
Ok.

ANSWER    CAPTAIN G.D. HICKS
Be there thirty minutes early so he could see me and ugh, Captain Essex told me to meet him and go up there. So we went up there and the Major looks at me and I walked in and at first he was typing. Then he turned around and looked at me and says ugh, did you understand the order that were given to you and I said well yes sir I was told to make a detail and he said well why did you put these other streets in here. He said you dis, did

4

you disobey a direct order? I said no sir. I said Captain Essex told me to encompass these roads in here and that's what I did. He said I told you, I told him to tell you just McGhee Road and Calamar Drive. He said why do you have Atlanta Highway in there? I said because we got hit at Eastdale Road Apartments. He said well why do you have Vaughn Road? I said well Vaughn Lakes was hit and the suspect ran toward Warren House and I said I was trying to be fair and try to cover as many areas as we can with the amount of personnel. I said if you want me to change it I can. He goes no I want to know why did you do disobey a direct order? I said sir I didn't disobey a direct order. He said well Captain Essex did you give him a, a did you not follow my orders? He said well yes sir and I was trying to take some of the heat off Captain Essex. I said maybe I misunderstood but I know what I was told and I said I, I put that on there from what I was told in there. He said well Captain Hicks you do awful lot of misunderstanding here lately and he said now let's talk about this twenty-five. He says ugh, you know you should have done a twenty-five report on that. I said no sir. He said tell me why? I said because it was a pedestrian that ran into the patrol car not the other way around, I mean we don't do that with bicycles that way or pedal cyclists and I said sir I, I got a, I know , I don't think I know everything but I said I got twelve years in traffic. Eight of those was spent in accident investigation, five and a half as shift commander and I'm a national certifies as accident reconstructionist. I said you can ask any accident reconstructionist that's not a collision and he says I said it a collision and that's why we work it that way. I said ok sir we followed your order. I said we do it that way. He said you know you should have something for documentation and I said well sir if wanted something for documentation we could have done incident offence report for accidental injury and that would have been the same thing, it would have been documentation but it would also we noted that it wasn't a collision. He said I said it was. I said sir, I ain't arguing with you but I don't agree. He said I'm just going to put in an investigation on you on this. I said well sir I, I mean you can do what you want. I said but I don't agree with you, it is not a collision. He said well get out of my office. Ok and all I did was take my right hand and rubbed my chin, that's it. Captain Essex was in there as a witness. The chairs that he had was kind of narrow and I had to laid my radio down on the floor. So I reached down to pick it p and before, when I rubbed my jaw he said don't you get mad at me mister. I said Major I don't, I don't know what you're talking about and I reached down to pick up my radio and when I did I could tell something was leering over me. Major Murphy had bridged up on the palms of his hands and was leaned over the desk with his head over the other side over me saying I can get a hell of a lot madder than you mister and trying to provoke me and I said Major I said I didn't say nothing to you, ain't no reason to be like this now. He said get out of my office. So I'm trying to control myself because I feel like he's provoking me. I feel like that he's trying to put me in a, in a hostile environment because I feel like he's trying to, to ugh, badger and beliter me, belittle me. So I grabbed my radio. I start walking out and apparently I ain't moving fast enough, so he runs around the desk and opens the door and says, I said get out of my office, and I said Major why are you yelling at me? He said I'm going to yell at you. I said why are you

yelling? I said there's no reason to yell at me. I said I'm leaving your office, ain't got to yell at me. He goes I'll yell at you because I can and I said sir that's not going to get it. I said I want to see the Chief and he said alright I'll tell him and I, he opened the door. When he was yelling this now and he's got his secretary out there and another civilian out there also who's witnessing this and, and you know this is embarrassing to me because there is no reason to sit there and yell and, and like I said try to ugh, impose yourself upon somebody. So as I'm walking out he yells at me to get Captain or excuse me, to get Lieutenant McMann, Lieutenant Reeves to be up in his office. I didn't know what that was so I said yes sir. So I as I went down there and I got them and they went up to his office and I asked Lieutenant McMann later what was going on and he, he had an incident where he got onto Lieutenant McMann because he didn't think Lieutenant McMann had sent him the results for the um, Mall holiday Financial Report on all the officers and Lieutenant McMann told him, he said, why have I hadn't got that of course Major Murphy typed for five minutes before he addressed them. He said I sent it to you Major. He said I sent it to you twice and that's when Major Murphy pulled that up and that he did fax them to him and said ok. Never apologized to him just said you're dismissed and told him he could go but the way he talked to me over that the more I got stewed over it and I, I went to the Chief because I, my, my RB book and standards says all you got to do is advise your chain of command that you want to see the Chief. That you want to pursue the next highest rank and that's what I did. So I went in there to see the Chief and ugh, secretary asked and I want to speak with the Chief. She said he is in a meeting right there. So I came up about every fifteen minutes, minutes and I, I was pretty upset by now and the Chief was walking and I told him I said I need to you sir and he said that ugh, he had a meeting to go to he said could I talk to Lieutenant Fleming? I said no sir I need to talk to you and he said I really need to get to this meeting. I said well sir something bad is fixing to happen and I, I've advised you and that's when he said come into my office and I told him how Major Murphy treated me. I told him that I'm, I'm forty-two years old, I got nineteen years down here. I'm soon to be forty-two in two months and I said I'm not going to be talked to like a child. I'm not going to be bullied. I'm not going to be intimidated and I'm not going to have somebody leering over the top of me like he thinks he's going to whip me and it ain't going to happen and I said might don't make right just because you out rank me. I said I, I'm not going to put up with that and then he ask me if anybody witnessed this and I said Captain Essex, so that's when he had me have a seat, get a drink of water and he called Captain Essex in. Then he called Major Murphy in and they talked. Then he me in with them and when I set down and explained to him exactly what I'm tell you Major Murphy tried to pipe up and say aw just calm down Captain Hicks and that's when the Chief said Major Murphy be quite I'm conducting this interview and I explained again what happened and the Major tried to say that I bowed up on him which was totally false lie. Then he said that this is a second time that I bowed up on him and I asked him I said well if this is the second time why didn't you report the first time and why ain't, why didn't you come to the Chief and report it and he didn't have an answer for that. So I said you can ask

Captain Essex and that's when the Chief said Captain Essex you're a third party tell me what happened and Captain Essex kind of nodded his head toward me and he said well I think it's not both said mostly what Captain Hicks said and I think Captain Essex was put between a rock and a hard spot right there between us and the Chief figured it out too, he said look I see what's going on here. He said Major Murphy I want you to go to your office. He said Gary I want you to go to your office. He said when I'm done talking with Captain Essex I'll call you and about thirty minutes later Mrs. Bonnie the secretary call and told me to come back up there and I think Major Murphy was leaving at that time and I walked in and set down and um, *(I forgot one part)* As I was, when he was talking with Captain Essex that's when I told um, the Chief I can't work in this environment anymore and the Chief said I tired of these complaints between Captains and Majors and he started to say Majors and I think he was going to say Lieutenants and that's when I told him, I explained to him again how he leaned over the desk at me and then Major Murphy tried to deny that, said I was exaggerating and I said that's a lie he did it and I looked at Major Murphy and I said I can't work for him anymore. I said he puts me in a hostile work environment and I'm not going to work for that man. I said I can't do it and that's when the Chief said do you understand the words you just used and I said yes sir. He said I have to take action on that do you mean them? I said yes sir and he said well ok and then um, of course then we went to our offices and that's when I came back up there. Um, he asked to call Major Dickson in and ask if I could come work for her and she said that would be fine and I've been there you know since this investigation started.

QUESTION    CHIEF W.D. DAVIS
Ok. Let me ask you. You mentioned an incident that happened in regards to some hepatitis B shots.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Can you go over what happened in regards to that?

ANSWER    CAPTAIN G.D. HICKS
Yes sir, um, on Thursday August twenty-third um, he got on to me about this, this memo, what it was is that ugh, we had six or seven units get out of Headquarters when they got ten-eight or fourteen-thirty hours which is two-thirty on a thirty-eight which is departmental duty and I was doing that because---

QUESTION    CHIEF W.D. DAVIS
Let's back up.  Prior to that did you talk with Major Murphy in regards to some hepatitis B shots?

ANSWER    CAPTAIN G.D. HICKS
He sent me an E-mail.

QUESTION    CHIEF W.D. DAVIS
And what did the E-mail say?

ANSWER    CAPTAIN G.D. HICKS
It said um, Captain Hicks please take care of this.

QUESTION    CHIEF W.D. DAVIS
And you had you still have that E-mail.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
And basically what it was talking about was bring certain officers in and having that shot given to them is that correct?

ANSWER    CAPTAIN G.D. HICKS
Correct, Right it was from John Carnell to him and then he forwarded it to me and it was ugh, six or seven officers to get their that was their sixth month boosters and they you know I coordinate with the nurses and the medics and stuff to get them down here and I'm thinking ok he said handle this that's the time be here at fourteen-thirty ok.  So we got them out.  Well he gets on the air and has me go to channel five.  Now channel five is not a supervisor channel.  Channel five is a utility channel used by all units for unit to unit con, ugh contact that the dispatcher does not interact on.  Channel seven is the supervisor channel.  So if he wanted to talk to me ugh, just for supervisory he'd have me go to seven but he had me go to five so that everyone could hear and he ask me, he said why do we have six units out of Headquarters on a thirty-eight and I told him.  Well pursuant to the memo come down that um, these guys were getting hepatitis shot.  The memo I got from you.  Apparently he didn't like that answer so he said PX me in the office.  Well I called him in the office and told him the memo I got and he said see me in my office, hangs up.  So I had Lieutenant Reeves be printing me off that memo and I go up there with it and he says why do you have all these units out?  I said sir I'm doing what your memo said here.  He said let me see that, so I handed it to him and he says why didn't you reschedule these times.  I said you know I been a supervisor ten years.  I've never rescheduled times because I feel like that were working with the medics.  We're working with the medical people to get them down here, therefore we're trying to put our schedule with theirs and this was sent in plenty of time.  I said I if I'd of rescheduled it a been a damn you do damn you don't because then you'd said why didn't you follow these orders I gave you.  Can't you read the memo and now you are saying that I should

8

of. You know changed it and he said well you shouldn't had them all them units out at that time. I said well sir I'll get them ten eight then. So we did. We rescheduled and got them ten eight and I told him I said will never have any other unit out at fourteen-thirty hours. I said from now on on the shoot when they get shots to come in early and then we will put in overtime and the only time they will be out at fourteen-thirty hours if it's an Internal Affair Investigation or Court and he said fine, dismissed. So I left the office then.

QUESTION    CHIEF W.D. DAVIS
You mentioned that Major Murphy had made some changes in regards to the way you, you and your officers receive misdemeanor warrants and regular warrants through the Warrant Clerk's Office. Can you explain that?

ANSWER    CAPTAIN G.D. HICKS
Yes ever since Major Murphy and, and his brother Pat Murphy been over the court system. They um, they changed a lot of things and it use to be before that you'd go in to see the Warrant Clerk and you'd articulate your probable cause and the warrant was issued. That's all the Warrant Clerk should be doing is finding if you had probable cause. Now the Warrant Clerk are trying the case, like their judges and now they're having to call Pat Murphy at home to get approval. We're having to release folks or they're having to put on the daily have to wait till we get consult with Mr. Pat Murphy to fine out if we could put them in jail or not. Which is kind of insulting to the officers. Um, we, we went around it a couple of times by going to the County and letting, and the County Magistrate say yea you got that but they came down and they said I don't know if it came from Major Murphy or the Chief but they said we couldn't do that no more. Couldn't by pass the City to go to the County, but the County didn't have no problem with our warrants.

QUESTION    CHIEF W.D. DAVIS
You mention earlier that this happened on, on occasion um, Major Murphy has gone to the Lieutenants below you to give specific orders and a assignments and by passed you.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
What, what happen in regards to that?

ANSWER    CAPTAIN G.D. HICKS
Um, let's see I had my notes written here. On December twentieth he called Lieutenant Rigsby to his office and asked about matters on the shift ugh, he told Rigsby to put Sergeant Oliver back in personnel and that's when he, he going through Lieutenants matters on the shift. I was working that day ugh, and he asked him a question if an officer got his car back, never said nothing to me on anything on that just when to the

9

Lieutenant on that.    Um, on twelve nineteen Major Murphy called Lieutenant McMann on his cell phone and wanted to know what was going on on Ann Street.  We was chasing two suspects on a code fifteen which is a purse snatching.  I again was working I was again involved in a foot pursuit and we caught um, he didn't say nothing to me. He didn't ask me if we had a radar detail going on, on Ray Thorington and this again by passed me.  Lieutenant came to me let me know when I said well you're; you're doing what you supposed to. Ugh, Lieutenant Ray on twelve eighteen ugh, no that's a different incident there.  On twelve nine ugh the Major contacted Rigsby again and advised him that he was taking away Fridays from second shift supervisors during the holidays.  Ugh, and what a Friday is, is an it's nothing guaranteed.  What that is; is ugh, supervisors have to come down there early. They come down there early to make sure the work sheets done and their there about an hour early or so and they make sure people call in sick are noted on there and basically make sure the cards and everything on there.  To reward them for this or to supplement that instead of paying them overtime an hour each day its on their Fridays you let them go for four hours earlier so, three or four hours early and that way they make up for that time.  Cut down on overtime.  Um, he took the Fridays away from second shift and he only did it for second which is the shift I command. It wasn't from first shift or it wasn't from third shift, just our shift and even after the holidays I don't think the guys still getting.  He told them just to put in overtime.  So they been putting in overtime on that.  Um, on twelve twenty-seven that's when I met with Lieutenant Ray.  He calls Lieutenant Ray in his office again I'm working and states that the about the keys for the car.  Some ideas for the keys to come up with it was a key board that we had in trying to get more ugh, control of the vehicles so an officer wouldn't just come in and grab a key that they would have to go through a supervisor and we could find out who it was and he didn't say nothing to me.  I even personally called him that day to let kind let him know I'm there and asked him about if we could use these other rooms for offices over there.  Of course he said we couldn't but I was there that day but he never discussed anything with me about the keys he went through the Lieutenants.  So those three times right there that I documented are just ordinary shifts stuff that should have been through me that didn't go through me, went through the Lieutenants. Then I'm having to get my instructions from the Lieutenants.

QUESTION    CHIEF W.D. DAVIS
            Let me ask you this, you mentioned that you worked part time on your off duty at Beasley.

ANSWER      CAPTAIN G.D. HICKS
            Yes sir.

QUESTION    CHIEF W.D. DAVIS
            Correct?

ANSWER      CAPTAIN G.D. HICKS
            Yes sir.

10

QUESTION  CHIEF W.D. DAVIS
You mentioned an incident that happened over there recently when you got called in. Could you explain to me what happened with that?

ANSWER  CAPTAIN G.D. HICKS
Yes sir it was on December thirtieth which was a Friday. Um, that's my off day. Myself and Captain Wilson both worked down there doing off duty security for them and basically all you do is make sure that the folks get to the parking lot you know they might get hurt. Nobody to harass them or rob them or anything. I got a call on my Link at ugh, twelve forty-five hours from the Major and all he said was come to my office; that was it and I you know not if you're tied up or nothing just come to my office. Yes sir so I get there and it's about –

QUESTION  CHIEF W.D. DAVIS
Once again this is your off day.

ANSWER  CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
You're off duty working another job.

ANSWER  CAPTAIN G.D. HICKS
Right, he didn't ask if you could come, he didn't ask if you were out of town or nothing he just said come to my office. So I got there and it's about one o'clock and he walks by and he looks at me and you can tell he's pissed off and he's got an Internal Investigation in his hand because you can see the confidential part on it and he says is Captain Essex here. No sir, he walks on about thirteen-thirty hours, one-thirty Captain Wilson comes in and it's his off day too because he was working the other building down there and he says what's going on and I said you got me I don't know. When the Major walked by says ya'll can have a seat. Well these are benches that are covered with sheet rock dust and construction materials, saws, and all this and I'm not going to sit in there and get my uniform soiled. So I just stood. He didn't offer us to go in his office, didn't offer us to go in the secretary's he just wanted us to stay out in the hallway. So he goes back inside and about thirteen-forty hours ugh, Captain Essex comes in after Captain Essex was off um, he'd been out on sick day with a pink eye. I think he caught that from his daughter. He's in civilian clothes and he sees me and Captain Wilson there and he says what's going on. I don't know and he says well come on in here and I said I don't think the Major wants us in there, I think he just wants to talk to you. So he goes in there, Major comes out again, got that file in his hand and looks at me and Captain Wilson and says it's bad gentlemen, it's bad.

11

QUESTION    CHIEF W.D. DAVIS
            Now Major Murphy is the one that came out and said that.

ANSWER      CAPTAIN G.D. HICKS
            Correct.

QUESTION    CHIEF W.D. DAVIS
            Ok.

ANSWER      CAPTAIN G.D. HICKS
            And he kept walking and you know we were worried what's going on now
            you know and we're just standing there, he comes back through he goes in
            his office and at fourteen hundred hours which is two o'clock he has Essex
            come out and get Captain Wilson and says come on in, so they are in there
            talking and they leave me out in the hall still. At fifteen hundred hours is
            when they called me back. Now I've been out in that hall standing since
            thirteen hundred hours. I've been standing in the hallway two hours, just
            standing there like a, a kindergartner standing in front of the principals
            office. People walking by and looking and it's kind of embarrassing you
            know you just told me to stay out there. So he calls me in and what it was
            about was a misunderstanding that he had on, on a statement from
            Sergeant Oliver and he thought we was trying to undermine him, which we
            wasn't.

QUESTION    CHIEF W.D. DAVIS
            Well let's, let's stop just a moment. What type of statement did he have?

ANSWER      CAPTAIN G.D. HICKS
            This was an Internal Affairs Investigation that he wanted on Sergeant
            Oliver because Sergeant Oliver he had, he had signed a, a memo from him
            that we would not say the word send the nearest available unit. He wanted
            you to say anything but that and Sergeant, it hadn't been too long since we
            had signed it and I, I wasn't working that evening Lieutenant McMann had
            told me about it and he said Sergeant Oliver it was about ten o'clock and
            was entering information in the daily, we had a lot of stuff going on they
            were looking for units and Sergeant Oliver said that you know sent the
            nearest available unit and Major Murphy heard it and got mad and called.
            He felt that there was deliberately disobeying his direct order but after
            talking with Lieutenant McMann, Sergeant Oliver was distracted on
            putting information on the daily and it's kind of a knee jerk reaction. He
            wasn't trying deliberately disobey nobody he was just trying to, to get the
            dispatchers problem covered so he could finish what he was doing because
            third shift was coming in to, to get their stuff on the computer. Well one
            person being in the bed at a time. So the Major called Lieutenant McMann
            and told him he wanted to address that and wanted, wanted Sergeant
            Oliver, Charlie written up. So that's what Lieutenant McMann did and he
            told him he said well Major called and gave me an order you know and he
            felt that that was the truth that he was telling the man. Ugh, Lieutenant
            McMann would have probably would have handled just available being the
            fact that it was not an intentional disobedience of order that he felt and,

12

and I, I trusted Lieutenant McMann's opinion. Well number one he was the one there and, and two he's been a supervisor for awhile. So um, when he told me that's what he had to do I understood? Well then he said that he got a note from the Major one or two days later that was resending the counseling form and was going to do an investigation on Charlie. Major wanted an investigation because he felt Charlie as deliberately disobeying him. Well this was a result of Sergeant Oliver's statement and, and what was what he was upset about was the fact that Captain Wilson had told me that he needed to talk to Sergeant Youngblood. Now I relayed that message to Sergeant Oliver. I don't know what he needed to Sergeant Youngblood about. I didn't know if somebody else might have said it I didn't know if, if he did I didn't think he did because I never heard Youngblood. I never heard nobody say that but I'm just relaying the words to him. I wasn't trying to undermine nobody, myself or Captain Wilson on trying to, to disobey anything on that. We were supporting what the Major said it's his division we were doing what we were told. Well Major thought we was undermining him. I said no that's not what the case was and I explained that to him. He said oh ok and he was he calmed down after that. Well he calls Lieutenant McMann in and the day before we had a ugh, a confusion of vehicles because we really don't have a whole lot of cars right now that could supply the, the men that we need for the units out there. We've had vehicles that had been wrecked and we've had folks, vehicles that had been um, discontinued and anyway ugh, first shift sometimes have to borrow from second, second from third whatever. So the officers looking for the vehicles so there was about three or four the day before that they was trying to find cars and they didn't sound real good on the air you know so we told them next time make sure that they find a car for they get them ten eight. That day went smooth and it was Lieutenant McMann's first day as a shift commander and he's thinking hey you know Major comment may he did a good job. So he calls Lieutenant McMann in and he sees myself, Captain Essex, Captain Wilson setting there and he knows it's Friday the off days so he, he knows it ain't too good. Well um, Lieutenant Mc (*excuse me*) Major Murphy called Lieutenant McMann behind his desk and he hands him this Confidential Internal Affairs Document and not only does he tell him to read from this he says read aloud from this. So he has him read aloud which was Sergeant Oliver's statement and Lieutenant McMann didn't give a statement or none of that. So he reading aloud from this and he says did you tell him that I told you to write him up? He said yes sir. Why did you say that? Because you did. You need to man up and assert your own leadership, your own responsibility. He said sir, I, I, resent that, he said I, I not, well he didn't say I resent that. He said sir I don't appreciate that. He said because ugh, I that's no way saying I'm not a man or not and I think Major Murphy realized what he said and goes why I mean you need assert yourself on there and you know it embarrass Lieutenant McMann and Lieutenant McMann trying to say hey that's not a reflection of leadership bad on my part I was just being honest. He said from now on if I tell you to do something you just make it sound like it comes from you and he told all of us that and he dismisses Lieutenant McMann after he chews him out and he'll admits to us that he got too loud with him ugh, and this that

13

conversation had Lieutenant McMann should have been just between him and Lieutenant McMann but he didn't front of three other Captains and embarrassing Lieutenant McMann.    Lieutenant McMann was pretty aggravated about it.

QUESTION    CHIEF W.D. DAVIS
Ok.  Captain Hicks you mentioned several people that you feel like could give me information in regards to this incident, the incidents that we discussed today and um, possibly other incidents dealing with Major Murphy.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Um, you mentioned Lieutenant Caulfield is that correct?

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Major Briscoe.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Captain McQueen.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Major West.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Sergeant King.

ANSWER    CAPTAIN G.D. HICKS
Sergeant J.E. King yes sir.

QUESTION    CHIEF W.D. DAVIS
Lieutenant Loria.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Captain Essex.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Captain Macaw.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Major Mitchell.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
And Major Dickson.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Is there anybody else that you feel like I need to talk to?

ANSWER    CAPTAIN G.D. HICKS
Um, Major Thuther would be a good one too he's retired now but he also worked for him. Um, Major Murphy deals with a leadership style that he likes to instill fear and intimidation.

QUESTION  CHIEF W.D. DAVIS
How do you know that?

ANSWER    CAPTAIN G.D. HICKS
Because he's tried it with me and he does it with Captain Wilson. Um, I know that's the leadership style he uses with Major Briscoe. When Briscoe was his Captain. Um,

QUESTION  CHIEF W.D. DAVIS
Have you ever heard him say that or anything in relation to that?

ANSWER    CAPTAIN G.D. HICKS
When I first got promoted to captain I went to his office he told me that when they quote "come to his office or my office to quake in their boots" and I don't agree with that. I said why is that? He said well they ought to, you ought to instill fear into them and I don't lead by that and I told him that. I like for folks be feel that they come and talk to me. You can be a leader without being a, a tyrant and I feel that that's his style. Ugh, he, his

15

leadership is that he is right because he is the Major and there's no other line. If you reach a different conclusion you're wrong and just because you reached a different conclusion I'm going to put an investigation on you and that's, that's what he does.

QUESTION    CHIEF W.D. DAVIS
Is there anything else that you feel like I need to know in regards to this incident or this relationship, working relationship?

ANSWER    CAPTAIN G.D. HICKS
I think that Major Murphy leads by um, not only does he create a hostile work environment and creates intimidation and fear for people feel reprise or they feel retaliation but he, it's severe gruvasive the atmosphere he creates. I feel that ugh, it is not only affected me but affected the other shift commanders. Ugh, I noticed it affected --?-- assignments because I was passed over once for first shift commander not asked he just told me I was going to stay where I'm at. Then I was passed over the fixing to make promotion February tenth my understanding is a new captain is going to first shift and that the might offer it to me later but from my understanding Lieutenant Reeves will be his acting shift commander right now second shift. Said the Major told him that I'm staying right where I'm at, on loan to the desk. Um,

QUESTION    CHIEF W.D. DAVIS
So you feel like the problems that you've had with Major Murphy is beginning to hurt your advancement in the career because you feel like Major Murphy is holding you back.

ANSWER    CAPTAIN G.D. HICKS
Absolutely, he moves Sergeant Johnson from third shift to second. He told me that I had to put him on bottom of seniority. This was situation involving a Jubilee that he didn't like the way that Sergeant Johnson answered him on this. Ugh, and he also put out a memo, I don't have that but Captain McQueen did that stated that he wanted the Sergeant Johnson was going to be on his preverbal shit list. Um, he practices retaliation. There's you can figure that man out, he goes from one extreme to the other. Ugh, there is no affinitive statement of what goes on the daily work format but if you mention something you're going to hear it. Captain Mc ugh, Wilson told me that they didn't they missed a address on a street and also that um, I want to say there's something that was omitted from there and he told him that oh it wasn't omitted he didn't like the fact that the business the statement that stated that there was no the alarm system was activated and that we responded to it. He didn't like that in the middle of the daily he wanted that at the beginning and he told Captain Wilson that he was going to quote "hammer his ass" over it.

QUESTION    CHIEF W.D. DAVIS
Has there ever been a part where you, he, you felt like he was threatening you other than the time in his office when he was over you?

16

ANSWER    CAPTAIN G.D. HICKS

He's, he's said it to me and other captains that he was going to take bars and the point that he made when he said he was going to put an investigation on me and he kicked me out of the office. He said to me in front of Captain Essex that I was incompetent that I didn't deserve to be a shift commander and that he was going to bust me to Lieutenant. He's called me several times at the house to get on to me about even when I'm not working. Um, this is created even more problems I had with high blood pressure. Two days I had to go home when the Firemedics checked me on my blood pressure that was one-ninety-two over one-twenty-four and the Firemedic told me I was at stroke level. Since I've been moved to the desk and I work for Major Dickson my blood pressure has been one-eighteen over seventy-eight best it's ever been. Now I don't say that you got to agree with the boss all the time I'm old enough I've been here long enough I know that's not going to happen but you treat folks fairly. You treat them like adults and you treat them the way you want to be treated. Um, there's no other Major down there that, that treats folks the way Major Murphy does and in my opinion he's the reason why it's hard to retain the quality people that we have but I'm not going to be bullied and intimidated and I, I not going to be put in an atmosphere where I'm constantly my stomach is upset because I don't automatically please him at his whim.

QUESTION    CHIEF W.D. DAVIS

Captain Hicks is there anything else that you would like to?

ANSWER    CAPTAIN G.D. HICKS

Just the fact that um, the investigation he did put on me um, one was unfounded and he to be told by the Chief to let me know that the final aspects of that. Um, the other one was punishment was ruled down by the' the ugh, accident (*excuse me*) trial board I'm waiting the Chief's final approval on that but that investigation was over omission of entry on the daily and first shift has done that everybody omits stuff every once in awhile and their shift commander not been brought up on charges. I felt the reason he did that is because I didn't discipline the Lieutenant hard enough the way he wanted it. The Lieutenant who was responsible for putting it on there was two Lieutenants looked at that card. One was on military leave and other was fixing to retire in two weeks and I the disciplinary action that I did is I did him a verbal counseling. He told me he messed up and I understood that and I wasn't going to put disciplinary action written on there when he leaves in two weeks. I felt the verbal was good enough. That's what we've done before. Ugh, when third shift had an omission on there they wrote up the supervisor that didn't put it on there but nothing happened to the shift commander and that day was Lieutenant Brown so they didn't do nothing so he, he singled me out to put this, this um, Departmental Action on and I feel he's doing that holding me back because I had seniority on, on one of the Captains that got Assistant Division Commander I don't have sour grapes on that because he's a good man and he deserves that, that's fine but I feel that I was passed over this

17

is going to be twice now for first shift commander and I feel that Major Murphy doing it intentionally.

QUESTION   CHIEF W.D. DAVIS
           Anything else?

ANSWER     CAPTAIN G.D. HICKS
           No sir not that I can think of.

QUESTION   CHIEF W.D. DAVIS
           Captain Hicks you are aware that this statement is being taped is that correct?

ANSWER     CAPTAIN G.D. HICKS
           Absolutely sir.

QUESTION   CHIEF W.D. DAVIS
           You are giving this statement voluntarily is that correct?

ANSWER     CAPTAIN G.D. HICKS
           Yes sir.

QUESTION   CHIEF W.D. DAVIS
           You have been read your Internal Investigation Warning is that correct?

ANSWER     CAPTAIN G.D. HICKS
           Yes sir.


CHIEF W.D. DAVIS
Therefore that's going to conclude this statement.  The ending time on this statement is sixteen twenty-nine hours .

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY HICKS,                            *
                                       *
        Plaintiff,                     *
                                       *
vs.                                    *       CASE NO: 2:06-CV-1017-WKW
                                       *
CITY OF MONTGOMERY and                 *
CHIEF ARTHUR BAYLOR,                   *
                                       *
        Defendants.                    *

## AFFIDAVIT OF K. J. MURPHY

Before me, the undersigned authority, personally appeared K.J. Murphy, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is K. J. Murphy. I am over nineteen years of age. I am a Lt. Colonel employed with the City of Montgomery as Deputy Chief of Police for the Montgomery Police Department. In January 2006, I was Commander of the Patrol Division. It is in that capacity that I state the following:

Captain Gary Hicks was transferred to the Patrol Division on October 8, 2004. In January, 2006, Captain Hicks was second shift commander. The regular work hours for second shift are 2:00 p.m. until 11:00 p.m. However, the shift commanders usually have to come in a little earlier than the shift starts to prepare for the shift and stay a little longer after the shift has ended to complete paperwork. The shift commander is responsible for the daily report for their shift. As second shift commander, Captain Hicks was also assigned a city vehicle.

On January 10, 2006, I met with Captain Hicks to discuss issues regarding his failure to follow orders that I had given. This was not a first time event. I had counseled

1

DEFENDANT'S
EXHIBIT
tabbies
2

Captain Hicks previously for not following orders or instructions, not following protocol and/or not handling and managing second shift properly.

On that day, Captain Hicks became defensive and hostile toward me. I felt like Captain Hicks was being aggressive toward me and I was not backing down. I yelled at him to get out of my office. Captain Hicks asked to see the Chief and I told him okay. I was later called into the Chief's office to discuss the matter while Captain Hicks was in there. During the meeting, Captain Hicks said the pressure was killing him and said that he could not work for me anymore.

On January 10, 2006, Captain Hicks was placed "on loan" status to the Administrative Division. Attached to my affidavit as *Exhibit 1* is the duty roster for January 10, 2006, indicating that Captain Hicks was "on loan" status to the Administrative Division.

Captain Hicks continued to work second shift. Because Captain Hicks was on loan and not transferred from Patrol Division as second shift commander, he kept the city vehicle assigned to him in Patrol as second shift commander. Captain Hicks remained "on loan" status until his permanent transfer to the Administrative Division on July 28, 2006. Attached to my affidavit as *Exhibit 2* is the duty roster for July 27, 2006 indicating that Captain Hicks was "on loan" status and *Exhibit 3* is the duty roster for July 28, 2006 indicating that Captain Hicks had been permanently transferred to the Administrative Division. At the time of his permanent transfer to the Administrative Division, Captain Hicks was relieved of the vehicle assigned to second shift commander for the Patrol Division.

On October 27, 2006, Captain Hicks was transferred back to the Patrol Division as first shift patrol commander. Attached to my affidavit as *Exhibit 4* is the transfer sheet

2

and duty roster for October 27, 2006 indicating that Captain Hicks was transferred back to the Patrol Division as first shift commander.

Captain Hicks was again assigned a vehicle from Patrol when he transferred as first shift commander. Captain Hicks is scheduled to work from 6:00 a.m. until 3:00 p.m. on first shift, however once again, as shift commander, he may have to come in a little early or leave a little later than the regular shift hours. The assignment of first shift commander is a very desired assignment amongst supervisory personnel.

I was promoted to Lt. Colonel on June 1, 2007. I was the Commander of the Patrol Division when Captain Hicks transferred back in October 2006 until I was my promoted. As Lt. Colonel, I continue to supervise the Patrol Division however there has been a new Major assigned as Commander to the division.

From approximately February 2006 until May 2006, my supervisory and management skills of the Patrol Division were the primary focus of an internal affairs investigation. There was never any finding that I discriminated against anyone or acted unlawful. I understand that many of the other members of the Montgomery Police Department may not agree with my manner of supervision. However, I had high expectations for the Patrol Divisions and was stern in maintaining those standards.

I have read the above and foregoing affidavit consisting of three (3) pages and state that it is true and correct to my present knowledge and information.

_K. J. Murphy_

**SWORN TO AND SUBSCRIBED** before me this 20th day of November, 2007.

_Tracie Davis_
Notary Public
My commission expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

(SEAL)

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EDDIE J. HAYNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:06cv1093-WKW |
| | ) | |
| | ) | |
| CITY OF MONTGOMERY, | ) | |
| ALABAMA | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF W. D. DAVIS

Before me, the undersigned authority, personally appeared W. D. Davis, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is William D. Davis.  I am over nineteen years of age.  I have been employed for the last five years as the Assistant Chief of the Fire Investigations Division for City of Montgomery Fire Department.  I have been conducting Internal Affairs Investigations for the City for at least fifteen years.  It is in that capacity that I state the following:

In January 2006, I was instructed to conduct an internal affairs investigation into a complaint by Captain Gary Hicks of hostile work environment with the Patrol Division of the Montgomery Police Department.  I interviewed Captain Hicks on February 1, 2006.  I have reviewed the recorded statement by Captain Hicks and it is consistent with my recollection of our interview.  I do not recall Captain Hicks ever telling me in any part of the interview, recorded or non-recorded, that he felt like there was corruption in the

1


DEFENDANT'S
EXHIBIT
3

Patrol Division or that he felt like his conflict with Major Murphy caused any kind of concern for the safety of the public.

Additionally, in my capacity as Assistant Chief of Fire Investigations, I am certified by the Alabama Peace Officers Standards and Training Commission, which means that I am sworn to uphold the laws of this city and state and authorized to make arrests. I do not recall Captain Hicks indicating making any allegations of criminal conduct by Major Murphy or anyone else within the Division.

I have read the above and foregoing affidavit consisting of two (2) pages and state that it is true and correct to my present knowledge and information.

_W.D. Davis_
W.D. Davis

**SWORN TO AND SUBSCRIBED** before me this 26th day of November, 2007.

_Tracie Davis_
Notary Public
My commission expires _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

(SEAL)

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **GARY HICKS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CASE NO: 2:06-CV-1017-WKW** |
| | * | |
| **CITY OF MONTGOMERY and** | * | |
| **CHIEF ARTHUR BAYLOR,** | * | |
| | * | |
| **Defendants.** | * | |

## AFFIDAVIT OF BOBBY BRIGHT

Before me, the undersigned authority, personally appeared Bobby N. Bright, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

1.     My name is Bobby Bright. I am over the age of nineteen years and I am a resident of Montgomery County, Alabama. I am currently the Mayor of the City of Montgomery and I was serving in this position at the time of events alleged in the Plaintiff's Complaints.

2.     Captain Gary Hicks came to see me following the completion of an internal affairs investigation into claims of hostile work environment of the Patrol Division. I do not recall Captain Hicks ever telling me that he felt like there was corruption in the Patrol Division or that he felt like his conflict with Major Murphy caused any kind of public safety concern. I know if I were informed there was corruption in the Police Department or public safety concerns, I would have done more than tell Chief A.D. Baylor to reassign Captain Hicks within the Police Department.

DEFENDANT'S
EXHIBIT
44

tabbies

3.    Captain Hicks came to see me to discuss his job assignment. After the internal affairs investigation was completed, Captain Hicks was informed by Chief Baylor that he was going back to the Patrol Division. Captain Hicks expressed to me that he could not work for Major Murphy and complained of the way Major Murphy supervised him.

4.    I contacted Chief Baylor and told him that I did not want him to put Captain Hicks back under the supervision of Major Murphy.

5.    Captain Hicks was transferred from the Patrol Division.  However, I was later informed that Captain Hicks was not happy with his new assignment. I requested that he report back to me.  Captain Hicks expressed that he was not happy with his assignment.  He felt like the assignment was degrading and did not appreciate having to answer to the jail administrator.

6.    Following my second conversation with Captain Hicks, I called Chief Baylor and told him that Captain Hicks needed to be moved from his assignment in the jail. Chief Baylor told me that it was Captain Hicks' suggestion to go to the jail when he was transferred from Patrol.  I told Chief Baylor to put Captain Hicks somewhere more useful in the department rather than at a desk in the jail.

7.    I do not recall Captain Hicks, in either conversation, reporting anything to me regarding corruption in the Patrol Division or telling me there was any kind of public safety concern.  If I had been told there was corruption in the Police Department or an issue regarding public safety for Montgomery, I would have certainly done more than have Captain Hicks reassigned.

I have read the above and foregoing affidavit consisting of three (3) pages and state that it is true and correct to my present knowledge and information.

_Bobby Bright_
Bobby N. Bright

**SWORN TO AND SUBSCRIBED** before me this 26th day of November, 2007.

_Tracie Davis_
Notary Public
My commission expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

(SEAL)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY HICKS,                              *
                                         *
        Plaintiff,                       *
                                         *
vs.                                      *        CASE NO:  2:06-CV-1017-WKW
                                         *
CITY OF MONTGOMERY and                   *
CHIEF ARTHUR BAYLOR,                     *
                                         *
        Defendants.                      *

### AFFIDAVIT OF BARBARA M. MONTOYA

Before me, the undersigned authority, personally appeared Barbara M. Montoya, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is Barbara M. Montoya.  I am over nineteen years of age.  I am currently employed as the Director of the City/County of Montgomery Personnel Department and have been since 1984.  It is in that capacity that I state the following:

The Montgomery City/County Personnel Department (Personnel Department) is a separate entity from the City of Montgomery and serves as the personnel department for the City of Montgomery (City), the County of Montgomery, the Montgomery Airport Authority and the Montgomery Housing Authority.

It is the responsibility of the Personnel Department to announce positions that are open for applications, recruit and qualify applicants for employment for the various entities it serves.  Applicants are certified to the appointing authorities in accordance with the law which established the Personnel Department. That is, the appointing authority may consider five candidates for each vacancy; a procedure known as the "Rule of Five".

1

DEFENDANT'S
EXHIBIT
5
tabbies

Pursuant to law, the appointing authority may choose any one of the top five candidates certified as eligible for employment.

Since 2001, it has been the policy of the current Mayor and the only Appointing Authority for the City of Montgomery that all registers are "open competitive". That means that city employees must compete with outside candidates for any city vacancy and there is no guarantee that a city employee will be in the top five candidates or will be considered or selected to fill a vacant position.

This policy applies to all city employees, except the ranked public safety positions, within the Police Department and Fire Department. The position of Municipal Jail Administrator is a civilian, not a ranked public safety position. There is only one Municipal Jail Administrator position for the City of Montgomery and it was filled December 7, 2001 by the appointment of Willie Collins. According to records maintained by the Personnel Department in the regular course of business, the position of Municipal Jail Administrator has not been vacated, nor have we been requested to open the position for applications or to create a second classification of Municipal Jail Administrator.

The classification of Municipal Jail Administrator is a pay grade 11 in the City of Montgomery Administrative Pay and Classification Plan with a pay range of $ 58,610 – 83,432. The ranked public safety position of Captain in the Montgomery Police Department is a pay grade 5 on the City of Montgomery Public Safety Pay and Classification Plan with a pay range of $ 52,952 – 75,379.

2

I have read the above and foregoing affidavit consisting of two (2) pages and state

that it is true and correct to my present knowledge and information.

*Barbara M. Montoya*
Barbara M. Montoya
Affiant

**SWORN TO AND SUBSCRIBED** before me this 16 day of November, 2007.

*Karen B. Cason*
Notary Public

My Commission Expires 2/24/2010

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

GARY HICKS              *
                            *
        Plaintiff,        *
                            *
VS.                       *    CIVIL ACTION NO.: 2:06-CV-1017-WKW
                            *
THE CITY OF MONTGOMERY     *    PLAINTIFF DEMANDS TRIAL BY JURY
                            *
and                      *
                            *
CHIEF ARTHUR BAYLOR       *
                            *
        Defendants.      *

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF**

COMES NOW the Plaintiff by and through undersigned counsel and would submit the following response to the Defendant's First Requests for Admissions to Plaintiff:

1.     The Plaintiff admits paragraph 1.

2.     The Plaintiff denies paragraph 2, as the transcript does not accurately reflect what was said in the oral statement given to Chief William Davis. The transcript contains errors and, therefore, is not accurate.

3.     Requests for Admission number 3 is denied in that the Plaintiff was advised to make a request for a transfer to the jail, and the Plaintiff requested to be transferred as the Administrator of the jail, not to be assigned to the jail, reporting to a civilian who was not a sworn officer.

Respectfully submitted on this the 20th day of November 2007.


DEFENDANT'S
EXHIBIT
6

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for the Plaintiff

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:    (334) 264-8118
Facsimile:    (334) 263-7598

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing on the parties listed below by placing same in the U.S. mail, postage prepaid, on this _20th_ day of _November_, 2007.

Kimberly O. Fehl, Esq.
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111

OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE OF ALABAMA,
## NORTHERN DIVISION

**GARY HICKS**                         )
                                       )
    **Plaintiff,**                    )
                                       )
**vs.**                                )    **2:06-CV-1017-WKW**
                                       )
**THE CITY OF MONTGOMERY**             )
**and CHIEF ARTHUR BAYLOR**            )
                                       )
    **Defendants.**                   )
                                       )

### DEFENDANTS' FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF

    Come now the Defendants, by and through undersigned counsel, and propounds the following First Requests for Admission of Facts to Plaintiff:

1.    I am familiar with the Departmental Manual of Rules and Regulations by the Montgomery Police Department.

2.    The attached is a copy of a true and correct statement that I gave on February 1, 2006 to Chief William Davis of the Montgomery Fire Department during an internal affairs investigation of Major (presently Lt. Col.) Murphy for hostile work environment.

3.    I submitted a request to transfer from the Patrol Division to the City Jail.

    Submitted this _19th_ day of October 2007.

                          Kimberly O. Fehl (FEH001)
                          Attorney for Defendants

**OF COUNSEL:**
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October *MMh* 2007, I sent a copy of the foregoing to the Plaintiff via

U.S. mail, first-class postage pre-paid to:

J. Bernard Brannan, Jr., Esq,
*The Brannan Law Firm, P. C.*
602 South Hull Street
Montgomery, AL 36104

Of Counsel

VOLUNTARY STATEMENT FORM
MONTGOMERY FIRE DEPARTMENT

DIVISION:                           Bureau of Investigations

NAME:                               Captain G.D. Hicks
                                    Montgomery Police Department

CONCERNING:                         Hostile Work Environment

LOCATION OF INTERVIEW:              Internal Affairs Office
                                    Montgomery Fire Department Headquarters

STATEMENT TAKEN BY:                 Chief W.D. Davis

BEGINNING TIME:                     February 1, 2006 – 1543 hours

This is Chief Davis with the Montgomery Fire Department. Today's date is February 1, 2006. The time is 1543 hours. The location is Fire Department Headquarters Internal Affairs Office. Also present in my office is Captain G.D. Hicks, ID 420 of the Montgomery Police Department. This will be a taped statement from Captain Hicks in regards of, in regards to a um, hostile work environment. It is also important to note that I am doing this internal affairs case at the request of Chief Baylor and the Mayor's Office.

QUESTION  CHIEF W.D. DAVIS
          Captain Hicks you have been read your Internal Investigation Warning is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.

QUESTION  CHIEF W.D. DAVIS
          You are giving this statement voluntarily is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.

QUESTION  CHIEF W.D. DAVIS
          And you are aware that this statement is being taped.

ANSWER    CAPTAIN G.D. HICKS
          Correct.

1

QUESTION    CHIEF W.D. DAVIS

What I like you to do for me ugh, Captain Hicks is I like for you to go over some of the things that you and I had talked about prior to this taped statement. Um, you stated that on December the twenty-seventh that um, Major Kevin Murphy made the comment that if he didn't get some answers regarding some patrol vehicles some damage to a patrol vehicle that he was going to take those patrol vehicles from those people in patrol. Can you tell me what initiated that whole thing what happened I understand that it was an incident that took place out in Southlawn. Can you explain to me what took place in regards to that?

ANSWER      CAPTAIN G.D. HICKS

The ugh, on the incident where he said he was to take the cars from Patrol Division was going to be involving Captain Wilson and Captain Wilson at twenty-two fifteen hours had told me that he had just got off the phone with the Major and there was some damage to the front of the vehicle and they were investigating to see what was going on. Um, he told him that the, he, he had gotten red in his face and really mad and he was flustered and he said that um, the Major told him if he didn't find the answers that he was taking everybody's vehicle from them in the Patrol Division. Um, I just told Captain Wilson to calm down and relax on that. Um, the situation involving Southlawn was a um, we had a, a foot pursuit and the officer was chasing a subject I can't remember exactly what the charge was. We had ugh, Corporal Green, Mark Green was with his partner and they were slowing down and almost to a slowing stop right there by the Winn Dixie and I think it was Church's Chicken right there. The suspect he said came running around the dumpster toward the front of the vehicle. *(excuse me).* Now Corporal Green was putting his vehicle in park and a slow stop less than five mile an hour. He was stopping the vehicle his partner was exiting the vehicle. He said the suspect was running toward him and he couldn't remember if the suspect was turned and looking to an officer chasing him or toward the car but he said the suspect was running toward him and kind of put his arm out and vaulted over he hood. Rolled across the hood and kept running and the other officers out on the scene had to tackle the guy. They got the subject in custody and the guy never complained about any injuries or anything. So the family got there and they talked the suspect in to complaining of that he was injured from the officers getting him down on the ground and taking him into custody not from the contact with the vehicle. Well I, I've been advised this when they get to Headquarters and I asked the Sergeant, Sergeant Johnson I said now we don't have a twenty-five do we. Twenty-five being a vehicle accident. He said no it's not a collision. He said according those on the scene this guy purposely you know ran and kind of rolled across the hood of the car and continued going. He had other avenues he could have taken to either way but he, he took that one route. I guess he thought that was the most expeditious. Well anyway um, I said ok so you satisfied with it and he said I am and I said any damage to the car. He said nope no damage to the car no injury to the suspect. Then the suspect gets to Headquarters he said his knee hurting. I told the Sergeant I said look to cover us to make sure that we don't deny anybody the right to medical

2

attention, make sure you call the medics. So the medics come, Firemedics come and look at him and he points to his knee. Well there's no obvious contusion or swelling or abrasion or nothing but to make sure everybody's covered they say you need to get an x-ray.

QUESTION   CHIEF W.D. DAVIS
Let me stop you right there. Do you remember what date that, that foot pursuit occurred on?

ANSWER    CAPTAIN G.D. HICKS
Um, I have it, I have it written down in my calendar on the day but I don't have that with me, with me sir.

QUESTION   CHIEF W.D. DAVIS
Ok. Go ahead.

ANSWER    CAPTAIN G.D. HICKS
Um, anyway they took him to the hospital and I told them to go ahead and take him up there and I let the Major know that we were going to have a bill on this because he came down was looking at some stuff on there and I told him nothing to it and he said ok. Well anyway um, they came back and they said there's no injuries to this guy, nothing at all and I believe the suspect was making this up to keep from going to jail. So we went ahead we did the arrest paperwork and the Major talked to me later he said look why don't we go ahead and do a collision report on this an accident report and I told him I said Major it's not an accident. I said this is pedestrian that purposely ran into the vehicle. I had went out and looked at it and I could see where the fingers of the, of the hand of the guy because it was all sweaty greasy palm stain on the hood. Was towards the grill which meant that he had to pivot his wrist a hundred and eighty degrees so he rode up on the heel of hand to go across. I said if he had got hit you know the arms would have been like out stretched and I said basically what the officer said I think this guy you know rolled across it and ugh, it's not, it's not a twenty-five. He said well it's just going to be for internal and he said just paperwork just in case this guy comes back later. Ok I said we usually do a State Form which is City Vehicle that's normal protocol and let me call a DNT on private property, which is Do Not Tally that means it don't get sent in to the State but everybody else gets a copy of this and of course the officer was real concerned about it and you know I, I told him I said don't worry about it because he was concerned that he was going to go to the Accident Review Board and everything and I said look it's not a collision. I said we're just doing this paperwork on this to cover us in case the guy comes back. Well that, the next day the officer ugh, gets a phone call from the Major and he verbally berates him on the phone saying you should have had better judgment you hit this guy.

QUESTION    CHIEF W.D. DAVIS
This is Major Kevin Murphy is that correct?

ANSWER    CAPTAIN G.D. HICKS
Correct, calls, calls Corporal Green on the phone and verb berates over that and basically makes Green feel like he's done a bad job, you know and Green came to me and I said don't worry about it. I said you were slowing stopping this guy ran into you. He said well I think the Major's mad at me. I said don't worry I'll explain. That also that same day when um, I was told to, to create a detail for robbery suppression. We've been hitting, we've been hit a lot with a lot of robberies of persons and a lot of it was Mexican victims. Um, anyway they, Captain Essex called me in who's my Supervisor. He's Assistant Division Commander and he says um, they want you to develop a, a detail encompassing the streets of McGhee Road, Calamar Drive, and I think there's one other that's what it was but anyway I said you know we have been hit a lot in the apartment complexes and I said how about if I make a grid and that way we'll have a one man unit patrolling that grid and that will be his job and I said I'll probably alternate it that way we don't create a pattern. He said that's fine. So I sit a couple of hours on this putting this together I put where the boundaries would be and how they rotate that and how we could ugh, substantiate the manpower to do this. Well the next day I get a call at the house and it's Captain Essex and he's telling me the Majors aggravated and wants to see me in his office at one-thirty. Ok, I'm what's he mad about. Well he don't like the detail you wrote. Alright, so I'm, I'm what could I've done to, to try to made that better. So I go in there and sit down and he immediately says—

QUESTION    CHIEF W.D. DAVIS
You come in on your off day.

ANSWER    CAPTAIN G.D. HICKS
No sir that was a regular work day.

QUESTION    CHIEF W.D. DAVIS
Ok.

ANSWER    CAPTAIN G.D. HICKS
That was regular work day I had to come in thirty minutes early.

QUESTION    CHIEF W.D. DAVIS
Ok.

ANSWER    CAPTAIN G.D. HICKS
Be there thirty minutes early so he could see me and ugh, Captain Essex told me to meet him and go up there. So we went up there and the Major looks at me and I walked in and at first he was typing. Then he turned around and looked at me and says ugh, did you understand the order that were given to you and I said well yes sir I was told to make a detail and he said well why did you put these other streets in here. He said you dis, did

4

you disobey a direct order? I said no sir. I said Captain Essex told me to encompass these roads in here and that's what I did. He said I told you, I told him to tell you just McGhee Road and Calamar Drive. He said why do you have Atlanta Highway in there? I said because we got hit at Eastdale Road Apartments. He said well why do you have Vaughn Road? I said well Vaughn Lakes was hit and the suspect ran toward Warren House and I said I was trying to be fair and try to cover as many areas as we can with the amount of personnel. I said if you want me to change it I can. He goes no I want to know why did you do disobey a direct order? I said sir I didn't disobey a direct order. He said well Captain Essex did you give him a, a did you not follow my orders? He said well yes sir and I was trying to take some of the heat off Captain Essex. I said maybe I misunderstood but I know what I was told and I said I, I put that on there from what I was told in there. He said well Captain Hicks you do awful lot of misunderstanding here lately and he said now let's talk about this twenty-five. He says ugh, you know you should have done a twenty-five report on that. I said no sir. He said tell me why? I said because it was a pedestrian that ran into the patrol car not the other way around, I mean we don't do that with bicycles that way or pedal cyclists and I said sir I, I got a, I know , I don't think I know everything but I said I got twelve years in traffic. Eight of those was spent in accident investigation, five and a half as shift commander and I'm a national certifies as accident reconstructionist. I said you can ask any accident reconstructionist that's not a collision and he says I said it a collision and that's why we work it that way. I said ok sir we followed your order. I said we do it that way. He said you know you should have something for documentation and I said well sir if wanted something for documentation we could have done incident offence report for accidental injury and that would have been the same thing, it would have been documentation but it would also we noted that it wasn't a collision. He said I said it was. I said sir, I ain't arguing with you but I don't agree. He said I'm just going to put in an investigation on you on this. I said well sir I, I mean you can do what you want. I said but I don't agree with you, it is not a collision. He said well get out of my office. Ok and all I did was take my right hand and rubbed my chin, that's it. Captain Essex was in there as a witness. The chairs that he had was kind of narrow and I had to laid my radio down on the floor. So I reached down to pick it p and before, when I rubbed my jaw he said don't you get mad at me mister. I said Major I don't, I don't know what you're talking about and I reached down to pick up my radio and when I did I could tell something was leering over me. Major Murphy had bridged up on the palms of his hands and was leaned over the desk with his head over the other side over me saying I can get a hell of a lot madder than you mister and trying to provoke me and I said Major I said I didn't say nothing to you, ain't no reason to be like this now. He said get out of my office. So I'm trying to control myself because I feel like he's provoking me. I feel like that he's trying to put me in a, in a hostile environment because I feel like he's trying to, to ugh, badger and beliter me, belittle me. So I grabbed my radio. I start walking out and apparently I ain't moving fast enough, so he runs around the desk and opens the door and says, I said get out of my office, and I said Major why are you yelling at me? He said I'm going to yell at you. I said why are you

5

yelling? I said there's no reason to yell at me. I said I'm leaving your office, ain't got to yell at me. He goes I'll yell at you because I can and I said sir that's not going to get it. I said I want to see the Chief and he said alright I'll tell him and I, he opened the door. When he was yelling this now and he's got his secretary out there and another civilian out there also who's witnessing this and, and you know this is embarrassing to me because there is no reason to sit there and yell and, and like I said try to ugh, impose yourself upon somebody. So as I'm walking out he yells at me to get Captain or excuse me, to get Lieutenant McMann, Lieutenant Reeves to be up in his office. I didn't know what that was so I said yes sir. So I as I went down there and I got them and they went up to his office and I asked Lieutenant McMann later what was going on and he, he had an incident where he got onto Lieutenant McMann because he didn't think Lieutenant McMann had sent him the results for the um, Mall holiday Financial Report on all the officers and Lieutenant McMann told him, he said, why have I hadn't got that of course Major Murphy typed for five minutes before he addressed them. He said I sent it to you Major. He said I sent it to you twice and that's when Major Murphy pulled that up and that he did fax them to him and said ok. Never apologized to him just said you're dismissed and told him he could go bout the way he talked to me over that the more I got stewed over it and I, I went to the Chief because I, my, my RB book and standards says all you got to do is advise your chain of command that you want to see the Chief. That you want to pursue the next highest rank and that's what I did. So I went in there to see the Chief and ugh, secretary asked and I want to speak with the Chief. She said he is in a meeting right there. So I came up about every fifteen minutes, minutes and I, I was pretty upset by now and the Chief was walking and I told him I said I need to you sir and he said that ugh, he had a meeting to go to he said could I talk to Lieutenant Fleming? I said no sir I need to talk to you and he said I really need to get to this meeting. I said well sir something bad is fixing to happen and I, I've advised you and that's when he said come into my office and I told him how Major Murphy treated me. I told him that I'm, I'm forty-two years old, I got nineteen years down here. I'm soon to be forty-two in two months and I said I'm not going to be talked to like a child. I'm not going to be bullied. I'm not going to be intimidated and I'm not going to have somebody leering over the top of me like he thinks he's going to whip me and it ain't going to happen and I said might don't make right just because you out rank me. I said I, I'm not going to put up with that and then he ask me if anybody witnessed this and I said Captain Essex, so that's when he had me have a seat, get a drink of water and he called Captain Essex in. Then he called Major Murphy in and they talked. Then he me in with them and when I set down and explained to him exactly what I'm tell you Major Murphy tried to pipe up and say aw just calm down Captain Hicks and that's when the Chief said Major Murphy be quite I'm conducting this interview and I explained again what happened and the Major tried to say that I bowed up on him which was totally false lie. Then he said that this is a second time that I bowed up on him and I asked him I said well if this is the second time why didn't you report the first time and why ain't, why didn't you come to the Chief and report it and he didn't have an answer for that. So I said you can ask

6

Captain Essex and that's when the Chief said Captain Essex you're a third party tell me what happened and Captain Essex kind of nodded his head toward me and he said well I think it's not both said mostly what Captain Hicks said and I think Captain Essex was put between a rock and a hard spot right there between us and the Chief figured it out too, he said look I see what's going on here. He said Major Murphy I want you to go to your office. He said Gary I want you to go to your office. He said when I'm done talking with Captain Essex I'll call you and about thirty minutes later Mrs. Bonnie the secretary call and told me to come back up there and I think Major Murphy was leaving at that time and I walked in and set down and um, (*I forgot one part*) As I was, when he was talking with Captain Essex that's when I told um, the Chief I can't work in this environment anymore and the Chief said I tired of these complaints between Captains and Majors and he started to say Majors and I think he was going to say Lieutenants and that's when I told him, I explained to him again how he leaned over the desk at me and then Major Murphy tried to deny that, said I was exaggerating and I said that's a lie he did it and I looked at Major Murphy and I said I can't work for him anymore. I said he puts me in a hostile work environment and I'm not going to work for that man. I said I can't do it and that's when the Chief said do you understand the words you just used and I said yes sir. He said I have to take action on that do you mean them? I said yes sir and he said well ok and then um, of course then we went to our offices and that's when I came back up there. Um, he asked to call Major Dickson in and ask if I could come work for her and she said that would be fine and I've been there you know since this investigation started.

QUESTION    CHIEF W.D. DAVIS
             Ok. Let me ask you. You mentioned an incident that happened in regards to some hepatitis B shots.

ANSWER      CAPTAIN G.D. HICKS
             Yes sir.

QUESTION    CHIEF W.D. DAVIS
             Can you go over what happened in regards to that?

ANSWER      CAPTAIN G.D. HICKS
             Yes sir, um, on Thursday August twenty-third um, he got on to me about this, this memo, what it was is that ugh, we had six or seven units get out of Headquarters when they got ten-eight or fourteen-thirty hours which is two-thirty on a thirty-eight which is departmental duty and I was doing that because---

QUESTION    CHIEF W.D. DAVIS
            Let's back up. Prior to that did you talk with Major Murphy in regards to
            some hepatitis B shots?

ANSWER      CAPTAIN G.D. HICKS
            He sent me an E-mail.

QUESTION    CHIEF W.D. DAVIS
            And what did the E-mail say?

ANSWER      CAPTAIN G.D. HICKS
            It said um, Captain Hicks please take care of this.

QUESTION    CHIEF W.D. DAVIS
            And you had you still have that E-mail.

ANSWER      CAPTAIN G.D. HICKS
            Yes sir.

QUESTION    CHIEF W.D. DAVIS
            And basically what it was talking about was bring certain officers in and
            having that shot given to them is that correct?

ANSWER      CAPTAIN G.D. HICKS
            Correct, Right it was from John Carnell to him and then he forwarded it to
            me and it was ugh, six or seven officers to get their that was their sixth
            month boosters and they you know I coordinate with the nurses and the
            medics and stuff to get them down here and I'm thinking ok he said handle
            this that's the time be here at fourteen-thirty ok. So we got them out. Well
            he gets on the air and has me go to channel five. Now channel five is not a
            supervisor channel. Channel five is a utility channel used by all units for
            unit to unit con, ugh contact that the dispatcher does not interact on.
            Channel seven is the supervisor channel. So if he wanted to talk to me
            ugh, just for supervisory he'd have me go to seven but he had me go to five
            so that everyone could hear and he ask me, he said why do we have six
            units out of Headquarters on a thirty-eight and I told him. Well pursuant
            to the memo come down that um, these guys were getting hepatitis shot.
            The memo I got from you. Apparently he didn't like that answer so he said
            PX me in the office. Well I called him in the office and told him the memo
            I got and he said see me in my office, hangs up. So I had Lieutenant Reeves
            be printing me off that memo and I go up there with it and he says why do
            you have all these units out? I said sir I'm doing what your memo said
            here. He said let me see that, so I handed it to him and he says why didn't
            you reschedule these times. I said you know I been a supervisor ten years.
            I've never rescheduled times because I feel like that were working with the
            medics. We're working with the medical people to get them down here,
            therefore we're trying to put our schedule with theirs and this was sent in
            plenty of time. I said I if I'd of rescheduled it a been a damn you do damn
            you don't because then you'd said why didn't you follow these orders I
            gave you. Can't you read the memo and now you are saying that I should

8

of. You know changed it and he said well you shouldn't had them all them units out at that time. I said well sir I'll get them ten eight then. So we did. We rescheduled and got them ten eight and I told him I said will never have any other unit out at fourteen-thirty hours. I said from now on on the shoot when they get shots to come in early and then we will put in overtime and the only time they will be out at fourteen-thirty hours if it's an Internal Affair Investigation or Court and he said fine, dismissed. So I left the office then.

QUESTION    CHIEF W.D. DAVIS
You mentioned that Major Murphy had made some changes in regards to the way you, you and your officers receive misdemeanor warrants and regular warrants through the Warrant Clerk's Office. Can you explain that?

ANSWER    CAPTAIN G.D. HICKS
Yes ever since Major Murphy and, and his brother Pat Murphy been over the court system. They um, they changed a lot of things and it use to be before that you'd go in to see the Warrant Clerk and you'd articulate your probable cause and the warrant was issued. That's all the Warrant Clerk should be doing is finding if you had probable cause. Now the Warrant Clerk are trying the case, like their judges and now they're having to call Pat Murphy at home to get approval. We're having to release folks or they're having to put on the daily have to wait till we get consult with Mr. Pat Murphy to fine out if we could put them in jail or not. Which is kind of insulting to the officers. Um, we, we went around it a couple of times by going to the County and letting, and the County Magistrate say yea you got that but they came down and they said I don't know if it came from Major Murphy or the Chief but they said we couldn't do that no more. Couldn't by pass the City to go to the County, but the County didn't have no problem with our warrants.

QUESTION    CHIEF W.D. DAVIS
You mention earlier that this happened on, on occasion um, Major Murphy has gone to the Lieutenants below you to give specific orders and a assignments and by passed you.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
What, what happen in regards to that?

ANSWER    CAPTAIN G.D. HICKS
Um, let's see I had my notes written here. On December twentieth he called Lieutenant Rigsby to his office and asked about matters on the shift ugh, he told Rigsby to put Sergeant Oliver back in personnel and that's when he, he going through Lieutenants matters on the shift. I was working that day ugh, and he asked him a question if an officer got his car back, never said nothing to me on anything on that just when to the

9

Lieutenant on that.   Um, on twelve nineteen Major Murphy called Lieutenant McMann on his cell phone and wanted to know what was going on on Ann Street.  We was chasing two suspects on a code fifteen which is a purse snatching.  I again was working I was again involved in a foot pursuit and we caught um, he didn't say nothing to me.  He didn't ask me if we had a radar detail going on, on Ray Thorington and this again by passed me.  Lieutenant came to me let me know when I said well you're; you're doing what you supposed to.  Ugh, Lieutenant Ray on twelve eighteen ugh, no that's a different incident there.  On twelve nine ugh the Major contacted Rigsby again and advised him that he was taking away Fridays from second shift supervisors during the holidays.  Ugh, and what a Friday is, is an it's nothing guaranteed.  What that is; is ugh, supervisors have to come down there early.  They come down there early to make sure the work sheets done and their there about an hour early or so and they make sure people call in sick are noted on there and basically make sure the cards and everything on there.  To reward them for this or to supplement that instead of paying them overtime an hour each day its on their Fridays you let them go for four hours earlier so, three or four hours early and that way they make up for that time.  Cut down on overtime.  Um, he took the Fridays away from second shift and he only did it for second which is the shift I command.  It wasn't from first shift or it wasn't from third shift, just our shift and even after the holidays I don't think the guys still getting.  He told them just to put in overtime.  So they been putting in overtime on that.  Um, on twelve twenty-seven that's when I met with Lieutenant Ray.  He calls Lieutenant Ray in his office again I'm working and states that the about the keys for the car.  Some ideas for the keys to come up with it was a key board that we had in trying to get more ugh, control of the vehicles so an officer wouldn't just come in and grab a key that they would have to go through a supervisor and we could find out who it was and he didn't say nothing to me.  I even personally called him that day to let kind let him know I'm there and asked him about if we could use these other rooms for offices over there.  Of course he said we couldn't but I was there that day but he never discussed anything with me about the keys he went through the Lieutenants.  So those three times right there that I documented are just ordinary shifts stuff that should have been through me that didn't go through me, went through the Lieutenants.  Then I'm having to get my instructions from the Lieutenants.

QUESTION   CHIEF W.D. DAVIS
Let me ask you this, you mentioned that you worked part time on your off duty at Beasley.

ANSWER      CAPTAIN G.D. HICKS
Yes sir.

QUESTION   CHIEF W.D. DAVIS
Correct?

ANSWER      CAPTAIN G.D. HICKS
Yes sir.

QUESTION   CHIEF W.D. DAVIS
You mentioned an incident that happened over there recently when you got called in. Could you explain to me what happened with that?

ANSWER     CAPTAIN G.D. HICKS
Yes sir it was on December thirtieth which was a Friday. Um, that's my off day. Myself and Captain Wilson both worked down there doing off duty security for them and basically all you do is make sure that the folks get to the parking lot you know they might get hurt. Nobody to harass them or rob them or anything. I got a call on my Link at ugh, twelve forty-five hours from the Major and all he said was come to my office; that was it and I you know not if you're tied up or nothing just come to my office. Yes sir so I get there and it's about –

QUESTION   CHIEF W.D. DAVIS
Once again this is your off day.

ANSWER     CAPTAIN G.D. HICKS
Yes sir.

QUESTION   CHIEF W.D. DAVIS
You're off duty working another job.

ANSWER     CAPTAIN G.D. HICKS
Right, he didn't ask if you could come, he didn't ask if you were out of town or nothing he just said come to my office. So I got there and it's about one o'clock and he walks by and he looks at me and you can tell he's pissed off and he's got an Internal Investigation in his hand because you can see the confidential part on it and he says sir, is Captain Essex here. No sir, he walks on about thirteen-thirty hours, one-thirty Captain Wilson comes in and it's his off day too because he was working the other building down there and he says what's going on and I said you got me I don't know. When the Major walked by says ya'll can have a seat. Well these are benches that are covered with sheet rock dust and construction materials, saws, and all this and I'm not going to sit in there and get my uniform soiled. So I just stood. He didn't offer us to go in his office, didn't offer us to go in the secretary's he just wanted us to stay out in the hallway. So he goes back inside and about thirteen-forty hours ugh, Captain Essex comes in after Captain Essex was off um, he'd been out on sick day with a pink eye. I think he caught that from his daughter. He's in civilian clothes and he sees me and Captain Wilson there and he says what's going on. I don't know and he says well come on in here and I said I don't think the Major wants us in there, I think he just wants to talk to you. So he goes in there, Major comes out again, got that file in his hand and looks at me and Captain Wilson and says it's bad gentlemen, it's bad.

QUESTION   CHIEF W.D. DAVIS
Now Major Murphy is the one that came out and said that.

ANSWER     CAPTAIN G.D. HICKS
Correct.

QUESTION   CHIEF W.D. DAVIS
Ok.

ANSWER     CAPTAIN G.D. HICKS
And he kept walking and you know we were worried what's going on now you know and we're just standing there, he comes back through he goes in his office and at fourteen hundred hours which is two o'clock he has Essex come out and get Captain Wilson and says come on in, so they are in there talking and they leave me out in the hall still. At fifteen hundred hours is when they called me back. Now I've been out in that hall standing since thirteen hundred hours. I've been standing in the hallway two hours, just standing there like a, a kindergartner standing in front of the principals office. People walking by and looking and it's kind of embarrassing you know you just told me to stay out there. So he calls me in and what it was about was a misunderstanding that he had on, on a statement from Sergeant Oliver and he thought we was trying to undermine him, which we wasn't.

QUESTION   CHIEF W.D. DAVIS
Well let's, let's stop just a moment. What type of statement did he have?

ANSWER     CAPTAIN G.D. HICKS
This was an Internal Affairs Investigation that he wanted on Sergeant Oliver because Sergeant Oliver he had, he had signed a, a memo from him that we would not say the word send the nearest available unit. He wanted you to say anything but that and Sergeant, it hadn't been too long since we had signed it and I, I wasn't working that evening Lieutenant McMann had told me about it and he said Sergeant Oliver it was about ten o'clock and was entering information in the daily, we had a lot of stuff going on they were looking for units and Sergeant Oliver said that you know sent the nearest available unit and Major Murphy heard it and got mad and called. He felt that there was deliberately disobeying his direct order but after talking with Lieutenant McMann, Sergeant Oliver was distracted on putting information on the daily and it's kind of a knee jerk reaction. He wasn't trying deliberately disobey nobody he was just trying to, to get the dispatchers problem covered so he could finish what he was doing because third shift was coming in to, to get their stuff on the computer. Well one person being in the bed at a time. So the Major called Lieutenant McMann and told him he wanted to address that and wanted, wanted Sergeant Oliver, Charlie written up. So that's what Lieutenant McMann did and he told him he said well Major called and gave me an order you know and he felt that that was the truth that he was telling the man. Ugh, Lieutenant McMann would have probably would have handled just available being the fact that it was not an intentional disobedience of order that he felt and,

12

and I, I trusted Lieutenant McMann's opinion. Well number one he was the one there and, and two he's been a supervisor for awhile. So um, when he told me that's what he had to do I understood? Well then he said that he got a note from the Major one or two days later that was resending the counseling form and was going to do an investigation on Charlie. Major wanted an investigation because he felt Charlie as deliberately disobeying him. Well this was a result of Sergeant Oliver's statement and, and what was what he was upset about was the fact that Captain Wilson had told me that he needed to talk to Sergeant Youngblood. Now I relayed that message to Sergeant Oliver. I don't know what he needed to Sergeant Youngblood about. I didn't know if somebody else might have said it I didn't know if, if he did I didn't think he did because I never heard Youngblood. I never heard nobody say that but I'm just relaying the words to him. I wasn't trying to undermine nobody, myself or Captain Wilson on trying to, to disobey anything on that. We were supporting what the Major said it's his division we were doing what we were told. Well Major thought we was undermining him. I said no that's not what the case was and I explained that to him. He said oh ok and he was he calmed down after that. Well he calls Lieutenant McMann in and the day before we had a ugh, a confusion of vehicles because we really don't have a whole lot of cars right now that could supply the, the men that we need for the units out there. We've had vehicles that have been wrecked and we've had folks, vehicles that had been um, discontinued and anyway ugh, first shift sometimes have to borrow from second, second from third whatever. So the officers looking for the vehicles so there was about three or four the day before that they was trying to find cars and they didn't sound real good on the air you know so we told them next time make sure that they find a car for they get them ten eight. That day went smooth and it was Lieutenant McMann's first day as a shift commander and he's thinking hey you know Major comment may he did a good job. So he calls Lieutenant McMann in and he sees myself, Captain Essex, Captain Wilson setting there and he knows it's Friday the off days so he, he knows it ain't too good. Well um, Lieutenant Mc (*excuse me*) Major Murphy called Lieutenant McMann behind his desk and he hands him this Confidential Internal Affairs Document and not only does he tell him to read from this he says read aloud from this. So he has him read aloud which was Sergeant Oliver's statement and Lieutenant McMann didn't give a statement or none of that. So he reading aloud from this and he says did you tell him that I told you to write him up? He said yes sir. Why did you say that? Because you did. You need to man up and assert your own leadership, your own responsibility. He said sir, I, I, resent that, he said I, I not, well he didn't say I resent that. He said sir I don't appreciate that. He said because ugh, I that's no way saying I'm not a man or not and I think Major Murphy realized what he said and goes why I mean you need assert yourself on there and you know it embarrass Lieutenant McMann and Lieutenant McMann trying to say hey that's not a reflection of leadership bad on my part I was just being honest. He said from now on if I tell you to do something you just make it sound like it comes from you and he told all of us that and he dismisses Lieutenant McMann after he chews him out and he'll admits to us that he got too loud with him ugh, and this that

13

conversation had Lieutenant McMann should have been just between him and Lieutenant McMann but he didn't front of three other Captains and embarrassing Lieutenant McMann.    Lieutenant McMann was pretty aggravated about it.

QUESTION    CHIEF W.D. DAVIS
Ok.  Captain Hicks you mentioned several people that you feel like could give me information in regards to this incident, the incidents that we discussed today and um, possibly other incidents dealing with Major Murphy.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Um, you mentioned Lieutenant Caulfield is that correct?

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Major Briscoe.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Captain McQueen.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Major West.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION    CHIEF W.D. DAVIS
Sergeant King.

ANSWER    CAPTAIN G.D. HICKS
Sergeant J.E. King yes sir.

QUESTION    CHIEF W.D. DAVIS
Lieutenant Loria.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

14

QUESTION  CHIEF W.D. DAVIS
Captain Essex.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Captain Macaw.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Major Mitchell.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
And Major Dickson.

ANSWER    CAPTAIN G.D. HICKS
Yes sir.

QUESTION  CHIEF W.D. DAVIS
Is there anybody else that you feel like I need to talk to?

ANSWER    CAPTAIN G.D. HICKS
Um, Major Thuther would be a good one too he's retired now but he also
worked for him.  Um, Major Murphy deals with a leadership style that he
likes to instill fear and intimidation.

QUESTION  CHIEF W.D. DAVIS
How do you know that?

ANSWER    CAPTAIN G.D. HICKS
Because he's tried it with me and he does it with Captain Wilson.  Um, I
know that's the leadership style he uses with Major Briscoe.  When Briscoe
was his Captain.  Um,

QUESTION  CHIEF W.D. DAVIS
Have you ever heard him say that or anything in relation to that?

ANSWER    CAPTAIN G.D. HICKS
When I first got promoted to captain I went to his office he told me that
when they quote "come to his office or my office to quake in their boots"
and I don't agree with that.  I said why is that?  He said well they ought to,
you ought to instill fear into them and I don't lead by that and I told him
that.  I like for folks be feel that they come and talk to me.  You can be a
leader without being a, a tyrant and I feel that that's his style.  Ugh, he, his

15

leadership is that he is right because he is the Major and there's no other line. If you reach a different conclusion you're wrong and just because you reached a different conclusion I'm going to put an investigation on you and that's, that's what he does.

QUESTION   CHIEF W.D. DAVIS
Is there anything else that you feel like I need to know in regards to this incident or this relationship, working relationship?

ANSWER   CAPTAIN G.D. HICKS
I think that Major Murphy leads by um, not only does he create a hostile work environment and creates intimidation and fear for people feel reprise or they feel retaliation but he, it's severe gruvasive the atmosphere he creates. I feel that ugh, it is not only affected me but affected the other shift commanders. Ugh, I noticed it affected --?-- assignments because I was passed over once for first shift commander not asked he just told me I was going to stay where I'm at. Then I was passed over the fixing to make promotion February tenth my understanding is a new captain is going to first shift and that the might offer it to me later but from my understanding Lieutenant Reeves will be his acting shift commander right now second shift. Said the Major told him that I'm staying right where I'm at, on loan to the desk. Um,

QUESTION   CHIEF W.D. DAVIS
So you feel like the problems that you've had with Major Murphy is beginning to hurt your advancement in the career because you feel like Major Murphy is holding you back.

ANSWER   CAPTAIN G.D. HICKS
Absolutely, he moves Sergeant Johnson from third shift to second. He told me that I had to put him on bottom of seniority. This was situation involving a Jubilee that he didn't like the way that Sergeant Johnson answered him on this. Ugh, and he also put out a memo, I don't have that but Captain McQueen did that stated that he wanted the Sergeant Johnson was going to be on his preverbal shit list. Um, he practices retaliation. There's you can figure that man out, he goes from one extreme to the other. Ugh, there is no affinitive statement of what goes on the daily work format but if you mention something you're going to hear it. Captain Mc ugh, Wilson told me that they didn't they missed a address on a street and also that um, I want to say there's something that was omitted from there and he told him that oh it wasn't omitted he didn't like the fact that the business the statement that stated that there was no the alarm system was activated and that we responded to it. He didn't like that in the middle of the daily he wanted that at the beginning and he told Captain Wilson that he was going to quote "hammer his ass" over it.

QUESTION   CHIEF W.D. DAVIS
Has there ever been a part where you, he, you felt like he was threatening you other than the time in his office when he was over you?

16

ANSWER    CAPTAIN G.D. HICKS

He's, he's said it to me and other captains that he was going to take bars and the point that he made when he said was going to put an investigation on me and he kicked me out of the office. He said to me in front of Captain Essex that I was incompetent that I didn't deserve to be a shift commander and that he was going to bust me to Lieutenant. He's called me several times at the house to get on to me about even when I'm not working. Um, this is created even more problems I had with high blood pressure. Two days I had to go home when the Firemedics checked me on my blood pressure that was one-ninety-two over one-twenty-four and the Firemedic told me I was at stroke level. Since I've been moved to the desk and I work for Major Dickson my blood pressure has been one-eighteen over seventy-eight best it's ever been. Now I don't say that you got to agree with the boss all the time I'm old enough I've been here long enough I know that's not going to happen but you treat folks fairly. You treat them like adults and you treat them the way you want to be treated. Um, there's no other Major down there that, that treats folks the way Major Murphy does and in my opinion he's the reason why it's hard to retain the quality people that we have but I'm not going to be bullied and intimidated and I, I not going to be put in an atmosphere where I'm constantly my stomach is upset because I don't automatically please him at his whim.

QUESTION    CHIEF W.D. DAVIS

Captain Hicks is there anything else that you would like to?

ANSWER    CAPTAIN G.D. HICKS

Just the fact that um, the investigation he did put on me um, one was unfounded and he to be told by the Chief to let me know that the final aspects of that. Um, the other one was punishment was ruled down by the' the ugh, accident (excuse me) trial board I'm waiting the Chief's final approval on that but that investigation was over omission of entry on the daily and first shift has done that everybody omits stuff every once in awhile and their shift commander not been brought up on charges. I felt the reason he did that is because I didn't discipline the Lieutenant hard enough the way he wanted it. The Lieutenant who was responsible for putting it on there was two Lieutenants looked at that card. One was on military leave and other was fixing to retire in two weeks and I the disciplinary action that I did is I did him a verbal counseling. He told me he messed up and I understood that and I wasn't going to put disciplinary action written on there when he leaves in two weeks. I felt the verbal was good enough. That's what we've done before. Ugh, when third shift had an omission on there they wrote up the supervisor that didn't put it on there but nothing happened to the shift commander and that day was Lieutenant Brown so they didn't do nothing so he, he singled me out to put this, this um, Departmental Action on and I feel he's doing that holding me back because I had seniority on, on one of the Captains that got Assistant Division Commander I don't have sour grapes on that because he's a good man and he deserves that, that's fine but I feel that I was passed over this

17

is going to be twice now for first shift commander and I feel that Major Murphy doing it intentionally.

QUESTION  CHIEF W.D. DAVIS
          Anything else?

ANSWER    CAPTAIN G.D. HICKS
          No sir not that I can think of.

QUESTION  CHIEF W.D. DAVIS
          Captain Hicks you are aware that this statement is being taped is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Absolutely sir.

QUESTION  CHIEF W.D. DAVIS
          You are giving this statement voluntarily is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.

QUESTION  CHIEF W.D. DAVIS
          You have been read your Internal Investigation Warning is that correct?

ANSWER    CAPTAIN G.D. HICKS
          Yes sir.


          CHIEF W.D. DAVIS
          Therefore that's going to conclude this statement. The ending time on this statement is sixteen twenty-nine hours .

18