IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

2008 JAN -4 P 12: 49

| | | |
|---|---|---|
| GARY HICKS | ★ | |
| | ★ | |
| Plaintiff, | ★ | |
| | ★ | |
| VS. | ★ | CIVIL ACTION NO.: |
| | ● | 2:06-CV-1017-WKW |
| THE CITY OF MONTGOMERY | ★ | |
| | ★ | |
| and | ★ | |
| | ★ | |
| CHIEF ARTHUR BAYLOR | ★ | |
| | ★ | |
| Defendants. | ★ | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for Plaintiff

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:   334/264-8118
Facsimile:   334/263-7598
Email:      jbb@brannanlaw.com

## TABLE OF CONTENTS

Table of Authority . . . . . . . . . . . . . . . . . . . . . . . ii

Plaintiff's Brief in Opposition to Defendant's
    Motion for Summary Judgment . . . . . . . . . . . . . . . . 1

    Statement of Facts . . . . . . . . . . . . . . . . . . 1

    Argument . . . . . . . . . . . . . . . . . . . . . . . . 15

Affidavit of Captain Gary Hicks . . . . . . . . . . . . . . . . 2

Deposition Transcript of Chief Arthur Baylor . . . . . . . . . 3

    Pages 1, 17, 22, 32, 36, 42, 46, 47, 52, 59, 73, 74, 46, 47,
    22

Deposition Transcript of Celia Dixon . . . . . . . . . . . . . 4

    Pages 1, 15, 18, 19, 20, 22, 23, 24, 25, 26, 28, 29, 32, 34,
    35, 36

Plaintiff's Evidentiary Submission in Opposition
    to Defendant's Motion for Summary Judgment . . . . . . . . 5

Plaintiff's Response to Defendant's Motion for
    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 6

i

**TABLE OF AUTHORITY**

**PAGE/TAB**

Affidavit of Captain Gary Hicks . . . . . . . . . . . . . . Tab 3

Berdin v. Dugin, 701 F.2d 909, 914 (CA 11 cert den)
    464 U.S. 893 (1983) . . . . . . . . . . . . . . . . . . 25

Brown v. Ft. Lauderdale, 923 F.2d 1474, 1480
    (CA 11 1991) . . . . . . . . . . . . . . . . . . . . . . 25

Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313,
    1318 (11th Cir. 2005) . . . . . . . . . . . . . . . 15, 16

Garcetti v. Ceballos, 126 S.Ct. 1951, 1958 (2006) . . 16, 17, 19

Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410,
    415-16 (1979) . . . . . . . . . . . . . . . . . . . . . 17

Jackson v. Gammon, 342 F.3d 105, 114 (2nd Cir. 2003) . . . . 19

Mitchell v. Hillsboro County, 468 F.3d 1276, 1282 . . . . 16, 17

Monel v. Department of Social Services, 436 U.S. 658
    (1978) . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Moore v. City of Kilgore, 877 F.2d 364, 371-72
    (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 19

Pembaur v. City of Cincinnati, 106 S.Ct. 1292 (1986) . . . . 25

Pickering v. Board of Education, 391 U.S. 563 (1968) . . 20, 21

Rankin v. McPhearson, 483 U.S. 378 (1987) . . . . . . . . . 17

Rookard v. Health and Hospitals Corp., 710 F.2d 41,
    45-46 (CA 2, 1983) . . . . . . . . . . . . . . . . . . . 25

Transcript of Deposition of Celia Dixon . . . . . . . . . Tab 5
    Pages 1, 15, 18, 19, 20, 22, 23, 24, 25, 26, 28, 29, 32, 34,
    35, 36

Transcript of Deposition of Chief Arthur Baylor . . . . . . Tab 4
    Pages 1, 17, 22, 32, 36, 42, 46, 47, 52, 59, 73, 74, 22

Vila v. Pardon, _____ F.3d _____, 207 WL 1158227 at
    *4 (11th Cir. 2007) . . . . . . . . . . . . . . . . 15, 16

ii

## STATEMENT OF FACTS

Captain Gary Hicks testified in his Affidavit that he is a Captain with the City of Montgomery's Police Department. Captain Hicks' ultimate supervisor, who is the final policy maker for the City of Montgomery Police Department, is Chief Arthur Baylor. Hicks has been assigned to the patrol division and at all times incident to the Complaint filed against Major Kevin Murphy, he was supervised by him. During his time under his supervision, Captain Hicks stated that Major Kevin Murphy treated the vast majority of persons assigned to the patrol division in an unfair and abusive way. His actions in supervising the employees assigned to the patrol division were contrary to the practices and policies of the Montgomery Police Department. There was mismanagement and corruption of the overall morale of the men due to the mismanagement and undue stress placed upon them by Major Murphy. Captain Hicks further testified that Murphy's actions caused the men to be reactive in their police duties, instead of proactive. This morale problem and fear in the men to be proactive caused a public safety concern, as the men were not efficiently going about their duties, afraid of making a mistake and being punished by Major Murphy. The men in the patrol division felt that the men's self-initiated calls for service were scrutinized by Major Murphy, and they were admonished continuously for mistakes or errors that did not exist. The entire division of men was constantly trying to

1

avoid retribution from Murphy. Major Kevin Murphy was confrontational and abusive to Captain Hicks, and to numerous others within the division. The morale within the division, due to Major Kevin Murphy's management, effected the efficiency of the division and the safety of the public. It was not a requirement of Captain Hicks' employment, nor a part of Captain Hicks' job description to complain or seek some form of grievance against Major Kevin Murphy. He was not compelled to do so as a part of his regular job duties as a Captain of the Montgomery Police Department, but he complained because the severe morale problems in the patrol division had a dramatic effect, in his opinion, on public safety. Captain Hicks made his complaint as a private citizen, but did so within the department rather than going public, even though it was a matter of public interest. There was an investigation that lasted over six months of Major Kevin Murphy as a result of Captain Hicks' complaint. Over 30 officers gave statements complaining about Major Kevin Murphy. Major Kevin Murphy was close to Chief Arthur Baylor, and since this investigation, Chief Arthur Baylor has been instrumental in having Major Kevin Murphy promoted to Deputy Chief and the rank of Lieutenant Colonel. The investigation of Major Kevin Murphy was conducted by the Montgomery Fire Department, and the individuals who gave statements were advised that Major Kevin Murphy would not be made aware of the substance of their statement, and that was not

2

true, as the Chief of Police provided those statements to Major
Kevin Murphy. When Captain Hicks made his complaint about Major
Kevin Murphy, he was assigned from the patrol division to the desk.
That assignment was commonly used to place officers who were under
investigation.  Major Kevin Murphy, who was the person who was
under investigation, was allowed to remain as the commander of the
patrol division.  While Captain Hicks was assigned to the desk,
Major Kevin Murphy told people that there was a big investigation
going on, and Captain Hicks has been assigned to the desk. He did
not relate that he was the one being investigated and that Captain
Hicks was the complaining party.  The Chief of Police had assigned
Captain Hicks to the desk, and while he remained assigned to the
desk, it gave the appearance that he was guilty of misconduct.
During the time that Captain Hicks was assigned to the desk, an
officer of the Montgomery Police Department was arrested for child
abuse, and the department released to the media that pending the
prosecution, that officer would be assigned to the desk, further
giving the appearance that Captain Hicks had committed wrongdoing.
While Captain Hicks was assigned to the desk, there was another
Montgomery police officer who had been accused of rape, and while
that was being investigated, he was assigned to the  desk, further
giving the appearance that Captain Hicks was there because he had
committed some form of wrongdoing.  Normally, the person under
investigation is moved to the desk, not the complaining party.

3

After the desk, the Chief had Captain Hicks assigned to the jail with no assigned duties. Major Kevin Murphy was never removed from his position, even though the investigation revealed a considerable number of officers complaining about his actions. While Major Kevin Murphy was under investigation, because of the close relationship between Murphy and the Chief, Murphy was in charge of the entire Police Department during absences of the Chief. Prior to Captain Hicks' complaint of Major Kevin Murphy and since that time, he has consistently stayed after midnight and sometimes until 1:30 a.m., when his shift ended at 11:00 p.m. Captain Hicks has always checked and re-checked the daily reports, both factually and grammatically. On numerous occasions, Major Kevin Murphy would call Captain Hicks at his residence from 7:00 a.m. to 7:30 a.m. to proverbially berate him over minor, unimportant grammar errors in the daily report made by individuals he supervised, such as the use of "was" and "were" in a sentence. Major Kevin Murphy also sent Captain Hicks and other supervisors threatening email over misspelled words in the daily log, stating that he would use severe disciplinary action against them if they didn't "tighten up." He also sent Captain Hicks and other subordinates threatening emails where he quoted Erwin Rommell. Once the six month investigation was completed, Captain Hicks was called to the Chief's office, along with Major Kevin Murphy. The Chief advised that the investigation was concluded and no action was going to be taken.

4

From the statements the Chief made during that meeting, it was obvious that Major Kevin Murphy had reviewed the file of complaints against him, even though during the investigation, the officers giving information had been advised that he would not receive such. At that time, Captain Hicks advised the Chief and Major Kevin Murphy that he did not feel that he could work in his division after the investigation and requested that he be transferred. At first, Chief Baylor advised that he would not entertain the transfer. During Captain Hicks' meeting with Chief Baylor and Major Kevin Murphy, Captain Purvis Fleming was also in the office, and he is the first person to suggest that Captain Hicks work in the jail as an administrator and liaison position over Warden Collins. The Chief made no response to that statement, and then advised Captain Hicks to type the letter as soon as possible. The Chief stated that Captain Hicks' position would be a "Super-Supervisor." Captain Hicks asked Chief Baylor how soon he needed to turn the request, and he advised him, "As soon as possible." Captain Hicks prepared a request for transfer, seeking to be the administrator of the jail, which would be the highest ranking official within the jail. Captain Hicks presented that to his supervisor at the time, Major Celia Dixon. She presented it to Chief Arthur Baylor. Upon receipt, Chief Arthur Baylor advised Major Celia Dixon that he did not know what this was about and that Captain Gary Hicks was not going to be transferred. The Chief

5

later denied this to Major Dixon and stated that he would not accept Captain Hicks' letter. Captain Hicks' complaint to the Chief concerning Major Kevin Murphy was not limited to his work conditions, but the overall morale problems for the entire patrol division, and that they were to such an extent, and that the patrol officers were so fearful of retribution for trivial mistakes, that they were not efficiently doing their job to protect the public. To Captain Hicks, this was a matter of great public concern, and if he had made it known to the media or the public in general, it would have caused the public to be fearful and to lose trust of the Police Department. Captain Hicks went through the channels, but his seeking redress for the actions of Major Kevin Murphy to the entire patrol division of the Police Department was in his capacity as a citizen, and was over public concern for the safety of those who depended on the patrol division of the City of Montgomery Police Department. Captain Hicks went through the proper channels and requested of the Chief to be allowed to speak with the Mayor of the City of Montgomery. Captain Hicks received permission to do so and met with the Mayor. Captain Hicks advised the Mayor of his assignment in the jail and that the safety of the City, which is a matter of public concern, was compromised, as there were few Captains now assigned to the patrol division, and that the division was mismanaged and the morale of the men was compromised to the extent that the public was not being adequately protected on the

6

street.    The Mayor advised Captain Hicks that he would be
transferred and would not be required to work under supervision of
Major Kevin Murphy.  Chief Arthur Baylor again called Captain Hicks
to his office and was visibly upset with him, and advised that he
would be assigned to the jail, that he would not be the jail
administrator, and that he would be supervised by a civilian
employee, the assistant warden.  Chief Baylor complained and said
to Captain Hicks, "You have gone above my head."  Captain Hicks was
not given any job responsibility when he was transferred to the
jail, and he was given little or nothing to do.  While assigned to
the jail, Captain Hicks was put in a room to be treated as an
office that had storage boxes and stored furniture.  There was no
typewriter or computer.  The desk had two broken drawers and the
automobile that was assigned to Captain Hicks was taken from him,
and he was the only Captain with the Montgomery Police Department
who was not assigned a vehicle.  The jail inmates had traditionally
hung their dirty laundry on the bars of the jail, which were
located right outside the area that Captain Hicks was given as an
office, which was more of a storage room with a sink.   After
receiving this assignment, Captain Hicks again asked to be allowed
to go to the Mayor.  Chief Arthur Baylor denied the request without
giving Captain Hicks a reason, other than he would not allow him to
go over his head again.  On one occasion, Captain Hicks had come
downstairs from the jail in order to enter certain information upon

7

the computer, and Chief Arthur Baylor saw him at that time, and advised Captain McLeod, the Assistant Division Commander of the Administrative Division, that he was not to leave the jail, and after that a memo was issued that stated that Captain Gary Hicks was "confined" to the jail. There were available Captain slots in a number of areas within the Montgomery Police Department that were not filled, but Captain Hicks remained assigned to the jail, reporting to a civilian employee in a capacity that, as far as the chain of command, would be equal to a Corporal or Sergeants position. Captain Hicks was denied the right to be assigned to one of the available Captain slots. Captain Hicks was not in an assigned slot working in the jail. Captains who had less time and grade than Captain Hicks received assignments for Captains, while he remained assigned in an undesignated slot in the jail. Captain Hicks' work hours were changed to be 4:00 p.m. until 1:00 a.m., and there was no other designated shift for those hours within the Police Department. Captain Hicks was the only employee of the Police Department working that designated shift. Those hours made it impossible for Captain Hicks to have any time to spend with his children during the week. When Captain Hicks complained about this assignment, Chief Arthur Baylor advised him that, "This is what you asked for." Captain Hicks told him that he did not ask to be assigned to the jail, reporting to a civilian, but rather to be the administrator of the jail as a Captain working a normal shift, and

8

only asked for that because it had been suggested by the Chief as the alternative to being assigned to work under Major Kevin Murphy. Mayor Bobby Bright, by and through his assistant, Michael Burdell, contacted Captain Hicks and had him report to him.  In that meeting, the Mayor said he had heard through a confidential source that Captain Hicks was dissatisfied with the jail assignment. Captain Hicks told the Mayor that he was dissatisfied and that he was being retaliated against.  The Mayor told Captain Hicks he would talk to the Chief and would call him back.  The Mayor did not call Captain Hicks back, but he received word that he was being assigned back to Major Kevin Murphy's division and would be required to report to another Captain who was junior to him.  While the Plaintiff was "confined" to work in the jail, a number of lieutenants were promoted to Captain, and two newly appointed Captains junior to Captain Hicks were promoted to Assistant Division Commander positions.  Therefore, Captain Hicks was passed over for these assignments and such was retaliation.  Captain Hicks believes Chief Baylor retaliated against him because he complained and caused Major Kevin Murphy to be investigated.  See Affidavit of Gary Hicks.

Arthur Baylor testified that he was the Chief of Police and that he did not need the Mayor's approval to make a transfer of a member of the Police Department.  (Baylor deposition page 17, lines 8-10)  He further testified that as to policy making authority for

9

the City of Montgomery Police Department, he was the final policy maker. (Baylor deposition page 22, lines 8-10)   Chief Baylor testified that at the time Captain Hicks complained about Major Murphy, he was a shift commander in patrol, and that upon complaining, he was loaned out of Murphy's division to the Administrative Division because he said he could not work for Murphy. The Chief stated that he called Major Celia Dixon to his office, as she was over the Administration Division, and he asked her if Hicks could go to work for her. Hicks stated that he could. He further stated that he left it up to Major Dixon to determine where Hicks was going to be assigned. (Baylor deposition page 32, lines 9-20)   He stated that he did not tell her to put Hicks in the jail, but gave her the option to use him where she wanted to. (Baylor deposition page 32, lines 21-23) Major Dixon's testimony was in conflict with the Chief's. She stated that she was directed by the Chief for Hicks to go to the jail, and that there was no slot for a sworn supervisor to be added to the jail personnel. (Dixon deposition page 15, lines 10-22) Major Dixon also testified that there was not any work assigned for Hicks to do in the jail and that he had to make work, and he found things that needed to be corrected within the jail, so he had to find work for himself to do.   She further stated that the division would have run fine without putting him in there. (Dixon deposition page 18, lines 16-23, page 19, line 1) She testified that there was an occasion when

10

Hicks had come downstairs from the jail and the Chief made a comment that he was not supposed to be there, but was supposed to be in the jail. She stated that the Chief said to use the term to her that Hicks was "confined to the jail." (Dixon deposition page 19, lines 2-23, page 20, lines 1-7)  Dixon stated that Hicks complained about reporting to someone who was not a sworn officer, as he was required to report to the Warden of the jail.  (Dixon deposition page 22, lines 12-15)  She also testified that Hicks was required to use an office that had a sink and storage items in it, and that she did not have any input in putting him in that office. (Dixon deposition page 23, lines 4-13)  She stated that Hicks complained to her about the "office," and that it kind of became a running joke.  Hicks told her could work wherever, trying to make the most of it.  She stated that once Hicks was transferred to her division, he did not have an automobile.  She further testified that he did not have an automobile when he was put on loan to her, and that as far as she knew, he was the only Captain who did not have an automobile assigned to him.  (Dixon deposition page 23, lines 20-23, page 24, lines 1-17)  Although the Chief testified that, Major Dixon had been saying, "I need help in the jail," and so forth and so forth, and the Chief further said that he asked Major Dixon, "Can you use him," referring to Hicks, and she said "Yes," because she was having some problems and she needed supervision.  (Baylor deposition page 36, lines 4-21)  Baylor

11

further stated "Gary Hicks said, 'Yes,' he wanted to go to the jail, and I put him in the jail under Major Dixon at his request and at her request." But Major Dixon testified that she did not want another supervisor added to the warden and his assistant, Mrs. Brantley. What she was looking for would be supervisory shift work, Corporals and Sergeants, not a Captain. She was not asking for a third supervisor in the jail, other than Mrs. Brantley and Warden Collins. (Dixon deposition page 25, lines 18-23, page 26, lines 3-8) Although she had other places she might could use Hicks, she testified that when he was given to her, she was instructed that he was to go to the jail. (Dixon deposition page 26, lines 17-19) Hicks told Major Dixon that he saw being in the jail as a punishment, and he complained that he felt it was a punishment. He told her he felt he was being retaliated against for complaining about Murphy. He told her during this time, he felt Murphy was causing major morale problems in his division, and that the morale problems that Murphy caused were effecting the efficiency of the division. Major Dixon felt that putting Hicks in the jail was just busy work, something to stick him in to find some place to stick him, and that there was not a need that he was filling in the jail. She further testified that she was aware of other places in the department where Hicks' ability could have been of better benefit to the Department. (Dixon deposition page 28, lines 9-23, page 29, lines 1-20) Major Dixon also testified that

12

she had made a recommendation for Hicks' hours in the jail, which would have been more beneficial to Hicks, but the Chief and Major Murphy made the determination that his hours would be from 4:00 in the evening until 1:00 in the morning. (Dixon deposition page 32, lines 2-23)   Major Dixon stated that she believed that Hicks was being punished and retaliated against because of complaining about Murphy, and that she did not feel that the Chief was trying to move Hicks for the betterment of the Department, but rather was trying to move Hicks because he wanted to punish Hicks. (Dixon deposition page 34, line 23, page 35, lines 1-11)   Dixon also testified that she had served time in the patrol division, and that if the officers in the patrol division are managed and treated unfairly in the way they are supervised, and a morale problem existed, that became a problem for the public and the City of Montgomery, and that if the patrol division was being run inefficiently because of morale problems, it was a matter of public concern to the citizens. (Dixon deposition page 35, lines 12-23, page 36, lines 1-7)   Chief Baylor denied that he had retaliated against Hicks (Baylor deposition page 42, lines 17-22), but that he knew if he retaliated against someone for exercising their First Amendment right to say something and complain about something, that law was clearly established and it would be against that law for him to retaliate because of them making a First Amendment statement.   He also testified at that time that he was not the person who made the

13

assignment of Hicks to the jail, but that was contrary to Major
Dixon's deposition testimony. (Baylor deposition page 46, lines
10-23, page 47, lines 9-16) The Chief testified that the position
that he claims Dixon put Hicks in was not slotted for a Captain,
and was actually not a slotted position. (Baylor deposition page
52, lines 20-22) Chief Baylor testified that even after the
investigation of Murphy, he made the recommendation to promote
Murphy to Lieutenant Colonel, and the Mayor took that
recommendation. (Baylor deposition page 59, lines 6-9) Although
Major Dixon had testified that she had nothing to do with placing
Gary Hicks in the storage room with the sink as an office, the
Chief testified that Major Dixon assigned him to that office, and
that she came to him and said, "We found Gary an office," and the
Chief said that it befuddled him because he was wondering where
they found an office, because they were short of offices in the
Police Department. The Chief stated that Dixon told him that they
were going to put him in the nurse's office or something, and they
said "We are going to get that cleaned out." He told them OK.
Major Dixon states that she had no input on putting Hicks in that
office. (Baylor deposition page 73, lines 14-23, page 74, lines 1-
10)

14

## ARGUMENT

Gary Hicks, in his Complaint, claims that Chief Arthur Baylor of the Montgomery Police Department, violated the First Amendment by causing his transfer to a job without assigned duties, his refusal to assign him to a position where he could be a productive supervisor, his requiring him to report to junior officers, and general harassment in retaliation for his Complaint about the way he and all other members of the patrol division were treated. Treatment which caused a general morale problem within the division, and effected the division's efficiency and, therefore, the safety of the public. The law is well established that a public employee may not be punished in retaliation for speech protected under the First Amendment. *Vila v. Pardon*, _____ f.3d _____, 207 WL1158227 at *4 (11th Cir. 207). In order to set forth a claim of retaliation, a public employee must meet a three-pronged test. The employee must show: (1) that he was speaking as a citizen on a matter of public concern, (2) that his interest as a citizen outweighed the interest of the government as an employer, and (3) the speech played a substantial or motivating role in the adverse employment action. Once the Plaintiff establishes these elements, the burden shifts to the Defendant to prove that it would have made the same adverse employment decision absent the employee's speech. See *Cook v. Gwinnett County Sch. Dist.*, 414 f.3d 1313, 1318 (11th Cir. 2005). The first two elements of the

15

three-pronged test are issues of law. _Vila,_ f.3d at _____, 2007 WL
1158227 at *4.  The third and fourth elements are issues of fact.
_Cook_, 414 f.3d at 1318. A public employee's speech is protected if
the employee was speaking as a citizen on a matter of public
concern.  _Vila_, _____ f.3d at _____, 2007 WL 1158227 at *4.  In
making the determination of whether or not the speech is a matter
of public concern, one must look at the content, form and context
of the speech.  _Mitchell v. Hillsboro County_, 468 f.3d 1276 at
1282.  The Supreme Court has recently stated that the inquiry is
whether the employee is making the protected statement as a citizen
on matters of public concern.  _Garcetti v. Ceballos_, 126 S.Ct.
1951, 1958 (2006).  See also _Vila_ supra.  The government, as an
employer, may not use the employment relationship to restrict the
liberties that employees would enjoy in their capacities as private
citizens.   Just because a person becomes an employee of the
government, they do not relinquish their rights of citizenship.

The content of Hicks's speech was that Murphy, through his
actions as the commander of the patrol division, was adversely
effecting the morale of all the men in the patrol division and
undermining the efficiency of that department.  Patrol is the
division with the most immediate contact with the citizens and with
the mission to not only arrest wrongdoers, but to prevent crime
from occurring.  They are the division of the police department
actually on the street protecting citizens.  The Plaintiff Hicks

16

complained that the rank and file officers in the patrol division, because of Murphy's treatment as the supervisor, were hampered and afraid to take action because of possible repercussions from Murphy. The speech that Hicks contends was protected was public in nature, as the morale and efficiency of the patrol division of the Montgomery Police Department communicated a subject of legitimate news interest and a subject of general interest and of value and concern to the citizens of the City of Montgomery, that is, to the public. _Mitchell_ supra. Not only did Hicks' speech touch on a matter of public concern, but Hicks spoke as a citizen on a matter of public concern. If Hicks were complaining only because he found it personally difficult to work for Murphy, and not also with concern for the division employees and lack of protection for the citizens as a result of the morale problems, his speech would not be protected. The fact that Hicks chose to  convey his complaint to the supervisor immediately above Murphy, that is the Chief of Police, rather than publically is a consideration but is not dispositive.  See _Rankin v. McPhearson_, 483 U.S. 378 (1987), and also _Ceballos_, 126 S.Ct. 1951, 1958 (2006), where the Court said that the fact that Ceballos expressed his views inside his office rather than publically was not dispositive. See also _Givhan v. W. Line Consol. Sch. Dist._, 439 U.S. 410, 415-16 (1979).   In that case, the Court held that the Plaintiff's freedom of speech was not lost to the public employee, because the employee arranged to

17

communicate privately with his employer, rather than to spread his views before the public. Therefore, although the form of Hicks' speech was a private complaint other than a public statement alone does not determine that Hicks spoke as an employee rather than as a citizen. The Plaintiff's motivation in speaking out was, at least in part, based upon public concern regarding the morale and efficiency of the patrol division and its effect on the protection of the citizens of Montgomery. On one hand, the Plaintiff's complaint concerned his individual treatment, but that was outweighed by his concern for the ultimate efficiency of the patrol division and its effect on public safety, and the poor morale of the division's effect on public safety. Hicks felt that there was fear of adverse treatment by the patrol division commander within the rank and file officers in the department, and as a result, they were so afraid of making a mistake, they would not efficiently do their job on patrol. Because Hicks was a member of the Police Department, it was more likely that such a complaint as he had would be brought by a police officer rather than a member in the general public. In that capacity, he was able to have information about a police supervisor abusing the public trust, and he would have a special interest in that matter. As a public employee and a police officer, Hicks was a member of the Montgomery community who was most likely to have informed opinions as to the operations of the patrol division of the Montgomery Police Department, an

18

operation which is of substantial concern to the public. If it followed that speech was not a matter of public concern, if it personally and directly effected the speaker, such would limit matters of speech of public concern to those people who had the least amount of first hand knowledge about the subject matter. See *Jackson v. Gammon*, 342 F.3d 105, 114 (2nd Cir. 2003). Hicks' speech cannot be categorized as completely private or completely public. The Courts have stated that "an employee's speech will rarely be entirely private or entirely public." See *Moore v. City of Kilgore*, 877 F.2d 364, 371-72 (5th Cir. 1989). Hicks, for the purposes of this cause, was speaking as a citizen on a matter of public concern in complaining about Murphy's treatment of the patrol division and its effect on the lack of efficiency of the division's effect on the public safety.

The Plaintiff Hicks was not speaking pursuant to his official duties. It was not a part of his job description to complain about his supervisor. Were he the supervisor complaining about his subordinate, such speech might be unprotected. It was not a part of Hicks' job duties to complain about the supervisor's management of the patrol division. The *Ceballos* rule for speech pursuant to official duties does not apply to Hicks.

In considering the second element of Hicks' First Amendment retaliation claim, that is whether the Plaintiff's interest as a citizen outweighed the interest of the government as an employer,

19

we must look to *Pickering v. Board of Education*, 391 U.S. 563 (1968). In deciding Summary Judgment, a Court must arrive at a balance between the interest of the employee as a citizen in commenting on matters of public concern and the interest of the government as an employer in promoting the efficiency of the service it performs. 391 U.S. 568. The *Pickering* balancing test is there to make sure that public employees exercising free speech rights as citizens do not inhibit the governments interest for maintaining efficiency and discipline in the public service. If Hicks' public protected speech occurred at a time, place and manner that disrupted the workplace operations and was disproportionate to his First Amendment interest, the balancing test would weigh in favor of the employer, the City of Montgomery. There is no evidence that Hicks' complaint disrupted the operation of the Montgomery Police Department. Although the complaint may have contributed to a strain in the working relationship between Hicks and Murphy, the evidence is that there was already tension between the two. The investigation of Murphy, which was conducted by a member of the investigative division of the Montgomery Fire Department, contained over 30 statements complaining about Murphy, and no action was taken against Murphy by the department, and if the department was not interested in having any disciplinary action against Murphy for his actions, the department should not have any interest in punishing or disciplining Hicks for filing a single

20

good faith complaint regarding Murphy's actions and the overall
morale decline in the patrol division of the department. The
purpose of the *Pickering* balancing test is to consider whether
Hicks' speech itself and events and circumstances incident to the
his speech, had disruptive effects that justified his transfer to
a position without any duties, failure to promote him and the
removal of equipment and benefits made available to other Captains.
Hicks' complaint was not violative of any rule or regulation of the
department. The Chief of Police retaliated against Hicks for his
complaint concerning patrol division leader, Kevin Murphy. That
retaliation was unjustified. Hicks' interest in speaking as a
citizen on a matter of public concern outweighed the interest of
the Chief of Police as a superior officer in transferring him,
failing to promote him, and the removal of equipment necessary to
do his job, which was provided to other Captains.

The third and fourth inquiries that must be made are issues of
fact related to causation. That is whether the speech played a
substantial or motivating role in the adverse employment action,
and whether the Defendant would have made the same adverse
employment decision absent the employee's speech. These two issues
are for the finder of fact. Hicks was performing his duty as a
Captain in the patrol division. He was a shift commander. Had he
not gone to the Chief and complained about Major Kevin Murphy, he
would not have been transferred to a position with no duties and he

21

would not have been confined to work in the jail. He was in "band A" for promotion and would have been promoted. He would have continued to have use of a city automobile and access to computer equipment, as all of the other Captains in the department, but because he complained, actions were taken against him and he no longer had those benefits. Therefore, based on what has been previously set forth, the third prong has been substantiated and should be presented to the trier of fact. The fourth element, that is the same decision would have been made without the complaint, cannot be supported, as the department had areas of need available for a Captain that were open and slots that were not filled, but refused to place the Plaintiff in those positions, obviously out of retaliation.

The Defendant contends that the Chief of Police is protected by the defense of qualified immunity, yet in his deposition testimony, the Chief of Police denying that he retaliated, admitted that he was aware that it would be contrary to law for him to retaliate against the Plaintiff. The Defendant cannot rely upon the defense of qualified immunity, stating that the law was not clearly established at the time of his actions, when he has testified that he knew that had he taken those actions, they would be contrary to law. (Baylor deposition page 46, lines 11-23, page 47, lines 1-5) It is Chief Baylor's position that he did not retaliate, and that is a question of fact to be determined by a

22

jury. From his testimony, he didn't elect to state, "I didn't retaliate, and if I had, I didn't know any better," or that, "I did not know that the law was clearly established." Instead, he denies retaliation, but affirmatively states that he knows that if, because Hicks filed the complaint that Hicks filed, he retaliated against him and transferred him and gave him a job without any duties, took away his automobile and failed to promote him when he was eligible and qualified, was a violation of law. The actions taken by the Chief were in the Chief's discretionary authority, even though they were improper. The Chief had the authority to transfer the Plaintiff to the jail to a job without any duties, and he had the authority not to recommend him for promotion. He also had the authority to take away access to the equipment that the Plaintiff needed to do his job, but the second step of the qualified immunity test is whether Baylor's conduct violated clearly established law, and based upon Baylor's testimony, Baylor was aware that if the trier of fact finds he acted in retaliation, he knew better, and knew that it was a violation of clearly established law.

There is a dispute of fact between the testimony of Baylor and the testimony of Major Celia Dixon, to whose division Hicks was transferred. If the jury believes Dixon rather than Baylor, then Baylor's actions were retaliatory, and based upon his own testimony, he knew that it was improper and a violation of law.

23

The question becomes, if Baylor took the actions he did in retaliation with the knowledge that such retaliation violated federal law, can he be protected by qualified immunity, and the answer is, of course, in the negative. Based upon his own testimony, Baylor had fair warning that his actions taken against Hicks were unconstitutional.

The City of Montgomery is a Defendant in this case, because the retaliation against the Plaintiff was taken by the final policy maker for the City of Montgomery as to the Police Department, and that is Chief Arthur Baylor. A single act by the policy maker may create liability for the Municipality, in this case, Baylor has testified that he was the final decision maker for the City of Montgomery as to the Police Department. (Baylor deposition page 22, lines 8-10) The actions taken in this case all were within the confines of the Montgomery Police Department, and were actions taken by the Chief of Police in his capacity as the final decision maker for the Department.

The Defendant, City of Montgomery, relies on _Monel v. Department of Social Services_, 436 U.S. 658 (1978), as the reason why the Municipality is due Summary Judgment, but the facts in this case are not as simple as _Monel_, in that the Chief of Police has testified that he is the final policy making authority for the Police Department of the City of Montgomery, and it is the Plaintiff's contention that the Chief of Police made the policy,

24

for which he was subject to transfer and other punishment and retaliation for his complaining against the Chief of Police's Major over the patrol division, Kevin Murphy. Plaintiff also contends that the policy established by the Chief of Police in transferring him was the moving force of the violation of his federally protected rights, and where these two requisites are satisfied, a single illegal act taken pursuant to the policy is sufficient basis for imposing Title 42 § 1983 liability upon the Municipality. See *Pembaur v. City of Cincinnati*, 106 S.Ct. 1292 (1986). The acts of the Chief of Police in this case represent municipal policy, because the Chief of Police has been given final authority to establish municipal policy with respect to the action ordered. That is, those matters within the Police Department of the City of Montgomery. *Pembaur*, supra. *Monel*, supra, itself allows that the conduct of those whose edicts or acts may fairly be said to represent official policy are binding on the Municipality. The question is whether the government official who engages in unconstitutional conduct is the final repository for government power. See *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41-45-46 (CA 2, 1983). See also *Berdin v. Dugin*, 701 F.2d 909, 914 (CA 11 cert den), 464 U.S. 893 (1983). See also *Brown v. Ft. Lauderdale*, 923 F.2d 1474, 1480 (CA 11, 1991). In this case, Arthur Baylor was the final policy maker and had final policy making authority over the matters within the Police Department,

25

and, therefore, the actions taken against the Plaintiff by Arthur Baylor were within his final policy-making authority, and are, therefore, attributable to the Municipality the City of Montgomery.

In conclusion, the Plaintiff's speech was as a citizen for the good of the public, in that he sought protection for all members of the patrol division so that they could efficiently protect the citizens of the City of Montgomery. His speech was speech protected by the First Amendment of the United States Constitution, and the Defendant Arthur Baylor retaliated against him for his complaint about the patrol division commander. The Chief has since been instrumental in having Kevin Murphy, the patrol division commander, promoted to the position of Lieutenant Colonel and Deputy Chief, after the Plaintiff and more than 30 members of the patrol division complained against him. The retaliation was unconstitutional, and the Chief of Police knew that it was prior to taking the action that he took. He is, therefore, not to benefit from the defense of qualified immunity, and since on these issues, he was the final policy maker for the City of Montgomery, the City of Montgomery is liable for his actions. The Defendant's Motion for Summary Judgment is due to be denied.

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for Plaintiff

26

```
OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:      334/264-8118
Facsimile:      334/263-7598
Email:          jbb@brannanlaw.com
```

### CERTIFICATE OF SERVICE

    I hereby certify that I have this date served a copy of the foregoing on the parties listed below by placing same in the U.S. mail, postage prepaid, on this _4Th_ day of <u>January</u>, 2008.

```
Kimberly O. Fehl, Esq.
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111
```

OF COUNSEL

27

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

GARY HICKS        *
       *
     Plaintiff,       *
       *
VS.        *   **CIVIL ACTION NO.: 2:06-CV-1017-WKW**
       *
THE CITY OF MONTGOMERY    *   **PLAINTIFF DEMANDS TRIAL BY JURY**
       *
and        *
       *
CHIEF ARTHUR BAYLOR     *
       *
     Defendants.     *

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff Gary Hicks and in response to the Defendant's Motion for Summary Judgment would set forth the following:

1.    The Plaintiff's claim of First Amendment based retaliation concerns actions taken by the Chief of Police, who was the final policy maker for the City of Montgomery on police-related issues, because the Plaintiff had complained about his immediate supervisor, Major Kevin Murphy, as to Murphy's treatment of all men within the patrol division. The Plaintiff complained that Murphy's treatment of all men he supervised effected the morale of the men and diminished their ability to do their jobs and serve the public. The Plaintiff had no duty, as a part of the requirements of his job, to complain about the actions of a superior officer.

2.    The Plaintiff was retaliated against by being placed in a position without any job

duties, when there were numerous captain assignments throughout the department that were not filled. The Plaintiff was assigned by the Chief of Police to an area within the jail where he had no duties nor any equipment to perform any function useful to the department. The Chief referred to him as being "confined to the jail."

3.    Chief Baylor is not entitled to qualified immunity for the claims against him in his individual capacity, as he has testified in deposition that he did not retaliate, but that he knew that retaliation by him against the Plaintiff, based on the facts and circumstances of this case, was wrong and would violate his constitutional rights, so that if the actions taken against the Plaintiff constituted retaliation, the defense of qualified immunity, based on the Chief of Police's testimony, would not be available to him.

4.    The City of Montgomery is liable to the Plaintiff because the retaliation against the Plaintiff Hicks was taken by the Chief of Police, who is the final policy-maker for the City of Montgomery on matters concerning the police department, as the Chief of Police testified to such in his deposition.

5.    In further support of this Response to Defendant's Motion for Summary Judgment, the Plaintiff would submit the Affidavit of the Plaintiff, Gary Hicks, and selected deposition testimony of Chief Arthur Baylor, Montgomery Police Department, and Major Celia Dixon, Montgomery Police Department, accompanied by the Plaintiff's Brief in Opposition, to Defendant's Motion for Summary Judgment.

Respectfully submitted this the _19th_ day of December, 2007.

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for Plaintiff

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:    334/264-8118
Facsimile:    334/263-7598
Email:        jbb@brannanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing on the parties listed below by placing same in the U.S. mail, postage prepaid, on this _19th_ day of December, 2007.

Kimberly O. Fehl, Esq.
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | | |
|---|---|---|
| GARY HICKS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| VS. | * | CIVIL ACTION NO.: 2:06-CV-1017-WKW |
| | * | |
| THE CITY OF MONTGOMERY | * | PLAINTIFF DEMANDS TRIAL BY JURY |
| | * | |
| and | * | |
| | * | |
| CHIEF ARTHUR BAYLOR | * | |
| | * | |
| Defendants. | * | |

## AFFIDAVIT OF CAPTAIN GARY HICKS

My name is Gary Hicks. I am a Captain with the City of Montgomery's Police Department. My ultimate supervisor, who is the final policy maker for the City of Montgomery Police Department, is Chief Arthur Baylor. I have been assigned to the patrol division and at all times incident to the Complaint I filed against Major Kevin Murphy, I was supervised by him. During my time under his supervision, Major Kevin Murphy treated the vast majority of persons assigned to the patrol division in an unfair and abusive way. His actions in supervising the employees assigned to the patrol division were contrary to the practices and policies of the Montgomery Police Department. There was mismanagement and corruption of the overall morale of the men due to the mismanagement and undue stress placed upon them by Major Murphy. Murphy's actions caused the men to be reactive in their police duties, instead of proactive. This morale problem and fear in the men to be proactive caused a public safety concern, as the men were not efficiently going about their duties, afraid of making a mistake and being punished by Major Murphy. The men in the patrol

division felt that the men's self-initiated calls for service were scrutinized by Major Murphy, and they were admonished continuously for mistakes or errors that did not exist. The entire division of men was constantly trying to avoid retribution from Murphy. Major Kevin Murphy was confrontational and abusive to me, and to numerous others within the division. The morale within the division, due to Major Kevin Murphy's management, effected the efficiency of the division and the safety of the public. It was not a requirement of my employment, nor a part of my job description to complain or seek some form of grievance against Major Kevin Murphy. I was not compelled to do so as a part of my regular job duties as a Captain of the Montgomery Police Department, but I complained because the severe morale problems in the patrol division had a dramatic effect, in my opinion, on public safety. I made my complaint as a private citizen, but did so within the department rather than going public, even though it was a matter of public interest. There was an investigation that lasted over six months of Major Kevin Murphy as a result of my complaint. Over 30 officers gave statements complaining about Major Kevin Murphy. Major Kevin Murphy was close to Chief Arthur Baylor, and since this investigation, Chief Arthur Baylor has been instrumental in having Major Kevin Murphy promoted to Deputy Chief and the rank of Lieutenant Colonel. The investigation of Major Kevin Murphy was conducted by the Montgomery Fire Department, and the individuals who gave statements were advised that Major Kevin Murphy would not be made aware of the substance of their statement, and that was not true, as the Chief of Police provided those statements to Major Kevin Murphy. When I made my complaint about Major Kevin Murphy, I was assigned from the patrol division to the desk. That assignment was commonly used to place officers who were under investigation. Major Kevin Murphy, who was the person who was under investigation, was allowed to remain as the commander of the patrol division. While I was assigned to the desk, Major Kevin Murphy told people that there was a big investigation going on, and

Captain Hicks has been assigned to the desk. He did not relate that he was the one being investigated and that I was the complaining party. The Chief of Police had assigned me to the desk, and while I remained assigned to the desk, it gave the appearance that I was guilty of misconduct. During the time that I was assigned to the desk, an officer of the Montgomery Police Department was arrested for child abuse, and the department released to the media that pending the prosecution, that officer would be assigned to the desk, further giving the appearance that I had committed wrongdoing. While I was assigned to the desk, there was another Montgomery police officer who had been accused of rape, and while that was being investigated, he was assigned to the desk, further giving the appearance that I was there because I had committed some form of wrongdoing. Normally, the person under investigation is moved to the desk, not the complaining party. After the desk, the Chief had me assigned to the jail with no assigned duties. Major Kevin Murphy was never removed from his position, even though the investigation revealed a considerable number of officers complaining about his actions. While Major Kevin Murphy was under investigation, because of the close relationship between Murphy and the Chief, Murphy was in charge of the entire Police Department during absences of the Chief. Prior to my complaint of Major Kevin Murphy and since that time, I have consistently stayed after midnight and sometimes until 1:30 a.m., when my shift ended at 11:00 p.m. I have always checked and re-checked the daily reports, both factually and grammatically. On numerous occasions, Major Kevin Murphy would call me at my residence from 7:00 a.m. to 7:30 a.m. to proverably berate me over minor, unimportant grammar errors in the daily report made by individuals I supervised, such as the use of "was" and "were" in a sentence. Major Kevin Murphy also sent me and other supervisors threatening email over misspelled words in the daily log, stating that he would use severe disciplinary action against us if we didn't "tighten up." He also sent me and other subordinates threatening emails where he quoted Erwin Rommell. Once

the six month investigation was completed, I was called to the Chief's office, along with Major Kevin Murphy. The Chief advised that the investigation was concluded and no action was going to be taken. From the statements the Chief made during that meeting, it was obvious that Major Kevin Murphy had reviewed the file of complaints against him, even though during the investigation, the officers giving information had been advised that he would not receive such. At that time, I advised the Chief and Major Kevin Murphy that I did not feel that I could work in his division after the investigation and requested that I be transferred. At first, Chief Baylor advised that he would not entertain the transfer. During my meeting with Chief Baylor and Major Kevin Murphy, Captain Purvis Fleming was also in the office, and he is the first person to suggest that I work in the jail as an administrator and liaison position over Warden Collins. The Chief made no response to that statement, and then advised me to type the letter as soon as possible. The Chief stated that my position would be a "Super-Supervisor." I asked Chief Baylor how soon I needed to turn the request, and he advised me, "As soon as possible." I prepared a request for transfer, seeking to be the administrator of the jail, which would be the highest ranking official within the jail. I presented that to my supervisor at the time, Major Celia Dixon. She presented it to Chief Arthur Baylor. Upon receipt, Chief Arthur Baylor advised Major Celia Dixon that he did not know what this was about and that Captain Gary Hicks was not going to be transferred. The Chief later denied this to Major Dixon and stated that he would not accept my letter. My complaint to the Chief concerning Major Kevin Murphy was not limited to my work conditions, but the overall morale problems for the entire patrol division, and that they were to such an extent, and that the patrol officers were so fearful of retribution for trivial mistakes, that they were not efficiently doing their job to protect the public. To me, this was a matter of great public concern, and if I had made it known to the media or the public in general, it would have caused the public to be fearful and to lose trust of the Police

Department. I went through the channels, but my seeking redress for the actions of Major Kevin Murphy to the entire patrol division of the Police Department was in my capacity as a citizen, and was over public concern for the safety of those who depended on the patrol division of the City of Montgomery Police Department. I went through the proper channels and requested of the Chief to be allowed to speak with the Mayor of the City of Montgomery. I received permission to do so and met with the Mayor. I advised the Mayor of my assignment in the jail and that the safety of the City, which is a matter of public concern, was compromised, as there were few Captains now assigned to the patrol division, and that the division was mismanaged and the morale of the men was compromised to the extent that the public was not being adequately protected on the street. The Mayor advised me that I would be transferred and would not be required to work under supervision of Major Kevin Murphy. Chief Arthur Baylor again called me to his office and was visibly upset with me, and advised that I would be assigned to the jail, that I would not be the jail administrator, and that I would be supervised by a civilian employee, the assistant warden. Chief Baylor complained and said to me, "You have gone above me head." I was not given any job responsibility when I was transferred to the jail, and I was given little or nothing to do. While assigned to the jail, I was put in a room to be treated as an office that had storage boxes and stored furniture. There was no typewriter or computer. The desk had two broken drawers and the automobile that was assigned to me was taken from me, and I was the only Captain with the Montgomery Police Department who was not assigned a vehicle. The jail inmates had traditionally hung their dirty laundry on the bars of the jail, which were located right outside the area that I was given as an office, which was more of a storage room with a sink. After receiving this assignment, I again asked to be allowed to go to the Mayor. Chief Arthur Baylor denied the request without giving me a reason, other than he would not allow me to go over his head again. On one occasion, I had come downstairs from the jail in

order to enter certain information upon the computer, and Chief Arthur Baylor saw me at that time, and advised Captain McCloud, the Assistant Division Commander of the Administrative Division, that I was not to leave the jail, and after that a memo was issued that stated that Captain Gary Hicks was "confined" to the jail. There were available Captain slots in a number of areas within the Montgomery Police Department that were not filled, but I remained assigned to the jail, reporting to a civilian employee in a capacity that, as far as the chain of command, would be equal to a Corporal or Sergeants position. I was denied the right to be assigned to one of the available Captain slots. I was not in an assigned slot working in the jail. Captains who had less time and grade than me received assignments for Captains, while I remained assigned in an undesignated slot in the jail. My work hours were changed to be 4:00 p.m. until 1:00 a.m., and there was no other designated shift for those hours within the Police Department. I was the only employee of the Police Department working that designated shift. Those hours made it impossible for me to have any time to spend with my children during the week. When I complained about this assignment, Chief Arthur Baylor advised me that, "This is what you asked for." And I told him that I did not ask to be assigned to the jail, reporting to a civilian, but rather to be the administrator of the jail as a Captain working a normal shift, and only asked for that because it had been suggested by the Chief as the alternative to being assigned to work under Major Kevin Murphy. Mayor Bobby Bright, by and through his assistant, Michael Burdell, contacted me and had me report to him. In that meeting, the Mayor said he had heard through a confidential source that I was dissatisfied with the jail assignment. I told the Mayor that I was dissatisfied and that I was being retaliated against. The Mayor told me he would talk to the Chief and would call me back. The Mayor did not call me back, but I received word that I was being assigned back to Major Kevin Murphy's division and would be required to report to another Captain who was junior to me. While the Plaintiff was "confined" to work in the jail, a

number of lieutenants were promoted to Captain, and two newly appointed Captains junior to me were promoted to Assistant Division Commander positions. Therefore, I was passed over for these assignments and such was retaliation. I believe Chief Baylor retaliated against me because I complained and caused Major Kevin Murphy to be investigated.

_____
GARY HICKS

SWORN TO AND SUBSCRIBED before me on this the 19th day of December, 2007.

_____
Notary Public

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:06-CV-1017-WKW

7

8    GARY HICKS,

9         Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY AND CHIEF ARTHUR BAYLOR,

12        Defendant(s).

13

14

15

16

17           DEPOSITION TESTIMONY OF:

18                CELIA DIXON

19

20   10:44 AM

21   9 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393



1          Q.    And you don't remember whether

2    Murphy was there or not -- do you remember any

3    other conversation with Murphy about it?

4          A.    I had had no conversation with

5    Major Murphy about it, no, sir.

6          Q.    Did you have any after that

7    meeting with Murphy?

8          A.    No, sir, I talked to Captain Hicks

9    after that.

10          Q.    What was your understanding of

11    where Hicks would be assigned when he was sent

12    to you?  Did anybody tell you where to put him?

13          A.    The Chief told me to put him -- I

14    mean, he would go to the jail.

15          Q.    Prior to the Chief telling you for

16    him to go to the jail, had anybody -- was there

17    any other supervisor in the jail other than the

18    jail administrator?

19          A.    He has an assistant to

20    Ms. Brantley.

21          Q.    Is she a sworn officer?

22          A.    Yes, sir.  She comes under the

23    old, I guess -- I don't know what you would call

1    having the problems with comprehending what he

2    was being told to do?

3           A.     Yes, sir.

4           Q.     Did you give any special

5    instructions to Hicks on what to do up there?

6           A.     I guess I told him to go up there

7    and make the best of it.

8           Q.     When you say "make the best of

9    it", was he complaining about having to go up

10   there?

11          A.     Yes, sir.

12          Q.     Did he constantly, from the time

13   he went up there until he left, complain about

14   being up there?

15          A.     Yes, sir.

16          Q.     Was there really something for him

17   to do up there, or was he just being assigned

18   there as just to have a place to put him?

19          A.     It was kind of make work, but he

20   found things that needed to be corrected within

21   the jail, so he found work for himself to do.

22          Q.     Would the division have run fine

23   without putting him up there?

```
 1            A.     Yes, sir.
 2            Q.     Was there ever an occasion where
 3     the Chief was in your presence and saw Hicks
 4     downstairs from the jail and the Chief made some
 5     comment to you about him not supposed to be
 6     there?
 7            A.     Yes, sir.
 8            Q.     Tell me about that.
 9            A.     I kind of felt sorry for him being
10     at the jail and he didn't have access to the
11     computer up there, and I told him whenever he
12     felt like he needed to get on the computer or if
13     he had some work to do, he was more than welcome
14     to come down to the back desk and use Captain
15     McCloud's computer.  And the Chief saw him down
16     there and I think it was after a morning meeting
17     one day -- or it was in the morning meeting, he
18     asked me why he was down there on the desk.  And
19     I explained to him about he didn't have access
20     to the computer.  He told us to get him access
21     to the computer that he did not want him behind
22     the back desk.
23            Q.     Did you ever hear the term used
```

1    that he was confined to the jail?

2         A.    Yes, sir.

3         Q.    Who did you hear use that word?

4         A.    The Chief did.

5         Q.    And the Chief told you that he was

6    confined to the jail?

7         A.    Yes, sir.

8         Q.    At first the terminology in the

9    department that would have been used for Hicks

10   being assigned to you was "on loan", is that

11   correct?

12        A.    Yes, sir.

13        Q.    Did that later become a transfer?

14        A.    Yes, sir.

15        Q.    How did that come about?

16        A.    I'm not sure.  I mean, I just knew

17   he was transferred to me.

18        Q.    You just received paperwork saying

19   that he was transferred?

20        A.    Yes, sir.

21        Q.    While he was on loan to you, did

22   he ever make any effort, that you know of, to

23   get himself permanently assigned there, or was

```
 1    Chief?
 2          A.      Yes, sir, I did.
 3          Q.      Is that what Hicks asked you to
 4    do?
 5          A.      Yes, sir, he did.
 6          Q.      Did Hicks ever put any paperwork
 7    in or do anything asking to be in a position
 8    where he reported to Warden Collins?
 9          A.      Where Hicks reported to Collins?
10          Q.      Yeah.
11          A.      No, sir.
12          Q.      He complained about reporting to
13    somebody that was not a sworn officer, did he
14    not?
15          A.      Yes, sir.
16          Q.      Is that something that he said was
17    a problem with him being in the position he was
18    in when he was in the jail?
19          A.      Yes, sir.
20          Q.      Did the Chief ever tell you Hicks
21    was supposed to use Warden Collins' office?
22          A.      Yes, sir.  He told -- he wanted --
23    when the computer was to be set up, he said you
```

1  could -- he could use Warden Collins' computer,

2  they could share an office or whatever it is you

3  wanted to do.

4        Q.    How did Hicks end up in the office

5  he was in:  The nurse's office?

6        A.    That's where Warden Collins and

7  Ms. Brantley put him.

8        Q.    And Warden Collins under the

9  circumstances was his supervisor?

10       A.    Yes, sir.

11       Q.    Did you have input in putting him

12 in there?

13       A.    No, sir.

14       Q.    Do you know how Warden Collins

15 came up with the plan to put him in there?

16       A.    No, sir.

17       Q.    Did you ever discuss him being in

18 there with Warden Collins?

19       A.    No, sir.

20       Q.    Did Hicks ever complain to you

21 about being in there?

22       A.    Yes, sir, he complained to me.  It

23 kind of became a running joke, but he said that

1    he would be okay with it, that he could work

2    wherever.

3        Q.    He didn't like it, but he was

4    doing it, is that what he was saying to you?

5        A.    Yes.

6        Q.    Did the Chief ever come to you and

7    ask you how Hicks was doing, or anything like

8    that?

9        A.    No, sir.

10       Q.    Once Hicks was transferred to your

11   division, did he have an automobile?

12       A.    No, sir.

13       Q.    Were you aware of any other

14   captain at that time that did not have an

15   automobile?

16       A.    No, sir, he didn't have an

17   automobile when he was put on loan to me.

18       Q.    Was he the only captain that did

19   not have an automobile?

20       A.    I think we have some that live out

21   of town that don't carry an automobile home, if

22   that's what you are asking.

23       Q.    They can't take one over 30 miles

1   or something like that?

2       A.    Are you asking if they had one

3   assigned to them or did they take one home?

4       Q.    I'm asking if there is any other

5   captain that didn't have a vehicle assigned to

6   them?

7       A.    No, sir.

8       Q.    Had you ever told the Chief before

9   they assigned Hicks there, had you ever told the

10  Chief I need some help in the jail?

11      A.    Yes, sir.

12      Q.    What were you asking for him to

13  give you in the jail?

14      A.    Correction officers.

15      Q.    Were you asking him to give a

16  different supervisor in the jail?

17      A.    No, sir.

18      Q.    Did you want another supervisor

19  added to the Warden and Ms. Brantley?

20      A.    We were trying to set up a

21  supervisory position for shift work, you know,

22  it would -- on our level it would be like

23  corporals and sergeants.

1        Q.    Didn't have that though?

2        A.    No, sir.

3        Q.    So you weren't asking for a third

4    supervisor in the jail other than Ms. Brantley,

5    Warden Collins -- you weren't asking for a third

6    person up there that was at a higher rank than a

7    sergeant, were you?

8        A.    No, sir.

9        Q.    While Hicks was on loan to you,

10   did he work anywhere other than in the jail for

11   you?

12       A.    I think there were several times

13   where I pulled him out of the jail because he

14   was like working one day out of the weekend that

15   I needed a supervisor on the desk, and I think I

16   used him once or twice like that.

17       Q.    But when he was given to you, you

18   were instructed that he was to go to the jail?

19       A.    Yes, sir.

20       Q.    And that was the Chief that told

21   you that?

22       A.    Yes, sir.

23       Q.    When Hicks filled out the

1   him and Major Murphy told him no that he

2   couldn't work for him.

3        Q.    Was this in front of the Chief

4   that it was going on?

5        A.    Yes, sir.

6        Q.    As a result of that, did he then

7   have to go back up and work in the jail?

8        A.    Yes, sir.

9        Q.    Did Hicks relate to you that he

10  saw being in the jail that he was being

11  punished?

12       A.    Yes, sir.

13       Q.    And did he complain that he felt

14  that that was punishment?

15       A.    Yes, sir.

16       Q.    Did he tell you that he felt like

17  he was being retaliated against?

18       A.    Yes, sir.

19       Q.    And that was for complaining about

20  Murphy?

21       A.    Yes, sir.

22       Q.    Did Hicks during this time tell

23  you that he felt like Murphy was causing major

1    morale problems in his division?

2         A.    Yes, sir.

3         Q.    Did Hicks ever tell you during

4    this time that he felt likes Murphy's morale

5    problems he caused were affecting the efficiency

6    of that division?

7         A.    Yes, sir.

8         Q.    Was what he was being required to

9    do by adding this slot that wasn't there in the

10   jail just busywork, something to stick him in to

11   find time?

12        A.    Yes, sir.

13        Q.    Although he was working, there

14   wasn't a need that he was filling?

15        A.    No, sir.

16        Q.    Were you aware of other places in

17   the department where Captain Hicks' ability

18   could have been a better benefit to the

19   department?

20        A.    Yes, sir.

21        Q.    How many people are assigned to

22   the jail on a shift?

23        A.    Maybe 60 -- I'm not sure of the

1    and for some of second shift, I think to be at

2    both of their roll calls.  And I was trying to

3    change the hours to go a little earlier, and

4    they went a little later instead.  I think

5    that's how that came about.

6         Q.    When would be the normal time for

7    second shift to come in?

8         A.    I think they have their roll

9    call -- they would be there like 2:00 to 2:30,

10   and I was trying to get him to come in a little

11   earlier so that he could meet with both shifts.

12        Q.    Did you make a request for him to

13   be able to come in a little earlier?

14        A.    I talked to the Chief about it,

15   yes, sir.

16        Q.    And instead of letting him come in

17   earlier and leave earlier, the Chief had him

18   come in later and leave later?

19        A.    Yes, sir.

20        Q.    So on that issue the Chief didn't

21   take your recommendation?

22        A.    No, sir, and it made it awkward

23   for holidays and overtime, and things like that.

1      Q.    Well, really what I'm asking is
2    there is nothing in a person's job description
3    down there that says you have got a duty as part
4    of your job to complain about the way your
5    supervisor manages?
6      A.    I really don't understand -- I
7    mean, you have to follow the chain of command.
8    If you have problems with the way your
9    supervisor is doing, your next option is to go
10   to the next supervisor; however, the major was
11   the supervisor that was doing all of the
12   injustice to Captain Hicks and he had nobody
13   further to complain to than the Chief, but then
14   the Chief was also doing the things to Hicks as
15   Major Murphy was, so he didn't have anybody in
16   the next chain to complain to.
17     Q.    But there was no requirement of
18   his job.  Hicks could have just grinned and
19   borne it -- I mean there was no requirement --
20   he was not doing anything in his job if he had
21   not complained?
22     A.    No, he didn't do anything wrong.
23     Q.    Do you believe that Hicks was

1    being punished and retaliated against because of
2    complaining about Murphy?
3         A.    I do.
4         Q.    When you had your meetings with
5    the Chief about this, did you feel like the
6    Chief was trying to move Hicks for the
7    betterment of the department, or did you feel
8    like he was trying to move Hicks because he
9    wanted to punish Hicks?
10        A.    It wasn't for the betterment of
11   the department.
12        Q.    Have you ever been assigned to the
13   Patrol Division?
14        A.    Yes, sir.
15        Q.    If in the Patrol Division, there
16   is unfairness in the way the men are supervised
17   and it creates -- and I say men generally
18   because I know we have lady police officers.
19        A.    I understand.
20        Q.    And they are being managed and
21   treated unfairly in the way they are supervised
22   and a morale problem existed, is that a problem
23   for the public in the City of Montgomery?

1        A.    It is.

2        Q.    And if the department, especially

3    the Patrol Division, if it is being run

4    inefficiently because of the morale problems, is

5    that something of public concern to the

6    citizens?

7        A.    Yes, sir.

8                MR. BRANNAN:  I don't have any

9    further questions.  Thank you.

10               MRS. FEHL:  I just want to get

11   one thing cleared up.

12

13   EXAMINATION BY MRS. FEHL:

14       Q.    When did you get the request for

15   him to be the jail administrator?  Let me state

16   it this way:  You said "given to me" -- when he

17   was given to you -- are you saying "given to you

18   when he transferred to the Administrative

19   Division" or are you saying "given to you when

20   he was put on loan", or both?

21       A.    I don't remember when he gave me

22   the transfer, but I know he was -- it just

23   happened all in one day because Major Murphy and

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

GARY HICKS                          *
                                    *
          Plaintiff,                *
                                    *
VS.                                 *    CIVIL ACTION NO.: 2:06-CV-1017-WKW
                                    *
THE CITY OF MONTGOMERY              *    PLAINTIFF DEMANDS TRIAL BY JURY
                                    *
and                                 *
                                    *
CHIEF ARTHUR BAYLOR                 *
                                    *
          Defendants.               *

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The attached Affidavit of Plaintiff Captain Gary Hicks, Plaintiff's Exhibit 1.

Deposition testimony of Chief Arthur Baylor, Plaintiff's Exhibit 2.

Deposition testimony of Major Celia Dixon, Plaintiff's Exhibit 2.

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for Plaintiff

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:    334/264-8118
Facsimile:    334/263-7598
Email:        jbb@brannanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing on the parties listed below by placing same in the U.S. mail, postage prepaid, on this _19th_ day of _December_, 2007.

Kimberly O. Fehl, Esq.
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111

OF COUNSEL