## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## NORTHERN DIVISION

2007 DEC 19  P 4: 53

| | | |
|---|---|---|
| **GARY HICKS** | * | |
| **Plaintiff,** | * | |
| | * | |
| **VS.** | * | **CIVIL ACTION NO.: 2:06-CV-1017-WKW** |
| | * | |
| **THE CITY OF MONTGOMERY** | * | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| | * | |
| **and** | * | |
| | * | |
| **CHIEF ARTHUR BAYLOR** | * | |
| | * | |
| **Defendants.** | * | |

### PLAINTIFF'S EVIDENTIARY SUBMISSION IN
### OPPOSITION TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

The attached Affidavit of Plaintiff Captain Gary Hicks, Plaintiff's Exhibit 1.

Deposition testimony of Chief Arthur Baylor, Plaintiff's Exhibit 2.

Deposition testimony of Major Celia Dixon, Plaintiff's Exhibit 2.

J. BERNARD BRANNAN, JR. (BRA022)
Attorney for Plaintiff

OF COUNSEL:
THE BRANNAN LAW FIRM, P.C.
602 South Hull Street
Montgomery, Alabama 36104
Telephone:    334/264-8118
Facsimile:    334/263-7598
Email:    jbb@brannanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing on the parties listed below by placing same in the U.S. mail, postage prepaid, on this ___19th___ day of ___December___, 2007.

Kimberly O. Fehl, Esq.
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

PLAINTIFF'S
EXHIBIT

_____1_____

GARY HICKS     *
    *
      Plaintiff,     *
    *
VS.     *    CIVIL ACTION NO.: 2:06-CV-1017-WKW
    *
THE CITY OF MONTGOMERY     *    PLAINTIFF DEMANDS TRIAL BY JURY
    *
and     *
    *
CHIEF ARTHUR BAYLOR     *
    *
      Defendants.     *

## AFFIDAVIT OF CAPTAIN GARY HICKS

My name is Gary Hicks. I am a Captain with the City of Montgomery's Police Department.

My ultimate supervisor, who is the final policy maker for the City of Montgomery Police

Department, is Chief Arthur Baylor. I have been assigned to the patrol division and at all times

incident to the Complaint I filed against Major Kevin Murphy, I was supervised by him. During my

time under his supervision, Major Kevin Murphy treated the vast majority of persons assigned to the

patrol division in an unfair and abusive way. His actions in supervising the employees assigned to

the patrol division were contrary to the practices and policies of the Montgomery Police Department.

There was mismanagement and corruption of the overall morale of the men due to the

mismanagement and undue stress placed upon them by Major Murphy. Murphy's actions caused

the men to be reactive in their police duties, instead of proactive. This morale problem and fear in

the men to be proactive caused a public safety concern, as the men were not efficiently going about

their duties, afraid of making a mistake and being punished by Major Murphy. The men in the patrol

division felt that the men's self-initiated calls for service were scrutinized by Major Murphy, and they were admonished continuously for mistakes or errors that did not exist. The entire division of men was constantly trying to avoid retribution from Murphy. Major Kevin Murphy was confrontational and abusive to me, and to numerous others within the division. The morale within the division, due to Major Kevin Murphy's management, effected the efficiency of the division and the safety of the public. It was not a requirement of my employment, nor a part of my job description to complain or seek some form of grievance against Major Kevin Murphy. I was not compelled to do so as a part of my regular job duties as a Captain of the Montgomery Police Department, but I complained because the severe morale problems in the patrol division had a dramatic effect, in my opinion, on public safety. I made my complaint as a private citizen, but did so within the department rather than going public, even though it was a matter of public interest. There was an investigation that lasted over six months of Major Kevin Murphy as a result of my complaint. Over 30 officers gave statements complaining about Major Kevin Murphy. Major Kevin Murphy was close to Chief Arthur Baylor, and since this investigation, Chief Arthur Baylor has been instrumental in having Major Kevin Murphy promoted to Deputy Chief and the rank of Lieutenant Colonel. The investigation of Major Kevin Murphy was conducted by the Montgomery Fire Department, and the individuals who gave statements were advised that Major Kevin Murphy would not be made aware of the substance of their statement, and that was not true, as the Chief of Police provided those statements to Major Kevin Murphy. When I made my complaint about Major Kevin Murphy, I was assigned from the patrol division to the desk. That assignment was commonly used to place officers who were under investigation. Major Kevin Murphy, who was the person who was under investigation, was allowed to remain as the commander of the patrol division. While I was assigned to the desk, Major Kevin Murphy told people that there was a big investigation going on, and

Captain Hicks has been assigned to the desk. He did not relate that he was the one being investigated and that I was the complaining party. The Chief of Police had assigned me to the desk, and while I remained assigned to the desk, it gave the appearance that I was guilty of misconduct. During the time that I was assigned to the desk, an officer of the Montgomery Police Department was arrested for child abuse, and the department released to the media that pending the prosecution, that officer would be assigned to the desk, further giving the appearance that I had committed wrongdoing. While I was assigned to the desk, there was another Montgomery police officer who had been accused of rape, and while that was being investigated, he was assigned to the desk, further giving the appearance that I was there because I had committed some form of wrongdoing. Normally, the person under investigation is moved to the desk, not the complaining party. After the desk, the Chief had me assigned to the jail with no assigned duties. Major Kevin Murphy was never removed from his position, even though the investigation revealed a considerable number of officers complaining about his actions. While Major Kevin Murphy was under investigation, because of the close relationship between Murphy and the Chief, Murphy was in charge of the entire Police Department during absences of the Chief. Prior to my complaint of Major Kevin Murphy and since that time, I have consistently stayed after midnight and sometimes until 1:30 a.m., when my shift ended at 11:00 p.m. I have always checked and re-checked the daily reports, both factually and grammatically. On numerous occasions, Major Kevin Murphy would call me at my residence from 7:00 a.m. to 7:30 a.m. to proverably berate me over minor, unimportant grammar errors in the daily report made by individuals I supervised, such as the use of "was" and "were" in a sentence. Major Kevin Murphy also sent me and other supervisors threatening email over misspelled words in the daily log, stating that he would use severe disciplinary action against us if we didn't "tighten up." He also sent me and other subordinates threatening emails where he quoted Erwin Rommell. Once

the six month investigation was completed, I was called to the Chief's office, along with Major

Kevin Murphy. The Chief advised that the investigation was concluded and no action was going to

be taken. From the statements the Chief made during that meeting, it was obvious that Major Kevin

Murphy had reviewed the file of complaints against him, even though during the investigation, the

officers giving information had been advised that he would not receive such. At that time, I advised

the Chief and Major Kevin Murphy that I did not feel that I could work in his division after the

investigation and requested that I be transferred. At first, Chief Baylor advised that he would not

entertain the transfer. During my meeting with Chief Baylor and Major Kevin Murphy, Captain

Purvis Fleming was also in the office, and he is the first person to suggest that I work in the jail as

an administrator and liaison position over Warden Collins. The Chief made no response to that

statement, and then advised me to type the letter as soon as possible. The Chief stated that my

position would be a "Super-Supervisor." I asked Chief Baylor how soon I needed to turn the request,

and he advised me, "As soon as possible." I prepared a request for transfer, seeking to be the

administrator of the jail, which would be the highest ranking official within the jail. I presented that

to my supervisor at the time, Major Celia Dixon. She presented it to Chief Arthur Baylor. Upon

receipt, Chief Arthur Baylor advised Major Celia Dixon that he did not know what this was about

and that Captain Gary Hicks was not going to be transferred. The Chief later denied this to Major

Dixon and stated that he would not accept my letter. My complaint to the Chief concerning Major

Kevin Murphy was not limited to my work conditions, but the overall morale problems for the entire

patrol division, and that they were to such an extent, and that the patrol officers were so fearful of

retribution for trivial mistakes, that they were not efficiently doing their job to protect the public.

To me, this was a matter of great public concern, and if I had made it known to the media or the

public in general, it would have caused the public to be fearful and to lose trust of the Police

Department. I went through the channels, but my seeking redress for the actions of Major Kevin

Murphy to the entire patrol division of the Police Department was in my capacity as a citizen, and

was over public concern for the safety of those who depended on the patrol division of the City of

Montgomery Police Department. I went through the proper channels and requested of the Chief to

be allowed to speak with the Mayor of the City of Montgomery. I received permission to do so and

met with the Mayor. I advised the Mayor of my assignment in the jail and that the safety of the City,

which is a matter of public concern, was compromised, as there were few Captains now assigned to

the patrol division, and that the division was mismanaged and the morale of the men was

compromised to the extent that the public was not being adequately protected on the street. The

Mayor advised me that I would be transferred and would not be required to work under supervision

of Major Kevin Murphy. Chief Arthur Baylor again called me to his office and was visibly upset

with me, and advised that I would be assigned to the jail, that I would not be the jail administrator,

and that I would be supervised by a civilian employee, the assistant warden. Chief Baylor

complained and said to me, "You have gone above me head." I was not given any job responsibility

when I was transferred to the jail, and I was given little or nothing to do. While assigned to the jail,

I was put in a room to be treated as an office that had storage boxes and stored furniture. There was

no typewriter or computer. The desk had two broken drawers and the automobile that was assigned

to me was taken from me, and I was the only Captain with the Montgomery Police Department who

was not assigned a vehicle. The jail inmates had traditionally hung their dirty laundry on the bars

of the jail, which were located right outside the area that I was given as an office, which was more

of a storage room with a sink. After receiving this assignment, I again asked to be allowed to go to

the Mayor. Chief Arthur Baylor denied the request without giving me a reason, other than he would

not allow me to go over his head again. On one occasion, I had come downstairs from the jail in

order to enter certain information upon the computer, and Chief Arthur Baylor saw me at that time, and advised Captain McCloud, the Assistant Division Commander of the Administrative Division, that I was not to leave the jail, and after that a memo was issued that stated that Captain Gary Hicks was "confined" to the jail. There were available Captain slots in a number of areas within the Montgomery Police Department that were not filled, but I remained assigned to the jail, reporting to a civilian employee in a capacity that, as far as the chain of command, would be equal to a Corporal or Sergeants position. I was denied the right to be assigned to one of the available Captain slots. I was not in an assigned slot working in the jail. Captains who had less time and grade than me received assignments for Captains, while I remained assigned in an undesignated slot in the jail. My work hours were changed to be 4:00 p.m. until 1:00 a.m., and there was no other designated shift for those hours within the Police Department. I was the only employee of the Police Department working that designated shift. Those hours made it impossible for me to have any time to spend with my children during the week. When I complained about this assignment, Chief Arthur Baylor advised me that, "This is what you asked for." And I told him that I did not ask to be assigned to the jail, reporting to a civilian, but rather to be the administrator of the jail as a Captain working a normal shift, and only asked for that because it had been suggested by the Chief as the alternative to being assigned to work under Major Kevin Murphy. Mayor Bobby Bright, by and through his assistant, Michael Burdell, contacted me and had me report to him. In that meeting, the Mayor said he had heard through a confidential source that I was dissatisfied with the jail assignment. I told the Mayor that I was dissatisfied and that I was being retaliated against. The Mayor told me he would talk to the Chief and would call me back. The Mayor did not call me back, but I received word that I was being assigned back to Major Kevin Murphy's division and would be required to report to another Captain who was junior to me. While the Plaintiff was "confined" to work in the jail, a

number of lieutenants were promoted to Captain, and two newly appointed Captains junior to me were promoted to Assistant Division Commander positions. Therefore, I was passed over for these assignments and such was retaliation. I believe Chief Baylor retaliated against me because I complained and caused Major Kevin Murphy to be investigated.

_____
GARY HICKS

SWORN TO AND SUBSCRIBED before me on this the 19TH. day of December, 2007.

_____
Notary Public

1



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06—CV—1017—WKW


GARY HICKS,

     Plaintiff(s),

vs.

CITY OF MONTGOMERY AND  CHIEF ARTHUR BAYLOR,

     Defendant(s).




DEPOSITION TESTIMONY OF:

CHIEF ARTHUR BAYLOR


December 12, 2007

9 AM

SELAH M. DRYER, CCR

18

looks at them, but he usually just gets
copies of when I'm promoting someone and
that's what he has to approve off on.

Q.   How does that work, the promotion and his
approval?

A.   Well, he gets a copy of the list and
usually I go with the staff, when the staff
brings it to me, I approve them and then I
give it to him.  He's the appointing
authority for the City.  So we can all make
recommendations but the Mayor has to approve
them.

Q.   He's the only one that can make a
promotion because that's a slot that would be
with the merit system and such as that, is
that correct?

A.   By the City chart he's the appointing
authority for the City, yes, sir.

Q.   But you don't need his approval to do a
transfer?

A.   No, sir, not in general, no, sir.

Q.   If you are going to make changes in

23

don't recall any that we didn't discuss at
staff because usually there is some research
that's going into it.  Usually it's not as
simple as wearing a hat.  Usually it's
shooting policies, those kinds of things that
even go down to legal, risk management, and
so forth.  So usually there is quite a bit of
discussion before they put it in writing and
get it out to the officers.

Q.  And you get all of that input from staff,
from legal, and everybody else before you
make a policy?

A.  Not on every — wearing a hat, no, I
don't need to talk to legal, but shooting
policies, those kinds of policies, yes we
usually do get input from legal and the staff
and everyone else.

Q.  And once you've gotten all of that input
for the police department, you make that
decision?

A.  I have the final decision when it comes
to the police department, not for the City as

23

24

a whole.

Q.  Sure.  That's all I'm asking for is for
the police department.  I'm not asking if you
are the final policy maker for anybody else.
I'm just asking for the police department.

A.  I got you.  But the other thing is, the
majority of the time — and I really can't
think of one — but the staff is usually
involved in almost all, if not all, of the
policies.

Q.  And they are recommending to you, and
then you are the final policy maker?

A.  Yeah.  I mean, we are sitting at a table
like this and we are hashing through it, and
usually there is a major that's going to be
sitting there doing the writing and he or she
is going to put it together and then they
will bring it back to the staff and if
necessary to legal and so forth.

Q.  But once all of that is done, the man
that's the final policy maker on that is you?

A.  The man that's the final policy —

24

34

where was Hicks assigned?

A.   When he was working for — well, Major
Murphy then, second shift patrol if I recall
right.

Q.   Was he the shift commander for that?

A.   Right.

Q.   At what point after the investigation was
called for, was it that he was transferred
out of Murphy's or loaned out of Murphy's
division?

A.   When he — if I recall right, when he
came to my office and he said I cannot work
for that man is when — he said I just can't
work for him, that's when I called Major
Dixon, who was at that time over
administration division and asked her could
she use him and asked Gary could you go to
work over there and he said, yes, sir, so it
was during the time while he was in the
office with me.

Q.   Did you leave it up to Major Dixon to
determine where he was going to be assigned?

34

35

A.   Yes, sir.

Q.   You didn't tell her put him here put him there, you just said can you use him take him, is that right?

A.   Yes, sir.

Q.   And she took him and do you know where she assigned him the first time, when he first got there?

A.   To be honest with you, I don't know exactly where she put him.  I remember seeing Gary several times, and he was in what was then Major Warrens old office, which is on the first floor right across from the deputy chief's office because he was working on some retirement stuff and just little stuff that she had him doing that I had given to her to get done.

Q.   Major Warren's old office, was that down near the desk?

A.   It's — to be honest with you, it's my old office when I was over that division. And it's right by my office and the deputy

35

38

to work.  And he went back to the Mayor and
the Mayor called me, and that's what I was
telling you earlier, said don't put him out
there find somewhere or put him somewhere.
And he was already working for Major Dixon,
and we were in he office and he sat there —
and if I recall right and you would have to
ask Captain Flemming about it — but they
were going back and forth because Major Dixon
had been saying I need help in the jail, and
so forth and so forth, and Gary said it
and/or Captain Flemming — but I think
Captain Flemming said something — and Gary
said I would like to work up in the jail.
And I said you want to work in the jail?  And
he said, yes, sir.  I said — because Gary
had changed his mind so many times on
everything.  And I said well give me
something in writing.  And then he came back
at a later time and gave me something saying
he wanted to be the jail administrator.  I
said, no, sir, there is only one jail

38

39

administrator according to personnel and it's
already filled by Mr. Collins.  And I said —
that's when — Gary, if you want to work the
jail then that's fine.  Major Dixon, can you
use him?  She said, yes because she was
having some problems and she needed
supervision.  And I said, okay since the
Mayor won't let me send you back to patrol,
where I think you should go — and I told him
that to his face said he needs to go back to
patrol where he's slotted and the Mayor said
no — so I said, yes, sir I'm following the
orders and he said, he meaning Gary Hicks,
said yes he wanted to go to the jail and I
put him in the jail under Major Dixon at has
request and at her request.

Q.  So it's your testimony that the first one
that came up with anything about going to the
jail was Gary Hicks?

A.  My testimony — that's not what I said.

Q.  Well, I'm not trying to put words —

A.  No, I'm just telling you the facts.  I

47

one of the reasons you don't, is because you know that's against the law, isn't that correct?

A.   The reason I don't is because it's just wrong period.

Q.   Sure.  But you understood even back when Hicks came to you that retaliating against somebody for what they had to say would be a violation of their constitutional rights, isn't that correct?

    MRS. FEHL:  Object to the form of the question.

Q.   (By Mr. Brannan)  I mean, you knew back then that that would be violating the constitutional rights?

A.   I don't retaliate against —

Q.   Sure.

A.   I don't retaliate, I never have because it's wrong, period.

Q.   And that's not my question.  I understand that's your position that you don't retaliate and never have.  I understand that's your

47

49

that if you retaliated against someone for
exercising their first amendment right to say
something and complain about something, you
knew that that law was clearly established
and it would be against that law for you to
retaliate because of them making a first
amendment statement, you knew that, didn't
you?

A.   Because it was wrong.

Q.   Exactly.

A.   It's just wrong, period.

Q.   Both.

A.   It's just wrong.

Q.   My question is:  Did you know, not only
was it just wrong, but it was also against
the constitution and against the law?

A.   My answer to it is:  It's wrong, period.

Q.   And I understand that's your position you
didn't do that, is that correct?

A.   Yes.

Q.   From your testimony you weren't the one
that made an assignment to the jail, that

49

50

would have been Dixon for Gary Hicks?

A.   When he was on loan.

Q.   Uh—huh.

A.   Right.   When he was on loan in January or whenever it started off, I just asked Major Dixon could she use him and she said yes.

Q.   Who made the decision when he was transferred?

A.   Gary asked.

Q.   I understand.   Who approved it?   Who put him there?

A.   He asked to be —— the Mayor said don't put him back in patrol, and Gary said yeah, I would like to work in the jail and that's when we put him in the jail with my approval and Major Dixon's approval.

Q.   I guess what I'm trying to get to is the "we."   Who would have been the person that would have assigned him there?

A.   Well, my assignment to him was patrol. And when the Mayor overrode that, he asked to go to the jail and that's where he was sent.

50

55

vehicle?

A.   Yeah, there are no slots for any captains that don't have vehicles.

Q.   At the time Hicks was assigned to the administrative division, was there any other captain that did not have a vehicle assigned to him?

A.   Well, he had his — when he started off Gary Hicks had his vehicle because he was on loan.  He requested to go to the jail, which was not slotted as a, quote, captain slot. That's when that car was going back to patrol to whoever was going to take his place in patrol.

Q.   And my question was:  Was there anybody else without one?  Any other captain without a vehicle at that time?

A.   At which time?

Q.   The time that Captain Hicks was assigned to the administrative division not on loan but transferred and his car was taken from him, was anybody else without a car?

*55*

62

Q.  Who made the decision to promote Murphy
to lieutenant colonel?

A.  I made the recommendation, the decision
was made by the Mayor.

Q.  What about Thompson, did you make that
recommendation also?

A.  The Mayor — he was retired, he came
back — like you were talking about Hardy, he
was retired he came back.

Q.  So he came back and he had been a deputy
chief and when he came back he was going to
be in that same slot?

A.  Yes, sir, because he was retired.

Q.  Did you have to approve that?

A.  No, the Mayor.

Q.  The Mayor made the decision to let him
come back?

A.  Correct.

Q.  Did he get any input from you on that?

A.  We talked about it several times, but the
Mayor said that he had told him when he
left — and I was not there when Thompson

62

76

retaliated against?

A.   If he did, I don't recall him saying
something about him being retaliated against.
He just did not like then Major Murphy.

Q.   Did the Mayor ever say anything about him
not liking the jail?

A.   I don't recall.

Q.   Did anybody ever talk to you before the
lawsuit was filed that Gary Hicks was
complaining about being in an office that had
a sink in it and things like that.

A.   Someone mentioned that to me, but now
Major Dixon assigned him to that office.   I
assigned him, like I told you earlier, to the
jail administrators office and they were
crossing paths for 30 minutes to an hour,
whatever the time when it was.   And Major
Dixon came to me and asked — said we found
Gary an office and I went — because it
befuddled me because I was wondering where
they found an office at because we are short
of offices everywhere in the police

76

77

department facility.  And they were like oh,
no, no, it's like the nurse's office or
something and they said we are going to get
that cleaned out.  And I said okay, but I
told you where to put him and I left that up
to her.  But as far as I was concerned he was
going to the jail administrator's office,
which is right at the front door.

Q.  Based on the comment you made right then,
you said that you told Celia Dixon, I told
you where to put him.  So you had told her to
put him in there?

A.  I told her to put —

Q.  To put him in jail administrators —

A.  Jail administrator's office because I
knew they didn't have any offices and that
way the secretary is in there, the jail
administrator is in there and it's a big
office and they could cross their paperwork
and see what is going on on first shift,
second shift, third shift and when the jail
administrator left then Captain Hicks would

87



PLAINTIFF'S
EXHIBIT
3

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06—CV—1017—WKW


GARY HICKS,

　　　Plaintiff(s),

vs.

CITY OF MONTGOMERY AND CHIEF ARTHUR BAYLOR,

　　　Defendant(s).


DEPOSITION TESTIMONY OF:

CELIA DIXON


10:44 AM

9 AM

105

around there and they were there when I got

there and the Chief asked me could Captain

Hicks work for me.

Q.   And you don't remember whether Murphy was

there or not, do you remember any other

conversation with Murphy about it?

A.   I had had no conversation with Major

Murphy about it, no, sir.

Q.   Did you have any after that meeting with

Murphy?

A.   No, sir, I talked to Captain Hicks after

that.

Q.   What was your understanding of where

Hicks would be assigned when he was sent to

you?  Did anybody tell you where to put him?

A.   The Chief told me to put him —— I mean,

he would go to the jail.

Q.   Prior to the Chief telling you for him to

go to the jail, had anybody —— was there any

other supervisor in the jail other than the

jail administrator?

A.   He has an assistant Ms. Brantley.

106

Q.   Is she a sworn officer?

A.   Yes, sir.  She comes under the old, I guess — I don't know what you would call it, but she is under the old administration as a sworn officer.

Q.   Does she have a police officer rank?

A.   No, sir, she's just known as the assistant warden.

Q.   Her title would be assistant warden.

A.   Yes, sir.

Q.   Does she have an office?

A.   Yes, sir.

Q.   Is her office separate from that of the jail administrator?

A.   Yes, sir, it is.

Q.   So in the jail, how many officers are there?

A.   The jail administrator's office is outside the jail and Ms. Brantley's office is inside the jail.

Q.   What are her duties?

A.   She is to assist the warden in anything

19

108

Q.  And Warden Collins was the one having the problems with comprehending what he was being told to do?

A.  Yes, sir.

Q.  Did you give any special instructions to Hicks on what to do up there?

A.  I guess I told him to go up there and make the best of it.

Q.  When you say "make the best of it" was he complaining about having to go up there?

A.  Yes, sir.

Q.  Did he constantly, from the time he went up there until he left, complain about being up there?

A.  Yes, sir.

Q.  Was there really something for him to do up there, or was he just being assigned there as just to have a place to put him?

A.  It was kind of make work, but he found things that needed to be corrected within the jail, so he found work for himself to do.

Q.  Would the division have run fine without

21

109

putting him up there?

A.   Yes, sir.

Q.   Was there ever an occasion where the
Chief was in your presence and saw Hicks
downstairs from the jail and the Chief made
some comment to you about him not supposed to
be there?

A.   Yes, sir.

Q.   Tell me about that.

A.   I kind of felt sorry for him being at the
jail and he didn't have access to the
computer up there, and I told him whenever he
felt like he needed to get on the computer or
if he had some work to do he was more than
welcome to come down to the back desk and use
Captain McCloud's computer.  And the Chief
saw him down there and I think it was after a
morning meeting one day — or it was in the
morning meeting, he asked me why he was down
there on the desk.  And I explained to him
about he didn't have access to the computer.
He told us to get him access to the computer

22

110

that he did not want him behind the back
desk.

Q.   Did you ever hear the term used that he
was confined to the jail?

A.   Yes, sir.

Q.   Who did you hear use that word?

A.   The Chief did.

Q.   And the Chief told you that he was
confined to the jail?

A.   Yes, sir.

Q.   At first the terminology in the
department that would have been used for
Hicks being assigned to you was on loan, is
that correct?

A.   Yes, sir.

Q.   Did that later become a transfer?

A.   Yes, sir.

Q.   How did that come about?

A.   I'm not sure.  I mean, I just knew he was
transferred me.

Q.   You just received paperwork saying that
he was transferred?

23

112

jail before, and that he wanted to, I guess, kind of being like in the chain of command that Warden Collins would come to him to handle problems before they got to me.

Q.   Did you take that request to the Chief?

A.   Yes, sir, I did.

Q.   Is that what Hicks asked you to do?

A.   Yes, sir, he did.

Q.   Did Hicks ever put any paperwork in or do anything asking to be in a position where he reported to Warden Collins?

A.   Where Hicks reported to Collins?

Q.   Yeah.

A.   No, sir.

Q.   He complained about reporting to somebody that was not a sworn officer, did he not?

A.   Yes, sir.

Q.   Is that something that he said was a problem with him being in the position he was in when he was in the jail?

A.   Yes, sir.

Q.   Did the Chief ever tell you Hicks was

26

113

supposed to use Warden Collins' office?

A.  Yes, sir.  He told — he wanted — when
the computer was to be set up, he said you
could — he could use Warden Collins'
computer, they could share an office or
whatever it is you wanted to do.

Q.  How did Hicks end up in the office he was
in:  The nurse's office?

A.  That's where Warden Collins and Ms.
Brantley put him.

Q.  And Warden Collins under the
circumstances was his supervisor?

A.  Yes, sir.

Q.  Did you have input in putting him in
there?

A.  No, sir.

Q.  Do you know how Warden Collins came up
with the plan to put him in there?

A.  No, sir.

Q.  Did you ever discuss him being in there
with Warden Collins?

A.  No, sir.

26

114

Q.   Did Hicks ever complain to you about
being in there?

A.   Yes, sir, he complained to me.   It kind
of became a running joke, but he said that he
would be okay with it, that he could work
wherever.

Q.   He didn't like it, but he was doing it,
is that what he was saying to you?

A.   Yes.

Q.   Did the Chief ever come to you and ask
you how Hicks was doing or anything like
that?

A.   No, sir.

Q.   Once Hicks was transferred to your
division, did he have an automobile?

A.   No, sir.

Q.   Were you aware of any other captain at
that time that did not have an automobile?

A.   No, sir, he didn't have an automobile
when he was put on loan to me.

Q.   Was he the only captain that did not have
an automobile?

27

115

A.   I think we have some that live out of
town that don't carry an automobile home, if
that's what you are asking.

Q.   They can't take one over 30 miles or
something like that?

A.   Are you asking if they had one assigned
to them or did they take one home?

Q.   I'm asking if there is any other captain
that didn't have a vehicle assigned to them?

A.   No, sir.

Q.   Had you ever told the Chief before they
assigned Hicks there, had you ever told the
Chief I need some help in the jail?

A.   Yes, sir.

Q.   What were you asking for him to give you
in the jail?

A.   Correction officers.

Q.   Were you asking him to give a different
supervisor in the jail?

A.   No, sir.

Q.   Did you want another supervisor added to
the Warden and Ms. Brantley?

116

A.   We were trying to set up a supervisory
position for shift work, you know, it would —
— on our level it would be like corporals and
sergeants.

Q.   Didn't have that though?

A.   No, sir.

Q.   So you weren't asking for a third
supervisor in the jail other than Ms.
Brantley, Warden Collins, you weren't asking
for a third person up there that was at a
higher rank than a sergeant, were you?

A.   No, sir.

Q.   While Hicks was on loan to you, did he
work anywhere other than in the jail for you?

A.   I think there were several times where I
pulled him out of the jail because he was
like working one day out of the weekend that
I needed a supervisor on the desk, and I
think I used him once or twice like that.

Q.   But when he was given to you, you were
instructed that he was to go to the jail?

A.   Yes, sir.

29

118

could go back and work on the shift work, you
know, go back to patrol, that he would try to
work for Major Murphy at the time. And I
mean, he was just about in tears and told
Major Murphy hadn't he worked good for him,
and couldn't he work for him and Major Murphy
told him no that he couldn't work for him.

Q. Was this in front of the Chief that it
was going on?

A. Yes, sir.

Q. As a result of that, did he then have to
go back up and work in the jail?

A. Yes, sir.

Q. Did Hicks relate to you that he saw being
in the jail that he was being punished?

A. Yes, sir.

Q. And did he complain that he felt that
that was punishment?

A. Yes, sir.

Q. Did he tell you that he felt like he was
being retaliated against?

A. Yes, sir.

119

Q.  And that was for complaining about
Murphy?

A.  Yes, sir.

Q.  Did Hicks during this time tell you that
he felt like Murphy was causing major morale
problems in his division?

A.  Yes, sir.

Q.  Did Hicks ever tell you during this time
that he felt likes Murphy's morale problems
he caused were effecting the efficiency of
that division?

A.  Yes, sir.

Q.  Was what he was being required to do by
adding this slot that wasn't there in the
jail just busywork something to stick him in
to find time?

A.  Yes, sir.

Q.  Although he was working, there wasn't a
need that he was filling?

A.  No, sir.

Q.  Were you aware of other places in the
department where Captain Hicks' ability could

120

have been a better benefit to the department?

A.  Yes, sir.

Q.  How many people are assigned to the jail
on a shift?

A.  Maybe 60 — I'm not sure of the exact
number, because they would — we would hire
them and people would quit, so I don't know
the exact number.

Q.  Is there a lot of turn overs in the jail?

A.  Yes, sir.

Q.  Were you given the latitude as the
commander of that division how many people
worked on each shift in jail and such as
that?

A.  No, sir, that was Warden Collins'
responsibility.

Q.  When Gary Hicks was changed to work from
four in the afternoon until one in the
morning, who made that decision?

A.  The Chief did and Major Murphy.

Q.  Was Major Murphy over patrol when that
decision was made?

33

121

A.  Yes, sir.

Q.  Would he be involved in making that decision because Hicks was on loan to you and worked for him, or how would he be involved in that decision?

A.  I would guess so, I'm not sure.

Q.  But was that during the time that Hicks was on loan and not transferred to you?

A.  I think it was.

Q.  If he had been transferred to you by then, Murphy as the major over the patrol division would have had no say—so in what hours Hicks worked?

A.  Correct.

Q.  Is it normal for the Chief to make the decisions as to what particular hours people would work?

A.  Yes, sir, depending on who they are.

Q.  So in certain circumstances the Chief makes the decision on the actual hours the person would work?

A.  Yes, sir, he can.

34

122

Q.   Did the Chief discuss with you why he was
making the decision to have Hicks work from
four to one?

A.   I think it had something to do with I
wanted Gary to work different hours so that
he could be there for some of first shift and
for some of second shift, I think to be at
both of their roll calls.  And I was trying
to change the hours to go a little earlier,
and they went a little later instead.  I
think that's how that came about.

Q.   When would be the normal time for second
shift to come in?

A.   I think they have their roll call — they
would be there like 2:00 to 2:30, and I was
trying to get him to come in a little earlier
so that he could meet with both shifts.

Q.   Did you make a request for him to be able
to come in a little earlier?

A.   I talked to the Chief about it, yes,
sir.

Q.   And instead of letting him come in

35