**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **GARY HICKS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CASE NO:  2:06-CV-1017-WKW** |
| | * | |
| **CITY OF MONTGOMERY and** | * | |
| **CHIEF ARTHUR BAYLOR,** | * | |
| | * | |
| **Defendants.** | * | |

## DEFENDANTS' REPLY BRIEF TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, City of Montgomery ("the City") and Chief Arthur Baylor ("Baylor"), submit the following Reply Brief to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, and state unto the Court the following:

### I.    SUMMARY OF HICKS' ALLEGATIONS

The Plaintiff, Gary Hicks ("Hicks"), submitted an affidavit, largely based on conclusory allegations, as evidence in his Statement of Facts in Response to Defendants' Motion for Summary Judgment. *(Doc. 13-2).*  Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56. Additionally, Hicks cites conversations that appear to be out of his presence and not based on personal knowledge as required by *Fed.Rules Civ.Proc.*Rule 56(e).

Among the retaliatory acts to which Hicks claims that he was subjected were (1) assignment

1

to the desk from patrol; (2) not having an assigned vehicle; (3) being supervised by the municipal jail administrator, a civilian, rather than being named municipal jail administrator; (4) assignment to an undesirable office in the jail; and (4) being denied promotions. *(Doc. 13-2).*

Hicks now claims that his complaint against Major Kevin Murphy ("Murphy") was made as a private citizen not in the course of his official duties as a police officer. *(Doc. 13-2).* Hicks repeatedly claims that he was not compelled to report nor was it job requirement of his position to report, as a Captain with the City of Montgomery Police Department, severe morale problems in the patrol division that, in his opinion, caused or had a dramatic effect on the safety of the public. *(Doc. 13-2).*

## II.    STATEMENT OF UNCONTESTED FACTS

It is clear from the Hicks' Response that genuine issues of material fact do not exist so as to preclude entry of summary judgment for the Defendants. The undisputed facts are as follows:

Hicks was a Captain with the Montgomery Police Department assigned to the Patrol Division. *(Doc. 13-2; DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).* Hicks complained to Baylor about Murphy and the way Murphy treated Hicks and others in the division. *(Doc. 13-2; DX 1, Baylor Affidavit and DX 9, Baylor Depo. p. 24, line 21 to p. 27, line 22).* Hicks complained of Murphy's management skills and the way that Murphy treated him in an earlier meeting. *(Doc. 13-2; DX 1, Baylor Affidavit and DX 8, Baylor Depo. p. 24, line 21 to p. 27, line 10).* After Hicks told Baylor that he could not work for Murphy, Hicks was assigned to the desk while an investigation into Hicks' complaints against Murphy was conducted. *(Doc 13-2; DX 1, Baylor Affidavit and DX 8, Baylor Depo, p. 32, lines 5 – 17, p. 35, lines 4-10).*

2

After the investigation, Baylor informed Hicks that he was going back to his allotted Captain position in the Patrol Division, but Hicks did not want to go back to work for Murphy. *(Doc 13-2; DX 1, Baylor Affidavit and DX 8, Baylor Depo. p. 15, lines 8 -18, p. 35 lines 14-16).* Hicks went to see the Mayor who later contacted Baylor and told him not to put Hicks back to work for Murphy. *(Doc 13-2; DX 1, Baylor Affidavit; DX 4, Bright Affidavit and DX 8, Baylor Depo. p. 15, lines 13-18, p. 48, lines 15-23).*

Hicks requested to be assigned to the jail as the Municipal Jail Administrator. *(Doc. 13-2; DX 1, Baylor Affidavit; DX 6, Plaintiff's Response to Defendants' Request for Admission, DX 8, Baylor Depo. p. 36, lines 12-17, p. 55, lines 19-23, p. 56, lines 10-15 and DX 9, Dixon Depo. p. 20, lines 5-7).* Hicks was permanently transferred to the Administrative Division at that time and relieved of the vehicle assigned to second shift commander for the Patrol Division. *(Doc. 13-2; DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and DX 8, Baylor Depo. p. 52 line 14 to p. 53,line 17).*

Baylor instructed that Hicks work out of the Municipal Jail Administrator's office. *(DX 1, Baylor Affidavit; DX 8, Baylor Depo. p. 74, line 18 to p. 76,  line 6 and DX 9, Dixon Depo. p. 22, lines 20, to p. 23, line 3).* Baylor also instructed that Hicks work a different schedule than the Municipal Jail Administrator worked, so there would not be overlapping of employees in that office. *(DX 1, Baylor Affidavit; DX 8, Baylor Depo. p. 56, lines 4-17 and DX 9, Dixon Depo. p. 30, line 12 to p. 32, line 5).*

The Mayor later learned that Hicks was not happy with his new assignment and asked to meet with Hicks. *(Doc. 13-2 and DX 4, Bright Affidavit).* Hicks told the Mayor that he was not happy with his assignment to the jail *(Doc. 13-2 and DX 4, Bright Affidavit).* The Mayor called Baylor and told him that Hicks needed to be moved from his assignment in the jail. *(Doc. 13-2 and*

*DX 3, Bright Affidavit).*

### III.   ARGUMENT

#### A.   HICKS' CLAIM OF FIRST AMENDMENT BASED RETALIATION

Hicks cannot support a claim of First Amendment based retaliation because the subject speech was not protected.  Although Hicks claims that he was making his complaint regarding Murphy's supervision of his employees as a private citizen and that morale issues in the Patrol Division created a matter of public concern, it is clear from the complaint and testimony that Hicks' subject speech was made pursuant to his official duties of employment based on a conflict with the management style of his immediate supervisor.  *(Doc. 13-2; DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and Doc. 1).*

Hicks' complaints regarding Major Murphy's management style are not a matter of public concern.  To prevail in this action, Hicks must first prove that his speech was done in his capacity as a citizen rather than in the context of his employment.  Although Hicks made no indication that he regarded his claims as a matter of public concern at the time he made his complaint to Baylor or Investigator Davis, Hicks now claims that he told the Mayor although the Mayor does not recall such a statement. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).* There were no claims made by Hicks to anyone regarding concern for the safety of the public. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).* There were no claims of corruption made by Hicks to anyone. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).*  There is absolutely no evidence that Hicks' statement was anything other than in his official capacity pursuant to his employment as a Captain who had a personality conflict with his

Major; therefore, Hicks cannot prevail on his claim of violation of his First Amendment rights.

In *Garcetti, et al. v. Ceballos*, 126 S.Ct. 1951, 2006 WL 1458026 (May 30, 2006), the U. S. Supreme Court held:

> "When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

It is clear from Hicks' affidavit testimony that his claims were made in the course of his job duties pursuant to his capacity as a government employee who had a problem with his supervisor's management style.  Hicks cannot now allege that his claims were made as a matter of public concern in an attempt to support a First Amendment claim.  Hicks' statements to the Mayor, Chief Baylor and to the internal affairs investigator were merely an internal grievance regarding routine supervision and management by Murphy.  *(Doc. 13-2; DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and Doc. 1).*  Hicks has nothing more than wholly unsupported conclusory allegations to support a public concern claim.  *(Doc. 13-2 and Doc. 1).*

Hicks' speech was not protected by the First Amendment. Therefore, Hicks cannot prevail on his First Amendment based claim of retaliation.  Hicks cannot now change the content of his complaints or his reasons for making them.  Hicks appears to be claiming that, in hindsight, he thinks his complaints were a matter of public concern, but this is too little too late. There is no evidence to indicate Hicks' reasons for complaining about Murphy brought his speech within the protection of the First Amendment. At the time there was nothing about public concern in the statements Hicks made to Baylor, the Mayor and Investigator Davis.  Now, faced with the legal standards he must meet in order to maintain this action, Hicks submits an affidavit that his complaints against Murphy were made as a citizen on a matter of public concern. This transparent

attempt to circumvent the requirements set out in *Garcetti* establishing what constitutes protected speech is disingenuous and should not be rewarded.

On page 2 of his affidavit, Hicks contends that it was not a requirement of his job as a Captain of the Montgomery Police Department to report that he had concerns on a matter that had a dramatic effect on public safety.

> Major Murphy was confrontational and abusive to me, and to numerous others within the division. The morale within the division, due to Major Kevin Murphy's management, effected the efficiency of the division and the safety of the public. It was not a requirement of my employment, nor a part of my job description to complain or seek some form of grievance against Major Kevin Murphy. I was not compelled to do so as a part of my regular job duties as a Captain of the Montgomery Police Department, but I complained because of the severe morale problems in the patrol division had a dramatic effect, in my opinion, on public safety. I made my complaints as a private citizen, but did so within the department rather than going public, even though it was a matter of public interest.

Hicks cannot have it both ways. Hicks is an officer sworn to protect the public. The safety of the public is always a job responsibility of a police officer and Hicks was a Captain and Second Shift commander. Further, on pages 4-5 in the affidavit Hicks states:

> My complaint to the Chief concerning Major Kevin Murphy was not limited to my work conditions, but the overall morale problems for the entire patrol division, and that they were to such an extent, and that the patrol officers were so fearful of retribution for trivial mistakes, that they were not efficiently doing their job to protect the public. To me, this was a matter of great public concern, and if I had made it known to the media or the public in general, it would have caused the public to be fearful and to lose trust of the Police Department. I went through channels, but my seeking redress for the actions of Major Kevin Murphy to the entire patrol division of the Police Department was in my capacity as a citizen, and was over public concern for the safety of those who depended on the patrol division of the City of Montgomery Police Department.

Hicks never told anyone that Murphy's behavior was matter of public concern, or that he

feared for the safety of the public, or that he knew of any corruption in the department. *(DX 1, Baylor Affidavit, DX 3, Davis Affidavit and DX 4, Bright Affidavit).* If Hicks truly thought Montgomery patrol officers were compromised in their ability to protect the public, then Hicks' had a duty, as a supervisor and sworn police officer, to report this concern to the Department.

Hicks cites *Vila v. Padron,* 484 F.3d 1334 (11th Cir. 2007), for the proposition that a public employee may not be punished in retaliation for speech protected under the First Amendment. In that case the Plaintiff, Adis Vila, made statements raising concerns about the legality of some actions taken at Miami-Dade Community College. Although Vila had levied serious charges about illegal activity, the Eleventh Circuit held that Vila had not engaged in speech protected by the First Amendment. Contrast Hicks' statements in the case at bar, wherein he basically complains that his boss is mean to people. Clearly, if Vila's complaints were not adequate to receive First Amendment protection, Hicks' are not.

In *Vose v. Kliment,* --- F.3d ---, 2007 WL 3120091, a case decided in October 2007, by the Seventh Circuit, a former police officer sued the chief of police and deputy police chief under 42 U.S.C. § 1983 alleging First Amendment violations. The Plaintiff, Ronald Vose, was a police sergeant in the narcotics division for the City of Springfield Police Department. Vose had been with the department for more than 26 years. Vose learned that detectives in the major case unit were using **phoney** drug investigations as a means to gather evidence by searching garbage, also known as "trash rip", from specific residences or locations in order to have a lawful basis to obtain search warrants for those locations. Vose was concerned that the trash rips and lack of coordination between his narcotics unit and the major case unit could compromise actual ongoing drug investigations. Vose also learned that detectives were violating laws applicable to the search

warrant process, and that the detectives filed false or misleading affidavits with the courts in support of the search warrants. Vose claimed that he spoke as a citizen in reporting the alleged misconduct because he discovered the alleged misconduct in an independent investigation that was not part of his duties. The Seventh Circuit held that the reports by Vose to his supervisors about suspected misconduct by other officers were not protected speech. Again, clearly Hicks' complaints fall well short of the standard required for First Amendment protection, if Vose's complaints of rampant Constitutional violations that directly impacted the public were not enough.

Here, Hicks made complaints as a government employee in the routine course of his job and pursuant to his official duties; therefore, his speech did not qualify for First Amendment protection. *Garcetti, et al. v. Ceballos*, 126 S.Ct. 1951, 2006 WL 1458026 (May 30, 2006). Hicks cannot prevail on his claim of violation of his First Amendment rights, and Defendants are entitled to summary judgment as a matter of law.

### B.  NO RETALIATION AGAINST HICKS

Although Hicks claims that he was subjected to retaliation, Hicks must first prove that he has participated in First Amendment protected speech. Retaliation is only actionable if it is for an unlawful reason. Hicks cannot prove this threshold issue, rendering further analysis unnecessary.

Assuming *arguendo* that Hicks' speech was protected and therefore retaliation would be unlawful, Hicks still cannot prevail on his claim of retaliation. Hicks claims Baylor retaliated against him by (1) moving him to the desk from patrol; (2) not assigning Hicks a vehicle; (3) assigning Hicks to work for a civilian rather than giving him the position of municipal jail administrator; (4) assigning Hicks to work in an undesirable office and at undesirable hours; and (4) denying Hicks promotions. *(Doc. 13-2).*

### 1. MOVING HICKS TO THE DESK.

Hicks makes irrelevant and immaterial conclusory allegations in his affidavit regarding what he thought about his assignment to the desk and others that had been assigned to the same position. The only reason Hicks was moved to the desk was Hicks' declaration that he could not work with Murphy. Hicks was being accommodated by being on loan then later transferred to another division from the time that he said that he could not work for Murphy in January 2006 until he was moved back to Patrol Division in October 2006.  *(DX 8, Baylor Depo. p. 32, lines 9 – 17, p. 35, line  15 – p. 37, line 7, p. 80, lines 9 -16 ).*   Hicks might have wanted other assignments and felt like he deserved more, but that does not support a claim for retaliation.

### 2. VEHICLE ASSIGNED TO HICKS.

When Hicks made his original complaint to Baylor in January 2006, Hicks stated that he could not longer work for Murphy.  *(DX 1, Baylor Affidavit and DX 9, Baylor Depo. p 15, lines 1-7, p. 32, lines 9 - 17).*   Hicks was immediately placed on loan status from Patrol Division to Administrative Division but continued to work second shift. *(DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and DX 8, Baylor Depo. p. 15, lines 1-7, p. 32, lines 9 - 17)).*   Because Hicks was on loan and not formally transferred from Patrol Division, he kept the city vehicle assigned to him in Patrol as second shift commander. *(DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and DX 8, Baylor Depo. p.  52 line 14 to p. 53 ,line 17).*

Hicks contends that part of Baylor's retaliation against him was taking away his vehicle. However Captain Hicks was not relieved of the vehicle assigned to him as second shift commander for the Patrol Division until he was actually transferred from the Patrol to Administrative Division in

July 2006. *(DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and DX 8, Baylor Depo.  p. 52 line 14 – p. 53, line 17)..*

There was no vehicle assigned to Hicks' position in the jail.  *(DX 8, Baylor Depo. p. 52 line 14  to p. 53, line 17).* When Hicks was permanently transferred to the Administrative Division, he was relieved of the vehicle assigned to second shift commander for the Patrol Division.  *(Doc. 13-2; DX 1, Baylor Affidavit; DX 2, Murphy Affidavit and DX 8,  Baylor Depo. p. 52 line 14 to  p. 53, line 17).* From January until July, 2006, Hicks kept and used the vehicle assigned to second shift patrol commander although he was not functioning in that capacity.  *(DX 1, Baylor Affidavit and DX 2, Murphy Affidavit and DX 7, Morris Affidavit).*  In fact, during that time his vehicle was replaced with a new one. *(DX 7, Morris Affidavit).*

### 3. ASSIGNING HICKS TO WORK FOR A CIVILIAN, NOT AS JAIL ADMINISTRATOR.

It was Hicks who asked to be assigned to the jail, indicating that he would like to be the Municipal Jail Administrator. *(Doc. 13-2; DX 1, Baylor Affidavit; DX 6, Plaintiff's Response to Defendants' Request for Admission, DX 8, Baylor Depo. p. 36, lines 12-17, p. 55, lines 19-23, p. 56, lines 10-15 and DX 9, Dixon Depo. p. 21, lines 5-7.* However, there is only one position for Municipal Jail Administrator and it was not open.  *(DX 1, Baylor Affidavit and DX 5, Montoya Affidavit).*

After his transfer request was approved, Hicks complained about reporting to a civilian employee, whom Hicks perceived as beneath him in rank. *(Doc. 13-2 and  DX 6, Plaintiff's Response to Defendants' First Request for Admissions).*  Contrary to Hicks' claim, the Municipal Jail Administrator is not a position equivalent to a Corporal or Sergeant.  In fact, the Warden position is in a higher pay grade than Hicks, the civilian equivalent to outranking someone *(DX 4,*

*Montoya Affidavit).*   Further, even Chief Baylor reports to civilians, and doing so is not unheard of or unseemly.  *(DX 8, Baylor Depo. p. 38, lines 5 - 17).*

### 4. <u>U**NDESIRABLE** O**FFICE AND** H**OURS**</u>.

Hicks complains that his about his office and desk in the jail. *(Doc. 13-2).*  However, Baylor instructed that Hicks work out of the Municipal Jail Administrator's office. *(DX 1, Baylor Affidavit; DX 8, Baylor Depo. p. 73, lines 19-23,  p.  74, line 18 to p. 76, line 6 and DX 9, Dixon Depo. p. 22, line 20 to p. 23, line 3).*   Warden Collins and Assistant Warden Brantley found another office for Hicks.  *(DX 8, Baylor Depo. p. 73, line 19 to p. 74, line 10 and DX 9, Dixon Depo. p. 23, lines 4-16).*

Hicks also claims that his work hours in the jail did not allow him to spend time with his family. *(Doc. 1 and Doc. 13-2).*   However, this claim does not make sense unless Hicks was visiting with his family in the middle of the night. Hicks remained on second shift until his permanent transfer in July 2006 to the Administrative Division, working second shift from 2:00 p.m. until 11:00 p.m. Baylor instructed that Hicks work a different schedule than the Municipal Jail Administrator worked, so there would not be overlapping of employees in that office. *(DX 1, Baylor Affidavit; DX 8, Baylor Depo. p. 56,  lines 4-17 and DX 9, Dixon Depo. p. 30, lines 12-15 and p.  31, line 18 to p. 32, line 5).*

Hicks now claims that prior to his complaints about Murphy and sometimes after that he consistently stayed at work after midnight and sometimes until 1:30 a.m. when his shift ended at 11:00 p.m., which is not very different from the 4:00 p.m. until 1:00 a.m. shift he worked while assigned to the jail.  *(Doc. 13-2, DX 1, Baylor Affidavit and DX 2, Murphy Affidavit).*  Further, despite the fact that Hicks himself requested the jail assignment, when the Mayor learned that Hicks was not happy with his jail assignment, he met with Hicks then called Baylor and ordered Hicks be

moved.  *(Doc. 13-2 and DX 4, Bright Affidavit).*

### 5. DENIED PROMOTIONS.

Finally, Hicks alleges that he was denied promotions but he was transferred back to the Patrol Division as first shift patrol commander in October 2006. *(DX 2, Murphy Affidavit).* Hicks is now scheduled to work from 6:00 a.m. until 3:00 p.m. Although again, as shift commander, he may have to come in a little early or leave a little later than the regular shift hours*,* this assignment as first shift commander is a very desirable assignment amongst supervisory personnel.  *(DX 2, Murphy Affidavit).*  Additionally Hicks has not provided any evidence of any promotions that he was denied or of any other captain slots available or that he requested.

In conclusion, as previously stated, Hicks must first prove that his complaints about Murphy were speech protected by the First Amendment.  Hicks cannot, and therefore his retaliation claim must fail.  Additionally, Hicks cannot show any retaliation by either the City of Montgomery or Chief Baylor.  Because Hicks made no First Amendment protected speech, there can be no unlawful retaliation. The facts do not show any actions that could be construed as retaliatory anyway.  Thus, Defendants are entitled to summary judgment as a matter of law.

### C. BAYLOR IS ENTITLED TO QUALIFIED IMMUNITY

Chief Baylor is entitled to qualified immunity.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  Hicks contends that Baylor knew his actions were unconstitutional, but that was not Baylor's testimony.  Baylor unequivocally stated that he did not retaliate against Hicks and he thought retaliation of any kind was wrong. *(DX 8, Baylor Depo. p. 42, line 17 to  p. 47, line 8).*

In order to receive qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002). It is undisputed that Baylor was acting as Hicks' supervisor and acting in his capacity as a police officer at all times relevant, therefore satisfying the first prong of the qualified immunity test.

Having established the first requirement, the burden shifts to the Hicks to prove that qualified immunity is not warranted. *Id.* First "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Sammons v. Taylor*, 967 F. 2d 1533, 1539 (11th Cir. 1992). "Then the burden shifts to the plaintiff to demonstrate that the defendant 'violated clearly established constitutional law.'" *Id.* As shown above, Hicks cannot prove that his speech was protected by the First Amendment. Therefore Hicks cannot prove that Baylor violated clearly established constitutional law.

Once the qualified immunity defense is raised, the plaintiff bears the burden of showing that the federal rights allegedly violated were "clearly established." *Barts v. Joyner*, 865 F. 2d 1187, 1190 (11th Cir. 1989), citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). There is nothing here to support a finding that Chief Baylor violated federal law. Hicks cannot establish a claim against Baylor for retaliation. Therefore, Baylor is entitled to summary judgment as a matter of law.

### D. CLAIMS AGAINST THE CITY OF MONTGOMERY

A municipality is liable only for its own wrongs and cannot be liable under the theory of respondeat superior. Hicks may not base claims against the City on respondeat superior or vicarious liability; rather, he must show an official policy or custom of the City directly caused the alleged

injury to him. A governing entity cannot be held liable in an action brought pursuant to 42 U.S.C.A. § 1983 under a theory of respondeat superior. *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 694 (1978).

Baylor is not the final policymaker for the City of Montgomery. The Mayor is the final policy maker for the City of Montgomery. Baylor advises the Mayor of transfers and recommends promotions to the Mayor. However, the Mayor has the ultimate authority to make or override any decision. *(DX 8, Baylor Depo. p. 14, lines 13 – 17, p. 15, lines 13- 18, p. 16, line 17-p. 17, line 21, p. 48, line 7- p. 51, line 15).*

Not only can Hicks not prevail on his claim of First Amendment based retaliation, Hicks has not submitted evidence that any final policymaker of the City acted with an unconstitutional motive. It is clear from the testimony of Baylor, as well as from Hicks' own affidavit that the Mayor had the authority to decide whether Hicks would be required to work under Murphy or be moved. *(Doc. 13-2; DX 1, Baylor Affidavit and DX 8, Baylor Depo. p. 14, lines 13 – 17, p. 15, lines 13- 18, p. 16, line 17-p. 17, line 21, p. 48, line 7- p. 51, line 15).* The Mayor accommodated Hicks at every request. *(Doc. 13-2; DX 1, Baylor Affidavit, DX 4, Bright Affidavit and DX 8, Baylor Depo. p. 14, lines 13 – 17, p. 15, lines 13- 18, p. 16, line 17, p. 17, line 21, p. 48, line, p. 51, line 15.).*

In the present case, Hicks cannot succeed on his claim of a practice or custom that would make the City of Montgomery liable under 42 U.S.C. § 1983. Hicks made his complaints against Murphy in January 2006. From that day, Hicks was transferred, on loan or otherwise accommodated at Hicks' request either to Chief Baylor or to the Mayor.

Merely using the words "policy" or "custom" or "unconstitutional" in the allegation is not sufficient to state a claim under 42 U.S.C. § 1983. *See Monell v. Dept. of Social Services*, 436 U.S.

14

658 (1978). Hicks has only made conclusory allegations in an effort to try to make the City liable. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56.

The City of Montgomery is entitled to summary judgment on Hicks's claim of First Amendment based retaliation as there is no genuine issue of any material fact.

## IV.    CONCLUSION

Hicks cannot succeed on any of his claims under the First Amendment. Hicks submits only conclusory allegations that his complaints about his supervisor mismanaging the patrol division were a matter of public concern and thus protected by the First Amendment. The allegations of the Complaint and undisputed facts reflect that Hicks' speech was made pursuant to his employment as a Captain in the Patrol Division of the Montgomery Police Department. Hicks' claims that Murphy was confrontational and abusive to Plaintiff and others within the division to the point that it affected morale and efficiency were directly related to his employment with the City, and were not made as a citizen in a matter of public concern.

Chief Baylor is entitled to qualified immunity for the reasons set forth above. Further, Hicks cannot prevail on his § 1983 claim against the City. From the day he made his claim, Hicks was transferred, on loan or otherwise accommodated at Hicks' requests made to Chief Baylor and the Mayor. The City has no custom or policy that has violated Hicks' constitutional rights. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56.

In light of the foregoing, summary judgment should be entered in favor of both Defendants

with respect to all claims.

Respectfully submitted this 2nd day of January, 2008.

/s/ Kimberly O. Fehl
Kimberly O. Fehl (FEH001)

OF COUNSEL:
City of Montgomery
City Attorney's Office
P. O. Box 1111
Montgomery, AL 36101-1111
Telephone:  (334) 241-2050
Facsimile:  (334) 241-2310

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of January, 2008, I electronically filed the foregoing with

the Court of the Clerk using the CM/ECF system to be upon the following:

J. Bernard Brannan, Jr.
*The Brannan Law Firm, P. C.*
602 South Hull Street
Montgomery, AL 36104

/s/ Kimberly O. Fehl
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **GARY HICKS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CASE NO:  2:06-CV-1017-WKW** |
| | * | |
| **CITY OF MONTGOMERY and** | * | |
| **CHIEF ARTHUR BAYLOR,** | * | |
| | * | |
| **Defendants.** | * | |

**EVIDENTIARY SUBMISSIONS IN SUPPORT OF DEFENDANTS'
REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Montgomery and A.D. Baylor, adopt and incorporate the previously submitted evidentiary submissions in support of Defendants' Motion for Summary Judgment:

> *DX 1, Affidavit of A.D. Baylor*
>
> *DX 2, Affidavit of K.J. Murphy*
>
> *DX 3, Affidavit of W.D. Davis*
>
> *DX 4, Affidavit of Mayor Bobby Bright*
>
> *DX 5, Affidavit of Barbara M. Montoya*
>
> *DX 6, Plaintiff's Response to Defendants' Request for Admission*

Also, Defendants submit the following additional evidentiary submissions in support of Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment:

> *DX 7, Affidavit of David Morris*

*DX 8, Deposition of Arthur Baylor*

*DX 9, Deposition of Celia Dixon[1]*

*Doc 13-2, PX 1, Affidavit of Gary Hicks*

Respectfully submitted this 2nd day of January, 2008.

<u>/s/ Kimberly O. Fehl</u>
Kimberly O. Fehl (FEH001)

OF COUNSEL:
City of Montgomery
City Attorney's Office
P. O. Box 1111
Montgomery, AL 36101-1111
Telephone:  (334) 241-2050
Facsimile:  (334) 241-2310

### **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of January, 2008, I electronically filed the foregoing with the Court of the Clerk using the CM/ECF system to be upon the following:

J. Bernard Brannan, Jr.
*The Brannan Law Firm, P. C.*
602 South Hull Street
Montgomery, AL 36104

<u>/s/ Kimberly O. Fehl</u>
OF COUNSEL

---

[1] Counsel for Defendants did not receive a formatted copy of the deposition transcript of Celia Dixon's testimony until late afternoon. Accordingly, Deponent Dixon has not yet had an opportunity to review and sign her deposition, although she previously reserved the right to do so.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION**

PLAINTIFF'S
EXHIBIT

*1*

| | | |
|---|---|---|
| **GARY HICKS** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **VS.** | * | **CIVIL ACTION NO.: 2:06-CV-1017-WKW** |
| | * | |
| **THE CITY OF MONTGOMERY** | * | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| | * | |
| **and** | * | |
| | * | |
| **CHIEF ARTHUR BAYLOR** | * | |
| | * | |
| **Defendants.** | * | |

**<u>AFFIDAVIT OF CAPTAIN GARY HICKS</u>**

My name is Gary Hicks. I am a Captain with the City of Montgomery's Police Department. My ultimate supervisor, who is the final policy maker for the City of Montgomery Police Department, is Chief Arthur Baylor. I have been assigned to the patrol division and at all times incident to the Complaint I filed against Major Kevin Murphy, I was supervised by him. During my time under his supervision, Major Kevin Murphy treated the vast majority of persons assigned to the patrol division in an unfair and abusive way. His actions in supervising the employees assigned to the patrol division were contrary to the practices and policies of the Montgomery Police Department. There was mismanagement and corruption of the overall morale of the men due to the mismanagement and undue stress placed upon them by Major Murphy. Murphy's actions caused the men to be reactive in their police duties, instead of proactive. This morale problem and fear in the men to be proactive caused a public safety concern, as the men were not efficiently going about their duties, afraid of making a mistake and being punished by Major Murphy. The men in the patrol

division felt that the men's self-initiated calls for service were scrutinized by Major Murphy, and they were admonished continuously for mistakes or errors that did not exist. The entire division of men was constantly trying to avoid retribution from Murphy. Major Kevin Murphy was confrontational and abusive to me, and to numerous others within the division. The morale within the division, due to Major Kevin Murphy's management, effected the efficiency of the division and the safety of the public. It was not a requirement of my employment, nor a part of my job description to complain or seek some form of grievance against Major Kevin Murphy. I was not compelled to do so as a part of my regular job duties as a Captain of the Montgomery Police Department, but I complained because the severe morale problems in the patrol division had a dramatic effect, in my opinion, on public safety. I made my complaint as a private citizen, but did so within the department rather than going public, even though it was a matter of public interest. There was an investigation that lasted over six months of Major Kevin Murphy as a result of my complaint. Over 30 officers gave statements complaining about Major Kevin Murphy. Major Kevin Murphy was close to Chief Arthur Baylor, and since this investigation, Chief Arthur Baylor has been instrumental in having Major Kevin Murphy promoted to Deputy Chief and the rank of Lieutenant Colonel. The investigation of Major Kevin Murphy was conducted by the Montgomery Fire Department, and the individuals who gave statements were advised that Major Kevin Murphy would not be made aware of the substance of their statement, and that was not true, as the Chief of Police provided those statements to Major Kevin Murphy. When I made my complaint about Major Kevin Murphy, I was assigned from the patrol division to the desk. That assignment was commonly used to place officers who were under investigation. Major Kevin Murphy, who was the person who was under investigation, was allowed to remain as the commander of the patrol division. While I was assigned to the desk, Major Kevin Murphy told people that there was a big investigation going on, and

Captain Hicks has been assigned to the desk. He did not relate that he was the one being investigated and that I was the complaining party. The Chief of Police had assigned me to the desk, and while I remained assigned to the desk, it gave the appearance that I was guilty of misconduct. During the time that I was assigned to the desk, an officer of the Montgomery Police Department was arrested for child abuse, and the department released to the media that pending the prosecution, that officer would be assigned to the desk, further giving the appearance that I had committed wrongdoing. While I was assigned to the desk, there was another Montgomery police officer who had been accused of rape, and while that was being investigated, he was assigned to the desk, further giving the appearance that I was there because I had committed some form of wrongdoing. Normally, the person under investigation is moved to the desk, not the complaining party. After the desk, the Chief had me assigned to the jail with no assigned duties. Major Kevin Murphy was never removed from his position, even though the investigation revealed a considerable number of officers complaining about his actions. While Major Kevin Murphy was under investigation, because of the close relationship between Murphy and the Chief, Murphy was in charge of the entire Police Department during absences of the Chief. Prior to my complaint of Major Kevin Murphy and since that time, I have consistently stayed after midnight and sometimes until 1:30 a.m., when my shift ended at 11:00 p.m. I have always checked and re-checked the daily reports, both factually and grammatically. On numerous occasions, Major Kevin Murphy would call me at my residence from 7:00 a.m. to 7:30 a.m. to proverably berate me over minor, unimportant grammar errors in the daily report made by individuals I supervised, such as the use of "was" and "were" in a sentence. Major Kevin Murphy also sent me and other supervisors threatening email over misspelled words in the daily log, stating that he would use severe disciplinary action against us if we didn't "tighten up." He also sent me and other subordinates threatening emails where he quoted Erwin Rommell. Once

the six month investigation was completed, I was called to the Chief's office, along with Major Kevin Murphy. The Chief advised that the investigation was concluded and no action was going to be taken. From the statements the Chief made during that meeting, it was obvious that Major Kevin Murphy had reviewed the file of complaints against him, even though during the investigation, the officers giving information had been advised that he would not receive such. At that time, I advised the Chief and Major Kevin Murphy that I did not feel that I could work in his division after the investigation and requested that I be transferred. At first, Chief Baylor advised that he would not entertain the transfer. During my meeting with Chief Baylor and Major Kevin Murphy, Captain Purvis Fleming was also in the office, and he is the first person to suggest that I work in the jail as an administrator and liaison position over Warden Collins. The Chief made no response to that statement, and then advised me to type the letter as soon as possible. The Chief stated that my position would be a "Super-Supervisor." I asked Chief Baylor how soon I needed to turn the request, and he advised me, "As soon as possible." I prepared a request for transfer, seeking to be the administrator of the jail, which would be the highest ranking official within the jail. I presented that to my supervisor at the time, Major Celia Dixon. She presented it to Chief Arthur Baylor. Upon receipt, Chief Arthur Baylor advised Major Celia Dixon that he did not know what this was about and that Captain Gary Hicks was not going to be transferred. The Chief later denied this to Major Dixon and stated that he would not accept my letter. My complaint to the Chief concerning Major Kevin Murphy was not limited to my work conditions, but the overall morale problems for the entire patrol division, and that they were to such an extent, and that the patrol officers were so fearful of retribution for trivial mistakes, that they were not efficiently doing their job to protect the public. To me, this was a matter of great public concern, and if I had made it known to the media or the public in general, it would have caused the public to be fearful and to lose trust of the Police

Department. I went through the channels, but my seeking redress for the actions of Major Kevin Murphy to the entire patrol division of the Police Department was in my capacity as a citizen, and was over public concern for the safety of those who depended on the patrol division of the City of Montgomery Police Department. I went through the proper channels and requested of the Chief to be allowed to speak with the Mayor of the City of Montgomery. I received permission to do so and met with the Mayor. I advised the Mayor of my assignment in the jail and that the safety of the City, which is a matter of public concern, was compromised, as there were few Captains now assigned to the patrol division, and that the division was mismanaged and the morale of the men was compromised to the extent that the public was not being adequately protected on the street. The Mayor advised me that I would be transferred and would not be required to work under supervision of Major Kevin Murphy. Chief Arthur Baylor again called me to his office and was visibly upset with me, and advised that I would be assigned to the jail, that I would not be the jail administrator, and that I would be supervised by a civilian employee, the assistant warden. Chief Baylor complained and said to me, "You have gone above me head." I was not given any job responsibility when I was transferred to the jail, and I was given little or nothing to do. While assigned to the jail, I was put in a room to be treated as an office that had storage boxes and stored furniture. There was no typewriter or computer. The desk had two broken drawers and the automobile that was assigned to me was taken from me, and I was the only Captain with the Montgomery Police Department who was not assigned a vehicle. The jail inmates had traditionally hung their dirty laundry on the bars of the jail, which were located right outside the area that I was given as an office, which was more of a storage room with a sink. After receiving this assignment, I again asked to be allowed to go to the Mayor. Chief Arthur Baylor denied the request without giving me a reason, other than he would not allow me to go over his head again. On one occasion, I had come downstairs from the jail in

order to enter certain information upon the computer, and Chief Arthur Baylor saw me at that time, and advised Captain McCloud, the Assistant Division Commander of the Administrative Division, that I was not to leave the jail, and after that a memo was issued that stated that Captain Gary Hicks was "confined" to the jail.   There were available Captain slots in a number of areas within the Montgomery Police Department that were not filled, but I remained assigned to the jail, reporting to a civilian employee in a capacity that, as far as the chain of command, would be equal to a Corporal or Sergeants position.  I was denied the right to be assigned to one of the available Captain slots.  I was not in an assigned slot working in the jail.  Captains who had less time and grade than me received assignments for Captains, while I remained assigned in an undesignated slot in the jail. My work hours were changed to be 4:00 p.m. until 1:00 a.m., and there was no other designated shift for those hours within the Police Department.  I was the only employee of the Police Department working that designated shift.  Those hours made it impossible for me to have any time to spend with my children during the week.  When I complained about this assignment, Chief Arthur Baylor advised me that, "This is what you asked for."  And I told him that I did not ask to be assigned to the jail, reporting to a civilian, but rather to be the administrator of the jail as a Captain working a normal shift, and only asked for that because it had been suggested by the Chief as the alternative to being assigned to work under Major Kevin Murphy.  Mayor Bobby Bright, by and through his assistant, Michael Burdell, contacted me and had me report to him.  In that meeting, the Mayor said he had heard through a confidential source that I was dissatisfied with the jail assignment.  I told the Mayor that I was dissatisfied and that I was being retaliated against.  The Mayor told me he would talk to the Chief and would call me back.  The Mayor did not call me back, but I received word that I was being assigned back to Major Kevin Murphy's division and would be required to report to another Captain who was junior to me.  While the Plaintiff was "confined" to work in the jail, a

number of lieutenants were promoted to Captain, and two newly appointed Captains junior to me were promoted to Assistant Division Commander positions. Therefore, I was passed over for these assignments and such was retaliation. I believe Chief Baylor retaliated against me because I complained and caused Major Kevin Murphy to be investigated.

_____
GARY HICKS

SWORN TO AND SUBSCRIBED before me on this the *19TH.* day of December, 2007.

_____
Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY HICKS,                          *
                                     *
        Plaintiff,                   *
                                     *
vs.                                  *        CASE NO:  2:06-CV-1017-WKW
                                     *
CITY OF MONTGOMERY and               *
CHIEF ARTHUR BAYLOR,                 *
                                     *
        Defendants.                  *

## AFFIDAVIT OF DAVID J. MORRIS

Before me, the undersigned authority, personally appeared David J. Morris, who is known to me and who, being first duly sworn, deposed on oath, and says:

My name is David J. Morris.  I am over nineteen years of age.  I am currently employed as the Superintendent of the Fuels Division of the City of Montgomery Fleet Management Department.  It is in that capacity that I state the following:

One of my duties as Fuels Division Superintendent is to keep records of fuel transactions for all authorized users. We collect and maintain this information electronically, and can sort the information into reports, such as the one attached.

Certain City employees are authorized to dispense fuel from City-owned and operated fuel dispensers for a variety of City uses, to include lawnmowers, garbage trucks and police vehicles. Every City employee authorized to dispense City fuel is assigned a unique User ID which is their personal PIN number that must be used before every fuel transaction. In addition to using his PIN, the employee must also use the vehicle key which is electronically coded with a unique City identification number

DEFENDANT'S
EXHIBIT
7

assigned to that vehicle. The employee must also input odometer mileage for the vehicle before any fuel will dispense. The Fuels Division collects this User and Vehicle data, along with the date, time and amount of fuel dispensed for every transaction at a City fuel dispenser.

Montgomery Police Officer Gary Hicks, Jr. has been assigned User ID No. 9181. On December 31, 2007, I generated a report, called a Fuelmaster Transaction Listing, wherein I listed all transactions in our system by User ID 9181 between January 1, 2006 and July 31, 2006. Fuel records from January to July, 2006, show that Gary Hicks routinely put fuel into a police vehicle every few days. At the beginning of June, 2006, Gary Hicks began putting fuel into a new police vehicle, with an initial odometer reading of 134 miles.

I have read the above and foregoing affidavit consisting of two (2) pages and state that it is true and correct to my present knowledge and information.

_____
David J. Morris, Affiant
Superintendent, Fuels Division

**SWORN TO AND SUBSCRIBED** before me this 2 day of January 2008.

Notary Public for the State of Alabama
My Commission Expires: 7-23-09

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GARY HICKS,                          *
                                     *
        Plaintiff,                   *
                                     *
vs.                                  *        CASE NO:  2:06-CV-1017-WKW
                                     *
CITY OF MONTGOMERY and               *
CHIEF ARTHUR BAYLOR,                 *
                                     *
        Defendants.                  *

## CERTIFICATE OF AUTHENTICITY

I hereby certify that the attached is a true and complete copy of the City of

Montgomery Fuel Records pertaining to User ID No. 9181, assigned to Gary Hicks, Jr.,

between January 1, 2006 and July 31, 2006, as they are kept in the Fuels Division of the

City of Montgomery Fleet Management Department.

I further certify that all records of the Fuels Division are in the care, custody and

control of the Fuels Division, and are made in the regular course of business, at the time

of the events, transactions or occurrences to which they refer, or within a reasonable time

thereafter.

Signed this the _2_ day of January 2008.

_____
David J. Morris
Custodian of City of Montgomery
Fuel Records

SWORN TO AND SUBSCRIBED before me this _2_ day of January 2008.

_____
Notary Public for the State of Alabama
My Commission Expires: _7-23-09_

# FUELMASTER TRANSACTION LISTING

## TRANSACTIONS LISTED BY USER ID

From Date: 1/1/2006 Time: 12:00:00AM  
To Date: 7/31/2006 Time: 11:59:59PM  
Print Date: 12/31/2007 Time: 1:48:01PM  
Page 1 of 4

**Transactions for USER ID: 00009181   HICKS, JR.,**

**Transactions for Vehicle 00000207 : POLICE PACKAGE   CROWN VIC P71**

| Date | Time | TC | Site User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|----|----|----|----|----|----|----|----|
| 1/4/2006 | 4:55:00PM | 00 | 00NR 00009181 | 124,380 | ******* | 3 | 2 | | 10.10GL | |
| 1/5/2006 | 6:07:00PM | 00 | 00NR 00009181 | 124,443 | ******* | 3 | 2 | | 13.10GL | |
| 1/8/2006 | 7:50:00PM | 00 | 00NR 00009181 | 124,743 | ******* | 1 | 2 | | 11.00GL | |
| 1/10/2006 | 7:36:00PM | 00 | 00NR 00009181 | 124,875 | ******* | 1 | 2 | | 12.50GL | |
| 1/15/2006 | 7:46:00PM | 00 | 00NR 00009181 | 125,025 | ******* | 1 | 2 | | 14.10GL | |
| 1/18/2006 | 11:25:00PM | 00 | 00NR 00009181 | 125,221 | ******* | 1 | 2 | | 10.50GL | |
| 1/23/2006 | 11:50:00PM | 00 | 00NR 00009181 | 125,394 | ******* | 1 | 2 | | 15.40GL | |
| 1/26/2006 | 6:01:00AM | 00 | 00TA 00009181 | 125,529 | ******* | 1 | 2 | | 11.20GL | |
| 1/26/2006 | 6:33:00PM | 00 | 00NR 00009181 | 125,688 | ******* | 3 | 2 | | 12.00GL | |
| 1/29/2006 | 5:55:00PM | 00 | 00NR 00009181 | 125,799 | ******* | 2 | 2 | | 9.09GL | |
| 2/2/2006 | 7:49:00PM | 00 | 00NR 00009181 | 125,957 | ******* | 1 | 2 | | 11.80GL | |
| 2/6/2006 | 12:14:00AM | 00 | 00NR 00009181 | 126,144 | ******* | 1 | 2 | | 13.20GL | |
| 2/10/2006 | 8:36:00PM | 00 | 00NR 00009181 | 126,353 | ******* | 1 | 2 | | 15.10GL | |
| 2/13/2006 | 7:11:00PM | 00 | 00NR 00009181 | 126,542 | ******* | 1 | 2 | | 12.20GL | |
| 2/16/2006 | 8:09:00PM | 00 | 00NR 00009181 | 126,717 | ******* | 1 | 2 | | 13.80GL | |
| 2/19/2006 | 6:59:00PM | 00 | 00NR 00009181 | 126,859 | ******* | 1 | 2 | | 8.40GL | |
| 2/22/2006 | 6:30:00PM | 00 | 00NR 00009181 | 127,162 | ******* | 1 | 2 | | 13.50GL | |
| 2/26/2006 | 11:47:00PM | 00 | 00NR 00009181 | 127,235 | ******* | 3 | 2 | | 12.10GL | |
| 3/1/2006 | 6:14:00PM | 00 | 00RA 00009181 | 127,471 | ******* | 1 | 2 | | 13.20GL | |
| 3/4/2006 | 8:34:00PM | 00 | 00NR 00009181 | 127,721 | ******* | 1 | 2 | | 7.90GL | |
| 3/9/2006 | 12:30:00AM | 00 | 00NR 00009181 | 127,899 | ******* | 1 | 2 | | 12.20GL | |
| 3/13/2006 | 10:44:00PM | 00 | 00NR 00009181 | 128,054 | ******* | 1 | 2 | | 10.60GL | |

# FUELMASTER TRANSACTION LISTING

## TRANSACTIONS LISTED BY USER ID

From Date: 1/1/2006    Time: 12:00:00AM
To Date: 7/31/2006    Time: 11:59:59PM

Print Date: 12/31/2007  Time: 1:48:01PM
Page 2 of 4

**Transactions for  USER ID: 000009181  HICKS, JR.,**

**Transactions for Vehicle 00000207 : POLICE PACKAGE  CROWN VIC P71**

| Date | Time | TC | Site | User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|------|---------|----------|---------|----------|---------|-----------|----------|-------|
| 3/19/2006 | 6:13:00PM | 00 | 00NR | 00009181 | 128,202 | ******* | 1 | 2 | | 14.50GL | |
| 3/22/2006 | 10:21:00PM | 00 | 00NR | 00009181 | 128,336 | ******* | 1 | 2 | | 9.50GL | |
| 3/27/2006 | 8:10:00PM | 00 | 00NR | 00009181 | 128,502 | ******* | 1 | 2 | | 13.20GL | |
| 3/30/2006 | 10:15:00PM | 00 | 00NR | 00009181 | 128,661 | ******* | 1 | 2 | | 10.70GL | |
| 4/2/2006 | 4:50:00PM | 00 | 00NR | 00009181 | 128,784 | ******* | 1 | 2 | | 13.30GL | |
| 4/5/2006 | 9:29:00PM | 00 | 00TA | 00009181 | 128,904 | ******* | 1 | 2 | | 11.60GL | |
| 4/3/2006 | 11:16:00PM | 00 | 00NR | 00009181 | 129,097 | ******* | 1 | 2 | | 13.10GL | |
| 4/10/2006 | 9:48:00PM | 00 | 00TA | 00009181 | 129,216 | ******* | 2 | 2 | | 10.30GL | |
| 4/12/2006 | 7:08:00PM | 00 | 00NR | 00009181 | 129,405 | ******* | 2 | 2 | | 12.60GL | |
| 4/16/2006 | 6:01:00PM | 00 | 00NR | 00009181 | 129,567 | ******* | 1 | 2 | | 9.90GL | |
| 4/20/2006 | 4:31:00PM | 00 | 00NR | 00009181 | 129,723 | ******* | 1 | 2 | | 9.20GL | |
| 4/23/2006 | 5:10:00AM | 00 | 00TA | 00009181 | 129,911 | ******* | 2 | 2 | | 13.60GL | |
| 4/27/2006 | 5:28:00PM | 00 | 00NR | 00009181 | 130,046 | ******* | 1 | 2 | | 13.60GL | |
| 4/30/2006 | 5:41:00PM | 00 | 00NR | 00009181 | 130,243 | ******* | 1 | 2 | | 12.50GL | |
| 5/4/2006 | 11:51:00AM | 00 | 00NR | 00009181 | 130,466 | ******* | 1 | 2 | | 13.30GL | |
| 5/10/2006 | 7:12:00PM | 00 | 00RA | 00009181 | 130,558 | ******* | 1 | 2 | | 12.50GL | |
| 5/12/2006 | 1:58:00PM | 00 | 00NR | 00009181 | 130,681 | ******* | 1 | 2 | | 12.30GL | |
| 5/15/2006 | 5:30:00PM | 00 | 00NR | 00009181 | 130,747 | ******* | 1 | 2 | | 4.90GL | |
| 5/18/2006 | 5:00:00PM | 00 | 00NR | 00009181 | 130,873 | ******* | 3 | 2 | | 11.80GL | |
| 5/21/2006 | 6:43:00PM | 00 | 00NR | 00009181 | 130,985 | ******* | 1 | 2 | | 12.30GL | |
| 5/23/2006 | 8:51:00PM | 00 | 00NR | 00009181 | 131,046 | ******* | 1 | 2 | | 6.50GL | |
| 5/24/2006 | 6:04:00PM | 00 | 00NR | 00009181 | 131,182 | ******* | 1 | 2 | | 10.30GL | |

**Transactions for Vehicle 00000434 :  MID SIZE 4-DOOR LUMINA**

| Date | Time | TC | Site | User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|------|---------|----------|---------|----------|---------|-----------|----------|-------|
| 5/23/2006 | 6:46:00PM | 00 | 00NR | 00009181 | 58,196 | ******* | 3 | 2 | | 4.50GL | |

# TRANSACTIONS LISTED BY USER ID

FUELMASTER TRANSACTION LISTING

From Date: 1/1/2006    Time: 12:00:00AM
To Date: 7/31/2006    Time: 11:59:59PM

Print Date: 12/31/2007  Time: 1:48:01PM
Page 3 of 4

**Transactions for  USER ID: 000009181   HICKS, JR.,**

**Transactions for Vehicle 00002937 : POLICE PACKAGE B&W**

| Date | Time | TC | Site | User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|------|---------|----------|---------|----------|---------|-----------|----------|-------|
| 2/2/2006 | 5:48:00PM | 00 | 00NR | 000009181 | 86,346 | ******** | 1 | 2 | | 8.00GL | |

**Transactions for Vehicle 00003396 : IMPALA MID SIZE SEDAN**

| Date | Time | TC | Site | User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|------|---------|----------|---------|----------|---------|-----------|----------|-------|
| 6/29/2006 | 4:11:00PM | 00 | 00NR | 000009181 | 17,271 | ******** | 3 | 2 | | 11.70GL | |

**Transactions for Vehicle 00003574 : POLICE PACKAGE B&W**

| Date | Time | TC | Site | User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|------|---------|----------|---------|----------|---------|-----------|----------|-------|
| 6/2/2006 | 8:40:00PM | 00 | 00NR | 000009181 | 134 | ******** | 1 | 2 | | 13.80GL | |
| 6/7/2006 | 8:10:00PM | 00 | 00NR | 000009181 | 304 | ******** | 3 | 2 | | 10.20GL | |
| 5/8/2006 | 8:31:00PM | 00 | 00NR | 000009181 | 395 | ******** | 1 | 2 | | 6.90GL | |
| 6/11/2006 | 3:04:00PM | 00 | 00NR | 000009181 | 564 | ******** | 1 | 2 | | 11.60GL | |
| 6/14/2006 | 6:17:00PM | 00 | 00NR | 000009181 | 738 | ******** | 1 | 2 | | 12.60GL | |
| 6/15/2006 | 8:15:00PM | 00 | 00NR | 000009181 | 845 | ******** | 1 | 2 | | 8.20GL | |
| 6/18/2006 | 5:21:00PM | 00 | 00NR | 000009181 | 1,012 | ******** | 1 | 2 | | 11.60GL | |
| 6/20/2006 | 5:00:00PM | 00 | 0BER | 000009181 | 1,149 | ******** | 2 | 2 | | 12.00GL | |
| 6/22/2006 | 7:46:00PM | 00 | 00NR | 000009181 | 1,284 | ******** | 1 | 2 | | 10.20GL | |
| 6/25/2006 | 4:51:00PM | 00 | 00NR | 000009181 | 1,462 | ******** | 1 | 2 | | 13.10GL | |
| 6/28/2006 | 4:35:00PM | 00 | 00NR | 000009181 | 1,653 | ******** | 1 | 2 | | 13.80GL | |
| 6/30/2006 | 1:51:00AM | 00 | 00NR | 000009181 | 1,790 | ******** | 1 | 2 | | 10.30GL | |
| 7/1/2006 | 11:42:00AM | 00 | 07TA | 000009181 | 1,905 | ******** | 2 | 2 | | 12.00GL | |
| 7/2/2006 | 5:41:00PM | 00 | 00NR | 000009181 | 1,960 | ******** | 1 | 2 | | 7.60GL | |
| 7/6/2006 | 8:44:00PM | 00 | 00NR | 000009181 | 2,148 | ******** | 1 | 2 | | 12.80GL | |
| 7/7/2006 | 7:07:00PM | 00 | 00NR | 000009181 | 2,308 | ******** | 1 | 2 | | 9.70GL | |
| 7/12/2006 | 6:10:00PM | 00 | 00NR | 000009181 | 2,487 | ******** | 1 | 2 | | 10.60GL | |
| 7/13/2006 | 8:01:00PM | 00 | 00NR | 000009181 | 2,542 | ******** | 2 | 2 | | 8.00GL | |
| 7/14/2006 | 8:26:00PM | 00 | 07TA | 000009181 | 2,542 | ******** | 2 | 2 | | 8.00GL | |
| 7/17/2006 | 8:08:00PM | 00 | 00NR | 000009181 | 2,583 | ******** | 3 | 2 | | 13.70GL | |

FUELMASTER TRANSACTION LISTING

TRANSACTIONS LISTED BY USER ID

From Date: 1/1/2006
Time: 12:00:00AM

To Date: 7/31/2006
Time: 11:59:59PM

Print Date: 12/31/2007 Time: 1:48:01PM

Page 4 of 4

Transactions for USER ID: 000009181   HICKS, JR.,

Transactions for Vehicle 00003574 :   POLICE PACKAGE B&W

| Date | Time | TC | Site User ID | Odometer | Next PM | Hose CC# | Product | Unit Cost | Quantity | Total |
|------|------|----|-----|----------|---------|----------|---------|-----------|----------|-------|
| 7/20/2006 | 7:13:00PM | 00 | 00NR 000009181 | 2,758 | ******** | 1 | 2 | | 11.10GL | |
| 7/23/2006 | 7:38:00PM | 00 | 00NR 000009181 | 2,917 | ******** | 1 | 2 | | 12.80GL | |
| 7/27/2006 | 5:59:00PM | 00 | 00TA 000009181 | 3,123 | ******** | 2 | 2 | | 12.90GL | |

Summary for USER ID : 000009181

Total for   69   transactions

Quantity
784.19

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:06-CV-1017-WKW

7

8    GARY HICKS,

9               Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY AND CHIEF ARTHUR BAYLOR,

12               Defendant(s).

13

14

15

16

17          DEPOSITION TESTIMONY OF:

18             CHIEF ARTHUR BAYLOR

19

20   December 12, 2007

21   9 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393

DEFENDANT'S EXHIBIT
tabbies
8



```
 1              I, Selah M. Dryer, a Notary Public for
 2     the State of Alabama at Large, acting as
 3     Commissioner, certify that on this date,
 4     pursuant to the Alabama Rules of Civil
 5     Procedure, and the foregoing stipulation of
 6     counsel, there came before me at the law
 7     office(s) of The Brannan Law Firm, 602 South
 8     Hull Street, Montgomery, Alabama  36104,
 9     commencing at approximately 9 AM on December 12,
10     2007, CHIEF ARTHUR BAYLOR, witness in the above
11     cause, for oral examination, whereupon the
12     following proceedings were had:
13
14              CHIEF ARTHUR BAYLOR,
15     being first duly sworn, was examined and
16     testified as follows:
17
18              COURT REPORTER:   Usual
19     stipulations?
20              MR. BRANNAN:   That's fine.
21              MRS. FEHL:   Yes.
22
23
```

1    major is captain, is that correct?

2         A.    Yeah, on the rank scale, yes, sir.

3         Q.    Is that also generally on the

4    reporting scale?

5         A.    Sometimes, not all the time now.

6         Q.    And when you say not all the time,

7    that means because sometimes majors are

8    reporting to captains?

9         A.    That has happened, yes, sir.  And

10   along with a number of other things that have

11   happened through the department -- it's whenever

12   the chief or the mayor has made the assignment.

13        Q.    Does the present mayor make

14   assignments in the police department?

15        A.    Usually -- he has.  He has told me

16   concerning this incident don't do something or

17   whatever -- yes, he has.

18        Q.    Well, be specific on that -- on

19   this incident, what did he tell you?

20        A.    About Captain Hicks.

21        Q.    What did the Mayor tell you on

22   that?

23        A.    Through the whole -- I guess we

```
 1    need to go through the whole story, but in a
 2    nutshell during the investigation I put Captain
 3    Hicks on loan to Administrative Division when
 4    Major Dixon said she could use him because
 5    Captain Hicks said that he could no longer work
 6    for "that man", meaning Major Murphy at the
 7    time.  And in a nutshell the answer to that is:
 8    We did an investigation, and once it was over
 9    and the Mayor said Murphy hadn't done anything
10    wrong it's just management style -- I said well,
11    I'm going to put him back to patrol where he
12    came from and that's when apparently Captain
13    Hicks went to the Mayor and the Mayor said well,
14    appease me, and he said that several times.  And
15    I said, sir, we don't have a whole lot of slots
16    for captains.  And he said well, don't put him
17    back over there right now -- or don't put him
18    back over there.
19         Q.    So the Mayor left it up to you
20    where to assign him -- he just said where not to
21    assign him.
22         A.    Yeah.  I told him we didn't have
23    any other slots for captain, and he said what I
```

1    just told you.  And he had been working for

2    Major Dixon prior to that on loan because she

3    said she could use him.

4          Q.      Normally when you are making a

5    transfer the Mayor doesn't get involved in that,

6    does he?

7          A.      Not usually, not normally.

8          Q.      Was this kind of extraordinary

9    that the Mayor was telling you what to do on a

10   transfer with Hicks?

11         A.      Like I said, he didn't normally

12   say anything -- usually he just gets copies --

13   I'm assuming he gets copies of the transfers and

14   looks at them, but he usually just gets copies

15   of when I'm promoting someone and that's what he

16   has to approve off on.

17         Q.      How does that work, the promotion

18   and his approval?

19         A.      Well, he gets a copy of the list

20   and usually I go with the staff, when the staff

21   brings it to me, I approve them and then I give

22   it to him.  He's the appointing authority for

23   the City.  So we can all make recommendations,

1    but the Mayor has to approve them.

2         Q.    He's the only one that can make a

3    promotion because that's a slot that would be

4    with the merit system and such as that, is that

5    correct?

6         A.    By the City chart he's the

7    appointing authority for the City, yes, sir.

8         Q.    But you don't need his approval to

9    do a transfer?

10        A.    No, sir, not in general, no, sir.

11        Q.    If you are going to make changes

12   in division names and things like that, you are

13   the one that does that, is that correct?

14        A.    Well, I usually advise him.

15        Q.    Sure.

16        A.    And if he has any problem with it,

17   then I'm sure he would say something -- if he

18   goes why are you doing this.  And of course, I

19   will tell him -- and if he has a problem with

20   it, then I wouldn't do it.  But in general no,

21   it's usually the chief and the staff.

22        Q.    Y'all make a decision, you always

23   let him know, and if he has a problem with it he

1   for the police department.

2        Q.      Tell me about the first time

3   Captain Hicks came to you with anything to do

4   with a problem?

5        A.      With what problem?

6        Q.      Well, has he come to you before

7   this litigation concerning complaints about

8   Murphy, has he ever come to you with a problem

9   before?

10       A.      See I hired Captain Hicks, so

11  that's been almost 20 years.

12       Q.      Now I'm not asking about anybody

13  except when you were Chief.  As a Chief, did he

14  ever come to you with any other problem other

15  than his complaint of Murphy?

16       A.      If he did, I don't recall it right

17  this second.

18       Q.      So take me through when he came to

19  you complaining about Murphy, tell me what

20  happened.

21       A.      It was January, I think, of '06 --

22  to be honest with you, I think I was walking out

23  the door -- what I call my side door -- my

```
 1    administrative assistant side door -- and Hicks
 2    and Captain Flemming were standing there.
 3    Captain Flemming was my administrative
 4    assistant.  And I said see you later, I have to
 5    go to an engagement, or an appointment or
 6    whatever I had and that's when Captain
 7    Flemming -- I think it was Captain Flemming --
 8    that said Chief, Captain Hicks wants to talk to
 9    you.  And I said can you handle it, I need to go
10    where I'm headed.  And he said -- either Gary or
11    Captain Flemming, or both said something to the
12    effect no, I really need to talk to you.  So
13    long story short, I didn't go to the
14    appointment, brought Captain Hicks into the
15    office, and I think Captain Flemming -- I'm
16    almost sure Captain Flemming was in there with
17    me -- and talked to Captain Hicks and he started
18    talking about Murphy's management style and went
19    on, and on, and on, and on about that.
20         Q.     What was the gist of his complaint
21    about the management style?  What was he saying?
22         A.     Well, he was mad at Murphy and
23    Murphy was mad at him.  And he was upset because
```

1    of some incident that had happened and Murphy

2    was upset with him.  And they had apparently had

3    some disagreement and I'm assuming it was in

4    Major Murphy -- well Colonel Murphy then --

5    Major Murphy's office.  I talked to him for a

6    while and if I recall I think I called Captain

7    Essex -- I think he was assistant division

8    commander.

9         Q.    Essex would have been assistant

10   division commander?

11        A.    Right -- at that time, if I recall

12   right.  And I think I talked to him, meaning

13   Captain Essex, and either at that time or at a

14   later time during this afternoon I also spoke

15   with then, Major Murphy and Captain Flemming was

16   in there.

17        Q.    What did Murphy tell you?

18        A.    I don't remember exactly what he

19   told me.  But they were talking about something

20   that had happened on Gary's shift in patrol and

21   apparently Murphy was not satisfied with what it

22   was, and that's when they got into a verbal

23   discussion about the incident and that's when, I

1  think, Gary got upset and came around to my

2  office.

3      Q.    Did either one of them tell you

4  that they were raising their voices at each

5  other or anything like that?

6      A.    I think either one or both might

7  have said -- I mean, there was nothing

8  physical -- but I think they were raising their

9  voices at each other.  Now, that's to the best

10 of them telling me about it.

11     Q.    And that's all my question is

12 about, what they told you.

13     A.    Right -- that's what I'm saying.

14     Q.    What brought about the

15 investigation of Murphy?

16     A.    Because Gary was making a

17 complaint.  And he said -- I don't remember his

18 exact words -- but I said Gary, you understand

19 what you are saying?  And he said, yes, sir.

20 And he came up to a general investigation of

21 hostile working environment, and that's what

22 brought the investigation about.

23     Q.    Was the investigation to determine

```
 1   recall right.

 2           Q.       Was he the shift commander for

 3   that?

 4           A.       Right.

 5           Q.       At what point after the

 6   investigation was called for, was it that he was

 7   transferred out of Murphy's or loaned out of

 8   Murphy's division?

 9           A.       When he -- if I recall right, when

10   he came to my office and he said I cannot work

11   for that man is when -- he said I just can't

12   work for him, that's when I called Major Dixon,

13   who was at that time over Administration

14   Division and asked her could she use him and

15   asked Gary could you go to work over there and

16   he said, yes, sir -- so it was during the time

17   while he was in the office with me.

18           Q.       Did you leave it up to Major Dixon

19   to determine where he was going to be assigned?

20           A.       Yes, sir.

21           Q.       You didn't tell her put him here

22   put him there -- you just said, can you use him

23   take him, is that right?
```

1    time from the time Hicks came to you complaining

2    until today, did you ever personally make a

3    decision on where he was going to be placed?

4         A.    The investigation started, I

5    think, back in January of '06 took several

6    months, I think three-plus months or whatever,

7    and what he was doing then I have -- he was

8    working on the desk, or working for the

9    Administrative Division, I should say, for Major

10   Dixon.  After that was over and the Mayor

11   advised me he didn't see anything wrong after

12   Chief Davis, I think it was, did the

13   investigation, he said tell Murphy to go ahead

14   and let's move on.  That's when I went to put

15   Captain Hicks back in Patrol Division and he

16   said he couldn't work for him.  And I said well,

17   Gary this is the police department -- this ain't

18   somewhere you can just decide where you want to

19   work.  And he went back to the Mayor and the

20   Mayor called me, and that's what I was telling

21   you earlier, said don't put him out there --

22   find somewhere or put him somewhere.  And he was

23   already working for Major Dixon, and we were in

1  her office and he sat there -- and if I recall
2  right and you would have to ask Captain Flemming
3  about it -- but they were going back and forth
4  because Major Dixon had been saying I need help
5  in the jail, and so forth and so forth, and Gary
6  said it and/or Captain Flemming -- but I think
7  Captain Flemming said something -- and Gary said
8  I would like to work up in the jail.  And I said
9  you want to work in the jail?  And he said, yes,
10  sir.  I said -- because Gary had changed his
11  mind so many times on everything -- and I said
12  well, give me something in writing.  And then he
13  came back at a later time and gave me something
14  saying he wanted to be the jail administrator.
15  I said, no, sir, there is only one jail
16  administrator according to Personnel and it's
17  already filled by Mr. Collins.  And I said --
18  that's when -- Gary, if you want to work the
19  jail then that's fine.  Major Dixon, can you use
20  him?  She said yes, because she was having some
21  problems and she needed supervision.  And I said
22  okay, since the Mayor won't let me send you back
23  to Patrol where I think you should go -- and I

1   told him that to his face, said he needs to go

2   back to Patrol where he's slotted and the Mayor

3   said no -- so I said, yes, sir I'm following the

4   orders and he said, he meaning Gary Hicks, said

5   yes he wanted to go to the jail and I put him in

6   the jail under Major Dixon at his request and at

7   her request.

8          Q.     So it's your testimony that the

9   first one that came up with anything about going

10  to the jail was Gary Hicks?

11         A.     My testimony -- that's not what I

12  said.

13         Q.     Well, I'm not trying to put

14  words --

15         A.     No, I'm just telling you the

16  facts.  I said, we were all sitting in the

17  office and what I said was either Gary or

18  Captain Flemming said it because Major Dixon

19  said she had problems up in the jail with

20  supervision.  And I think Captain Flemming said

21  something and Gary said yeah, I would like to

22  work up in the jail.

23         Q.     In this meeting Hicks was there,

1    you were there, Flemming was there, was Dixon in

2    that meeting?

3          A.     Yeah, I think Major Dixon was

4    there too -- I'm almost sure she was.

5          Q.     Is there a rule and regulation or

6    a law, or anything that you are familiar with,

7    that concerns a police officer reporting to a

8    civilian other than a public official that's

9    been elected?

10          A.     I don't know of a law -- not to my

11    knowledge.

12          Q.     You don't know of anything that

13    would keep that from happening or would prohibit

14    that I mean?

15          A.     Not to my knowledge, no, sir.  I

16    mean, we report to like Michael Briddell, Jeff

17    Downs -- they are all civilians.

18          Q.     Without the authority of the Mayor

19    they can't tell you what to do, can they?

20          A.     We report to them.

21          Q.     Did you ever, while Captain Hicks

22    was assigned to the jail, complain to Celia

23    Dixon or anyone else that was over Hicks about

1    rank -- if you leave the department without

2    retiring, you usually come back as a rank less

3    than what you were.

4            Q.      But if you retire and you come

5    back, you come back the same rank?

6            A.      Yes, sir, if there is a slot open.

7            Q.      When A.J. Hardy came back, what

8    division did he go to?

9            A.      I would have to look that up.

10           Q.      Was there ever a time when he ran

11    the jail?

12           A.      Yeah, back -- I'm guessing 10, 15

13    years ago, yes, sir.

14           Q.      Before he retired?

15           A.      Yes, sir, the first time, yes,

16    sir.

17           Q.      Now, from your testimony, Chief,

18    and from the affidavit you filed, it's my

19    understanding that your contention is you

20    haven't done anything to retaliate against

21    Captain Hicks, is that correct?

22           A.      That's correct.

23           Q.      And in fact from the affidavit and

```
1   documents you filed, that's one of the positions
2   you take is that "I just haven't retaliated
3   against him at all", is that correct?
4          A.      That's correct.
5          Q.      And you know that it would be
6   improper to retaliate against him, is that
7   correct?
8          A.      Yes.
9                  MRS. FEHL:  Object to the form
10  of the question.
11         Q.      (By Mr. Brannan)  It's your
12  understanding that it would be improper to
13  retaliate against him?
14         A.      Against anyone.
15         Q.      And if someone makes a statement
16  or files a grievance or complains about
17  something going on in the department, you
18  understand that for you to retaliate against
19  them for doing that would be wrong, is that
20  correct?
21                 MRS. FEHL:  Object to the form
22  of the question, you can answer.
23         Q.      (By Mr. Brannan)  You understand
```

```
1    that would be wrong, do you not?

2         A.    Correct.

3         Q.    And back to the time that Captain

4    Hicks came to you and complained, back then you

5    knew that if you did retaliate against him for

6    complaining about another officer and that was

7    the sole reason you retaliated, you realized

8    then that that would be contrary to the law back

9    then, didn't you?

10                MRS. FEHL:  Object to the form

11   of the question.

12        A.    I don't retaliate against anyone,

13   period.

14        Q.    (By Mr. Brannan)  I understand

15   that.  And one of the reasons you don't, is

16   because you know that's against the law, isn't

17   that correct?

18        A.    The reason I don't is because it's

19   just wrong, period.

20        Q.    Sure.  But you understood even

21   back when Hicks came to you that retaliating

22   against somebody for what they had to say would

23   be a violation of their constitutional rights,
```

1    isn't that correct?

2                        MRS. FEHL:   Object to the form

3    of the question.

4            Q.      (By Mr. Brannan)   I mean, you knew

5    back then that that would be violating the

6    constitutional rights?

7            A.      I don't retaliate against --

8            Q.      Sure.

9            A.      I don't retaliate, I never have

10   because it's wrong, period.

11           Q.      And that's not my question.   I

12   understand that's your position that you don't

13   retaliate and never have -- I understand that's

14   your position.   My question is:  Not only did

15   you know it was just wrong, but back at the time

16   that Hicks came to you, you knew that it would

17   have been a violation of law to do that, didn't

18   you?

19                        MRS. FEHL:   I'm going to

20   object to the form of the question.   Are you

21   saying retaliation for instance like that's

22   protected, like if you make -- if somebody makes

23   comments of discriminatory treatment then you

1    can have retaliation.  But if you are saying

2    that I came in and said I don't like your tie

3    and I retaliated against you, that's protected

4    by the constitution.  Is that what you are

5    saying or are you just saying the law for

6    retaliation for making a comment on

7    discrimination?  That's why I'm objecting to the

8    form, because you are asking for a legal --

9              MR. BRANNAN:  Sure.

10         Q.    (By Mr. Brannan)  My question is:

11   Back when Hicks came to you, at that time you

12   knew that if you retaliated against someone for

13   exercising their first amendment right to say

14   something and complain about something, you knew

15   that that law was clearly established and it

16   would be against that law for you to retaliate

17   because of them making a first amendment

18   statement, you knew that, didn't you?

19         A.    Because it was wrong.

20         Q.    Exactly.

21         A.    It's just wrong, period.

22         Q.    Both.

23         A.    It's just wrong.

1      Q.      My question is:  Did you know, not
2   only was it just wrong, but it was also against
3   the constitution and against the law?
4      A.      My answer to it is:  It's wrong,
5   period.
6      Q.      And I understand that's your
7   position -- you didn't do that, is that correct?
8      A.      Yes.
9      Q.      From your testimony you weren't
10   the one that made an assignment to the jail,
11   that would have been Dixon for Gary Hicks?
12      A.      When he was on loan.
13      Q.      Uh-huh.
14      A.      Right.  When he was on loan in
15   January or whenever it started off, I just asked
16   Major Dixon could she use him and she said yes.
17      Q.      Who made the decision when he was
18   transferred?
19      A.      Gary asked.
20      Q.      I understand.  Who approved it?
21   Who put him there?
22      A.      He asked to be -- the Mayor said
23   don't put him back in patrol, and Gary said

1    yeah, I would like to work in the jail and

2    that's when we put him in the jail with my

3    approval and Major Dixon's approval.

4         Q.    I guess what I'm trying to get to

5    is the "we." Who would have been the person

6    that would have assigned him there?

7         A.    Well, my assignment to him was

8    patrol. And when the Mayor overrode that, he

9    asked to go to the jail and that's where he was

10   sent.

11        Q.    Now when you used the term the

12   Mayor overrode that. The Mayor called you up

13   and said appease me, put him somewhere else, is

14   that right?

15        A.    He said appease me, don't send him

16   back to Patrol -- and I said Mayor, we don't

17   have a lot of slots for captains. And I said he

18   needs to go back to where he's assigned, which

19   was Patrol Division. And he said, he meaning

20   Gary Hicks, said he didn't want to go back. And

21   the Mayor said don't send him back. And my

22   position was you need to go to patrol. The

23   Mayor's position was no. So with Gary asking

```
 1   for and with Major Dixon's approval since she
 2   could use him because she needed supervision, he
 3   was sent to the jail.
 4        Q.      And if I were looking at
 5   paperwork, would there be paperwork sending him
 6   to the jail?
 7        A.      Whenever he was transferred it
 8   should be paperwork.
 9        Q.      On that paperwork who would be the
10   one signing off and sending him to the jail?
11        A.      Usually the chief is the one --
12   well, but it's not going to say the jail, it's
13   going to say Administrative Division.
14        Q.      All I'm trying to get to, Chief,
15   I'm not trying to confuse you or anything --
16        A.      I'm not confused.
17        Q.      -- I'm just trying to find out who
18   is the guy that did that.  I know the Mayor used
19   the term "appease me" because the Mayor was not
20   the one making the assignment -- he was asking
21   you because you were the one that makes those
22   assignments.
23        A.      My assignment for Gary Hicks,
```

1  Captain Gary Hicks, was Patrol and the Mayor

2  overrode that.  So with the Mayor and with Gary

3  Hicks and Major Dixon saying she could use him

4  and Gary Hicks saying he wanted to go to the

5  jail, that's when he went to the jail slash

6  Administrative Division.

7       Q.    And I appreciate all of that

8  background.  All I'm trying to get is:  Who

9  makes the transfer?  Without all of that

10 explaining, I understand how we got where we did

11 in your position, but who is the person that

12 actually makes the transfer to the

13 Administrative Division?

14      A.    You say don't do all of the

15 explaining, but I'm going to explain it again.

16      Q.    Well, I don't need to hear the

17 same thing again, Chief.

18           MRS. FEHL:  Did you sign a

19 form to transfer him administration division.

20           THE DEPONENT:  Either I did or

21 if I wasn't there maybe one of the deputy chiefs

22 did -- I'm not sure.

23      Q.    (By Mr. Brannan)  You or a deputy

1    chief -- one major can't assign somebody to

2    another division, can they?

3         A.    If something happened, yeah, they

4    can use that administrative authority to do

5    it -- it's usually temporary.  The chief or

6    deputy chief will come back and look at it.

7         Q.    The chief is going to come back

8    and look at it if the deputy chief does it,

9    isn't he?

10        A.    I'm sure the chief is always going

11   to look at it.

12        Q.    The buck stops there, isn't that

13   correct?

14        A.    Well, it didn't really stop there,

15   it stopped at the Mayor's office -- but yes.

16        Q.    Now, what captains don't have

17   vehicles assigned to them?  And when I say

18   captains, I mean, captain slots or appointments,

19   which ones don't have vehicles?

20        A.    Right now?

21        Q.    Back when this went on and now?

22        A.    Right now all of them should have

23   vehicles.

```
 1        Q.    No matter what place they're
 2   assigned to?
 3        A.    Well, if they're assigned to the
 4   allotted slots, they would have vehicles.  Now
 5   if there is something that's very unusual and
 6   the vehicles that we had are assigned to those
 7   slots, that's where the vehicles stay.
 8        Q.    And that's what I'm trying to
 9   figure out.  Are there any slots for captains
10   right now where the captain does not have a
11   vehicle?
12        A.    Yeah, there are no slots for any
13   captains that don't have vehicles.
14        Q.    At the time Hicks was assigned to
15   the Administrative Division, was there any other
16   captain that did not have a vehicle assigned to
17   him?
18        A.    Well, he had his -- when he
19   started off Gary Hicks had his vehicle because
20   he was on loan.  He requested to go to the jail,
21   which was not slotted as a, quote, captain
22   slot.  That's when that car was going back to
23   Patrol to whoever was going to take his place in
```

1    Patrol.

2          Q.    And my question was:  Was there

3    anybody else without one?  Any other captain

4    without a vehicle at that time?

5          A.    At which time?

6          Q.    The time that Captain Hicks was

7    assigned to the Administrative Division, not on

8    loan but transferred and his car was taken from

9    him, was anybody else without a car?

10          A.    No.  And the reason Captain Hicks'

11    car was assigned to Patrol Division, the only

12    reason he had the car was because he was on loan

13    initially for those three or four months

14    whatever the investigation took when he asked to

15    go to a nonslotted captain slot, that's when

16    that car was going back to Patrol for them to

17    use in the slot that it belongs.

18          Q.    And since there was no slot, then

19    it's your position there was no car, so that's

20    why he had no car?

21          A.    The jail administrator has a car

22    and he was not the jail administrator.  They had

23    a jail administrator already assigned there.

1   yes, sir, I can work for Patrol.  And he asked

2   them Major Murphy -- Major Murphy, let me ask

3   you something, did I do a good job when I was in

4   Patrol and Murphy turned to him and said you did

5   not do a good job, Captain Hicks -- and Captain

6   Hicks turned as red as the pad that is sitting

7   in front of the lady here and that's it.

8        Q.    The flip-flopping was first he

9   didn't want to be in Patrol when he made the

10  complaint, is that the first change?

11       A.    I can't give you the exact, but he

12  kept going back and forth that he could, he

13  couldn't, he could, he couldn't, he could and

14  couldn't.  And I said, Gary, just give me -- if

15  you say you want to go to the jail, give me

16  something in writing so I would have something

17  documented -- that's all I asked him for.

18       Q.    What did he bring you?

19       A.    He brought me something saying he

20  wanted to be transferred to the jail as jail

21  administrator.  And I said no, Gary, we have a

22  jail administrator that's assigned to the jail

23  already and that's Mr. Collins.

```
 1        Q.    Is it your recollection that he

 2   brought that to you or did Major Dixon bring it

 3   to you?

 4        A.    I don't know which one brought it

 5   to me.

 6        Q.    But after it was brought to you

 7   you are saying you told Gary no, we already got

 8   one?

 9        A.    Right.  It might have been Major

10   Dixon, it might have been Captain Hicks -- but I

11   told him I said no.  I said you are not going to

12   be the jail administrator because I'm not going

13   to move the jail administrator out and put

14   somebody else in there until you guys say the

15   jail administrator can't do his job.

16        Q.    You don't remember though whether

17   that was a conversation with Celia Dixon or

18   whether that was a conversation with Gary

19   Hicks?

20        A.    Correct.

21        Q.    If the conversation was with Celia

22   Dixon, did you ever call Gary Hicks in and have

23   that conversation with him yourself?
```

1    Bureau of Prisons and whether he was sworn, I

2    know and he's been here before me and he's still

3    here.

4        Q.    Did the Mayor ever tell you that

5    Gary Hicks told him that he thought he was being

6    retaliated against?

7        A.    If he did, I don't recall him

8    saying something about him being retaliated

9    against.  He just did not like then Major

10   Murphy.

11       Q.    Did the Mayor ever say anything

12   about him not liking the jail?

13       A.    I don't recall.

14       Q.    Did anybody ever talk to you

15   before the lawsuit was filed that Gary Hicks was

16   complaining about being in an office that had a

17   sink in it and things like that.

18       A.    Someone mentioned that to me, but

19   now Major Dixon assigned him to that office.  I

20   assigned him, like I told you earlier, to the

21   jail administrator's office and they were

22   crossing paths for 30 minutes to an hour,

23   whatever the time when it was.  And Major Dixon

1    came to me and asked -- said we found Gary an

2    office and I went -- because it befuddled me

3    because I was wondering where they found an

4    office at because we are short of offices

5    everywhere in the Police Department facility.

6    And they were like oh, no, no -- it's like the

7    nurse's office or something and they said we are

8    going to get that cleaned out. And I said okay,

9    but I told you where to put him and I left that

10   up to her. But as far as I was concerned he was

11   going to the jail administrator's office, which

12   is right at the front door.

13       Q.    Based on the comment you made

14   right then, you said that you told Celia Dixon,

15   I told you where to put him. So you had told

16   her to put him in there?

17       A.    I told her to put --

18       Q.    To put him in the jail

19   administrator's --

20       A.    Jail administrator's office

21   because I knew they didn't have any offices and

22   that way the secretary is in there, the jail

23   administrator is in there and it's a big office

1   and they could cross their paperwork and see

2   what is going on on first shift, second shift,

3   third shift -- and when the jail administrator

4   left then Captain Hicks would take over there,

5   and they would have to pass the paperwork along.

6   Major Dixon or someone in her division came up

7   with the idea of finding him a separate office.

8       Q.    Did you ever hear about him being

9   upset about that office?

10      A.    If I did I don't recall that.

11  Again, after she came and said I found him

12  another office and I questioned her why, you

13  know, you're putting him in there.  I said tell

14  me where you found the office because we were so

15  short on offices and she said it's a nurse's

16  office, I think, and blah, blah, blah and we are

17  cleaning it out and doing this, and I said okay,

18  you handle it.

19      Q.    But you never got any complaint

20  back after that that Hicks had gone to the Mayor

21  and complained about it?

22      A.    The Mayor might have said

23  something, but I told him and Celia the same

1    thing I'm telling you where I told them to put
2    him was right in the jail administrator's
3    office.
4        Q.    You had nothing to do with him
5    being in there?
6        A.    Negative, not one thing.
7        Q.    And somebody may have told you he
8    was complaining about it or may not -- you just
9    don't have a recollection?
10        A.    I don't recall, because I know
11    where I told them to put him.
12        Q.    Did you ever issue any memo that
13    referred to Hicks as being, quote, confined to
14    the jail?
15        A.    No.
16        Q.    Did you ever see any such memo?
17        A.    Not to my knowledge, no, sir.
18        Q.    Do you know whether or not the
19    people that gave statements concerning Kevin
20    Murphy to Davis, do you know whether or not they
21    were told that Murphy would not receive copies
22    of what they have said?
23        A.    I don't know anything about that.

```
 1    all the way through, do you see anything in

 2    there that would cause Hicks to think he had

 3    been retaliated against?

 4         A.    Not to my knowledge, no, sir --

 5    no.

 6         Q.    Do you believe that all the way

 7    through this regardless of who made the

 8    decisions that Hicks was treated fairly?

 9         A.    Yes, sir, he was treated fairly

10    and he was treated at a number of things at his

11    request.

12         Q.    And that would be him requesting

13    to be assigned to the jail?

14         A.    Yes.  Requesting to leave patrol

15    and then later on requesting to work in the jail

16    and so forth.

17                   MR. BRANNAN:  I don't have any

18    further questions.  Thank you, Chief.

19                   THE DEPONENT:  Thank you.

20                   MRS. FEHL:  None.

21              * * * * * * * * * * * * * * * * * * *

22                        10:39 AM

23              FURTHER DEPONENT SAITH NOT
```

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:06-CV-1017-WKW

7

8    GARY HICKS,

9         Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY AND CHIEF ARTHUR BAYLOR,

12        Defendant(s).

13

14

15

16

17              DEPOSITION TESTIMONY OF:

18                   CELIA DIXON

19

20   10:44 AM

21   9 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393

DEFENDANT'S
EXHIBIT
9

COPY



1    I, Selah M. Dryer, a Notary Public for

2 the State of Alabama at Large, acting as

3 Commissioner, certify that on this date,

4 pursuant to the Alabama Rules of Civil

5 Procedure, and the foregoing stipulation of

6 counsel, there came before me at the law

7 office(s) of The Brannan Law Firm, 602 South

8 Hull Street, Montgomery, Alabama  36104,

9 commencing at approximately 10:44 AM on December

10 12, 2007, CELIA DIXON, witness in the above

11 cause, for oral examination, whereupon the

12 following proceedings were had:

13

14      CELIA DIXON,

15 being first duly sworn, was examined and

16 testified as follows:

17

18      COURT REPORTER:  Usual

19 stipulations?

20     MRS. FEHL:  Yes.

21     MR. BRANNAN:  Yes.

22

23

1    that he was confined to the jail?

2         A.    Yes, sir.

3         Q.    Who did you hear use that word?

4         A.    The Chief did.

5         Q.    And the Chief told you that he was

6    confined to the jail?

7         A.    Yes, sir.

8         Q.    At first the terminology in the

9    department that would have been used for Hicks

10   being assigned to you was "on loan", is that

11   correct?

12        A.    Yes, sir.

13        Q.    Did that later become a transfer?

14        A.    Yes, sir.

15        Q.    How did that come about?

16        A.    I'm not sure.  I mean, I just knew

17   he was transferred to me.

18        Q.    You just received paperwork saying

19   that he was transferred?

20        A.    Yes, sir.

21        Q.    While he was on loan to you, did

22   he ever make any effort, that you know of, to

23   get himself permanently assigned there, or was

1    he satisfied with working as being on loan?

2        A.    He was satisfied as being working

3    on loan for the time being.  I don't guess he

4    really knew what was going to happen.

5        Q.    Did he ever give you any paperwork

6    requesting to be the jail administrator?

7        A.    Yes, sir, he did.

8        Q.    Was this before he ever went up to

9    the jail at first?

10       A.    I'm not sure.

11       Q.    Tell me what you remember about

12   him giving you paperwork requesting to be the

13   jail administrator?

14       A.    He gave me the paperwork, said

15   that he could work for me.  I told him I didn't

16   have a place for him.  He said you know with him

17   being up in the jail, officers had been in the

18   jail -- that sworn officers had run the jail

19   before, and that he wanted to, I guess, kind of

20   being like in the chain of command that Warden

21   Collins would come to him to handle problems

22   before they got to me.

23       Q.    Did you take that request to the

```
 1    Chief?
 2         A.     Yes, sir, I did.
 3         Q.     Is that what Hicks asked you to
 4    do?
 5         A.     Yes, sir, he did.
 6         Q.     Did Hicks ever put any paperwork
 7    in or do anything asking to be in a position
 8    where he reported to Warden Collins?
 9         A.     Where Hicks reported to Collins?
10         Q.     Yeah.
11         A.     No, sir.
12         Q.     He complained about reporting to
13    somebody that was not a sworn officer, did he
14    not?
15         A.     Yes, sir.
16         Q.     Is that something that he said was
17    a problem with him being in the position he was
18    in when he was in the jail?
19         A.     Yes, sir.
20         Q.     Did the Chief ever tell you Hicks
21    was supposed to use Warden Collins' office?
22         A.     Yes, sir.  He told -- he wanted --
23    when the computer was to be set up, he said you
```

1    could -- he could use Warden Collins' computer,

2    they could share an office or whatever it is you

3    wanted to do.

4        Q.    How did Hicks end up in the office

5    he was in:  The nurse's office?

6        A.    That's where Warden Collins and

7    Ms. Brantley put him.

8        Q.    And Warden Collins under the

9    circumstances was his supervisor?

10       A.    Yes, sir.

11       Q.    Did you have input in putting him

12   in there?

13       A.    No, sir.

14       Q.    Do you know how Warden Collins

15   came up with the plan to put him in there?

16       A.    No, sir.

17       Q.    Did you ever discuss him being in

18   there with Warden Collins?

19       A.    No, sir.

20       Q.    Did Hicks ever complain to you

21   about being in there?

22       A.    Yes, sir, he complained to me.  It

23   kind of became a running joke, but he said that

```
 1    exact number, because they would -- we would

 2    hire them and people would quit, so I don't know

 3    the exact number.

 4         Q.    Is there a lot of turnovers in the

 5    jail?

 6         A.    Yes, sir.

 7         Q.    Were you given the latitude as the

 8    commander of that division how many people

 9    worked on each shift in jail and such as that?

10         A.    No, sir, that was Warden Collins'

11    responsibility.

12         Q.    When Gary Hicks was changed to

13    work from four in the afternoon until one in the

14    morning, who made that decision?

15         A.    The Chief did and Major Murphy.

16         Q.    Was Major Murphy over Patrol when

17    that decision was made?

18         A.    Yes, sir.

19         Q.    Would he be involved in making

20    that decision because Hicks was on loan to you

21    and worked for him, or how would he be involved

22    in that decision?

23         A.    I would guess so, I'm not sure.
```

1          Q.     But was that during the time that

2     Hicks was on loan and not transferred to you?

3          A.     I think it was.

4          Q.     If he had been transferred to you

5     by then, Murphy as the major over the Patrol

6     Division would have had no say-so in what hours

7     Hicks worked?

8          A.     Correct.

9          Q.     Is it normal for the Chief to make

10    the decisions as to what particular hours people

11    would work?

12         A.     Yes, sir, depending on who they

13    are.

14         Q.     So in certain circumstances the

15    Chief makes the decision on the actual hours the

16    person would work?

17         A.     Yes, sir, he can.

18         Q.     Did the Chief discuss with you why

19    he was making the decision to have Hicks work

20    from four to one?

21         A.     I think it had something to do

22    with I wanted Gary to work different hours so

23    that he could be there for some of first shift

1    and for some of second shift, I think to be at

2    both of their roll calls.  And I was trying to

3    change the hours to go a little earlier, and

4    they went a little later instead.  I think

5    that's how that came about.

6         Q.    When would be the normal time for

7    second shift to come in?

8         A.    I think they have their roll

9    call -- they would be there like 2:00 to 2:30,

10   and I was trying to get him to come in a little

11   earlier so that he could meet with both shifts.

12        Q.    Did you make a request for him to

13   be able to come in a little earlier?

14        A.    I talked to the Chief about it,

15   yes, sir.

16        Q.    And instead of letting him come in

17   earlier and leave earlier, the Chief had him

18   come in later and leave later?

19        A.    Yes, sir.

20        Q.    So on that issue the Chief didn't

21   take your recommendation?

22        A.    No, sir, and it made it awkward

23   for holidays and overtime, and things like that.