IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GARY HICKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:06-cv-1017-WKW [wo] |
| | ) |
| CITY OF MONTGOMERY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on the defendants' Motion for Summary Judgment (Doc. # 8). Gary Hicks ("Hicks"), a Captain in the City of Montgomery's Police Department, brings one claim of First Amendment-based retaliation pursuant to 42 U.S.C. § 1983 against Defendant City of Montgomery ("City") and Defendant Arthur Baylor ("Chief Baylor"), the Chief of the Police Department. (Compl.)  For the reasons set forth below, the defendants' summary judgment motion is due to be granted.

**I. FACTS AND PROCEDURAL HISTORY**

Kevin Murphy ("Major Murphy") was a Major and Patrol Division Commander in the City Police Department in January 2006. (Defs.' Mot. Summ. J. Br. 3.)  Hicks was also assigned to the Patrol Division as a second shift commander and reported to Major Murphy. (*Id.*)  In January 2006, Hicks met with Chief Baylor to complain about Major Murphy's management style and inform him that he could no longer work for him. (*Id.*)  He also alleged that Major Murphy was creating a hostile work environment. (*Id.* at 4.)  Chief Baylor

informed the City Attorney of this allegation on January 10, 2006, and as a result, an internal affairs investigation was conducted by the City Fire Department. (*Id.*; Pl.'s Resp. Br. 2.)

During the course of the investigation, over thirty officers made statements to the investigator, including Hicks, on February 1, 2006. (Doc. # 9-2, at 6-24.) In his statement, Hicks describes various instances of Major Murphy's conduct that constitute the reasons for his complaint. (*See id.*) According to Hicks, Major Murphy allegedly:

1. Demanded answers from police officers about damage to their patrol vehicle that occurred when it hit a suspect during a chase, (*id.* at 8-9);

2. Chastised the officers who hit the suspect with their car and threatened to take away all the vehicles in Patrol Division, (*id.* at 8);

3. Critiqued Hicks's written detail for robbery suppression and yelled at him, (*id.* at 10);

4. Got mad at another officer for not sending him a financial report and did not apologize when he discovered the report was sent, (*id.* at 12);

5. Talked to Hicks "like a child" and attempted to bully and intimidate him, (*id.*);

6. Chastised him for sending so many units out on departmental duty at the same time to receive Hepatitis B shots and asked him why he did not reschedule them, (*id.* at 13);

7. Increased scrutiny of how warrants were issued in the department,

        which "is kind of insulting to the officers," (*id.* at 15);

8. Bypassed Hicks to give orders and assignments to officers below him, such as one time when he asked a Lieutenant if an officer had gotten his car back or checked on the status of a purse snatching, (*id.* at 15-16);

9. Ended a practice of letting second shift supervisors leave work three to four hours early as a reward on Fridays during the Christmas holidays, (*id.* at 16); and

10. Reprimanded him for omitting an entry in a type of police report even though "everybody omits stuff every once in awhile." (*Id.* at 23.)

Hicks also claims that Major Murphy "berate[d] him over minor, unimportant grammar errors," sent him a threatening email over misspelled words, and quoted Erwin Rommel in another email. (Pl.'s Resp. Br. 4.) Hicks claims these incidents led to the "corruption of the overall morale of the men due to the mismanagement and undue stress placed upon them by Major Murphy." (*Id.* at 1.) Nowhere in his statement does he allege any corruption within the police department, however. (*See* Doc. # 9-2, at 6-24.)

The investigation lasted between three to six months. (Defs.' Mot. Summ. J. Br. 4; Pl.'s Resp. Br. 2.) Its conclusion found no wrongdoing on behalf of Major Murphy. (Defs.' Mot. Summ. J. Br. 4.) Because Hicks did not wish to work with Major Murphy, he was temporarily transferred to the Administrative Division during the course of the investigation. (*Id.* at 3.) After the investigation was over, he was supposed to return to Patrol Division, but

instead he met with the Mayor to request that he not be sent back. (*Id.* at 5; Pl.'s Resp. Br. 5.) At the Mayor's request, Hicks was not sent back to work under Major Murphy. (Defs.' Mot. Summ. J. Br. 5.) During a meeting to determine where to place Hicks, another captain suggested he could work in the City jail as an administrator. (Pl.'s Resp. Br. 5.) Hicks agreed to the assignment, but he prepared a request seeking to become the highest ranking employee at the jail – the Municipal Jail Administrator ("MJA"). (*Id.*) According to Hicks, Chief Baylor denied the transfer to become the MJA but eventually granted it after another request from the Mayor. (*Id.* at 7.) However, the transfer that Chief Baylor granted was not for the MJA position, but rather a lower ranked position which reported to the MJA.[1] (*Id.*)

Hicks claims his jail assignment was in retaliation for making his complaint against Murphy. He claims that his office at the jail was small, filled up with used furniture and boxes, and did not contain a computer or typewriter. (*Id.*) His assigned car was taken from him, thereby making him the only captain in the Police Department without one.[2] (*Id.*) He also claims that he was given little to do while assigned at the jail and that he was given unique and undesirable work hours.[3] (*Id.*)

---

[1] According to the defendants, there is only one position for MJA and it was not open at the time. (Defs.' Mot. Summ. J. Br. 6.) Furthermore, the position is "a classified position in which applicants must be qualified as certified by the Montgomery City/County Personnel Board." (*Id.*) It is not clear whether Hicks could have met the required qualifications for MJA.

[2] The defendants assert that the vehicle was retrieved only because he was no longer in Patrol Division. (Defs.' Mot. Summ. J. Br. 5.)

[3] His hours at the jail were from 4:00 p.m. to 1:00 a.m. (Pl.'s Resp. Br. 8) – not very different from his hours as the second shift commander, which were from 2:00 p.m. to 11:00 p.m. (Defs.' Mot. Summ. J. Br. 3.) The defendants explain his jail hours as being

The Mayor eventually learned of Hicks's unhappiness with his position at the jail and again requested that Hicks be transferred to another position. (Defs.' Mot. Summ. J. Br. 6.) On October 27, 2006, Hicks was transferred back to Patrol Division under Major Murphy's supervision, except this time as a first shift commander. (*Id.* at 7.) Hicks claims that he had to report to another captain who was junior to him and that he was passed over for promotions while he was assigned to work at the jail. (Pl.'s Resp. Br. 9.) In July 2007, Major Murphy was promoted to Lt. Colonel as the Police Department's Deputy Chief. (Defs.' Mot. Summ. J. Br. 7.) Although Murphy is no longer Hicks's direct supervisor, Hicks's division remains under Murphy's supervision as Deputy Chief. (*Id.*)

Hicks filed his Complaint (Doc. # 1) with this court on November 13, 2006. The defendants filed their summary judgment motion (Doc. # 8) on November 26, 2007, to which Hicks responded (Doc. # 11) and the defendants replied (Doc. # 18).

## II. JURISDICTION AND VENUE

Because this case arises under the First Amendment and 42 U.S.C. § 1983, the court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting both.

---

necessary to prevent the overlapping of employees in the jail administrator's office and to provide longer supervisory coverage on the three-shift work day of jail employees. (*Id.* at 6.)

## III. STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if a "'reasonable jury could return a verdict for the non-moving party.'" *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *United*

*States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

### A.  *First Amendment Retaliation*

A government employer may not retaliate against a public employee for speech protected under the First Amendment. *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006). This freedom of speech enjoyed by public employees is not absolute, however. *Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007). In order to establish a claim of retaliation, a public employee must establish: "(1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action." *Id.* The first two elements are questions of law; the third element is a question of fact. *Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). If all three elements are established by the plaintiff, the burden then shifts to the government employer "to prove it would have made the same adverse employment decision absent the employee's speech." *Vila*, 484 F.3d at 1339. Whether the government has met its burden is a question of fact, and it must be proved by a preponderance of the evidence. *Cook*, 414 F.3d at 1318.

Whether the employee spoke as a citizen on a matter of public concern is the threshold issue. "When a public employee speaks as an employee on matters of personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated." *Vila*, 484 F.3d at 1339. In order to determine if the speech was a matter of public concern, courts must examine "'the content, form, and context of a given statement, as revealed by the whole record.'" *Mitchell*, 468 F.3d at 1283 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). In doing so, the court must ask "whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." *Id.* (internal quotation marks and citations omitted).

Content is the most important factor used in determining if the speech is a matter of public concern. *Mitchell*, 468 F.3d at 1284. Hicks's speech was a complaint about his supervisor. The content of that complaint consists of a litany of incidents in which Hicks disagreed with his supervisor's behavior. The vast majority of these incidents involve Hicks personally being chastised by his boss. Rightly or wrongly, Murphy's management style is not such that it creates an issue of public concern. It simply raises an issue of concern to the employees in the Police Department who work for him. While Hicks tacks on a supposed secondary effect of poor officer morale in an attempt to mask his speech as a matter of public concern, it is clear that the main thrust of his complaint is a disagreement with his direct supervisor's management style and his displeasure of having to work under the supervisor.

There is no evidence whatsoever that Major Murphy's management style led to any deterioration of police performance.

The form of Hicks's speech was that of an internal employee grievance. Hicks did not speak out publicly, notify the press, or otherwise publish his complaint. He claims he did not do so because "it would have caused the public to be fearful and to lose trust of the Police Department." (Pl.'s Resp. Br. 6.) Regardless of his reason, the form of his complaint remains that of an internal grievance. In *Hartwell*, the employee complained about a co-worker who was allegedly violating an internal policy regarding personal appearance. *Hartwell v. City of Montgomery, Ala.*, 487 F. Supp. 2d 1313, 1323 (M.D. Ala. 2007). The *Hartwell* court stated that if the employee "was complaining about [the co-worker] merely because he found it personally difficult to work with someone . . . and wished to improve his day-to-day employment experience within the fire department, then such speech was in his capacity as an employee and not as a citizen." *Id.* (citing *Mitchell*, 468 F.3d at 1283 n.17 (recognizing that "[a]n employee's quotidian, work-a-day grievances are not constitutionally protected")).

It is clear from Hicks's complaint that he found it difficult to work for Murphy. In fact, this is all his complaint entails. He wanted to replace Murphy's leadership style with that of an open, friendly style where people feel free to come by and talk. (Doc. # 9-2, at 21.) This type of complaint falls squarely within a "wish[ ] to improve his day-to-day employment experience," and does not warrant First Amendment protection. *Hartwell*, 487 F. Supp. 2d

9

at 1323.

The context of Hicks's speech also persuades the court that it was not a matter of public concern. As a police officer, Hicks is part of a quasi-military organization with a heightened need for order. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1159 (11th Cir. 2002). Murphy was at all times Hicks's superior, and Hicks was subject to his orders. It is clear from Hicks's statements made during the course of the investigation that his constant and overarching reason for complaining was his disapproval of Murphy's "leadership style that . . . instill[s] fear and intimidation." (Doc. # 9-2, at 21.) As Hicks puts it, Murphy's leadership style was "that he is right because he is the Major and there's no other line." (*Id.* at 22.) Hicks claims Murphy treated him and others in an "unfair and abusive way" leading to a "morale problem" because police officers were "afraid of making a mistake and being punished." (Pl.'s Resp. Br. 1.) Examples of Murphy's "unfair" behavior include chastising officers for grammatical errors and misspelled words, and critiquing a written police detail plan prepared by Hicks. (*Id.* at 4; Doc. # 9-2, at 10-11.)

Although Hicks throws around the phrase "corruption of the overall morale," (*id.* at 1), he notably never alleges that Murphy was actually engaged in corrupt police practices. The Eleventh Circuit has held that a police officer's reporting of the tampering of arrest records constituted speech that was a matter of public concern. *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1292 (11th Cir. 2000) ("An attempt to disclose alleged corruption within a police department is speech related to a matter of public concern . . . .").

Demanding grammatically correct police records, even if done in a crude and threatening manner, is entirely different from tampering with arrest records. Rather than exposing corruption within the police department, Hicks is essentially complaining "that his boss is mean to people," as the defendants aptly summarize it. (Defs.' Reply Br. 7.) At its heart, this is the grievance of an employee, not the grievance of a citizen.

Hicks cannot establish the first necessary element of his retaliation claim, and there is no need to press forward with the remaining analysis. *Mitchell*, 468 F.3d at 1287 ("Because [the plaintiff's] comments did not touch on an issue of public concern, the district court did not need to engage in the subsequent balancing of interests. . . ."). Therefore, the defendants' summary judgment motion is due to be granted.

## V.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the defendants' Motion for Summary Judgment (Doc. # 8) is GRANTED as to each and every claim brought by the plaintiff.

An appropriate judgment will be entered.

DONE this 12th day of March, 2008.

                                                /s/   W.  Keith Watkins  
                                                UNITED STATES DISTRICT JUDGE